NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| **KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.Ş.,**<br><br>　　　　　　　**Plaintiff,**<br><br>　　**v.**<br><br>**UNITED STATES,**<br><br>　　　　　　　**Defendant,**<br><br>　　**and**<br><br>**REBAR TRADE ACTION COALITION,**<br><br>　　　　　　　**Defendant-Intervenor.** |

Before: Hon. Gary S. Katzmann,
　　　　　Judge

Court No. 24-00096

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages: 6, 18, 20-25, 28-29, 31-33

<u>**REBAR TRADE ACTION COALITION'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: February 21, 2025

Ct. No. 24-00096                                    NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................1

II.     RULE 56.2 STATEMENT ....................................................................................1

        A.      Administrative Determination Under Appeal ......................................1

        B.      Issues of Law Presented .........................................................................1

        C.      Request for Court Order and Relief Sought.........................................2

III.    LEGAL AND FACTUAL BACKGROUND .......................................................2

        A.      Exemptions from the BITT .....................................................................2

        B.      Selection of the Benchmark Used to Value Certain GOT-Provided
                Land ...........................................................................................................5

        C.      Law 4447 ...................................................................................................8

        D.      Law 27256 ...............................................................................................10

IV.     STANDARD OF REVIEW .................................................................................11

V.      SUMMARY OF ARGUMENT ...........................................................................12

VI.     ARGUMENT .......................................................................................................14

        A.      Commerce's Specificity and Benefit Findings Regarding the BITT
                Should be Affirmed.................................................................................14

                i.      The BITT Program is *De Jure* Specific ................................. 14

                ii.     Commerce's Application of AFA to Determine the Benefit
                        to Kaptan is Supported by Substantial Evidence ...................... 16

        B.      Commerce's Selected Benchmark for Land is Supported by
                Substantial Evidence.............................................................................21

                i.      Commerce's Rationales for Declining to Use the C&W
                        Report are Supported by Substantial Evidence......................... 23

                ii.     Kaptan Does Not Persuade That Commerce Erred in
                        Assessing the Reliability of the Two Benchmark Data
                        Sources....................................................................................... 26

        C.      Commerce's Determination to Countervail Kaptan's Benefits Under
                Law 4447 Is Supported by Substantial Evidence ...............................30

        D.      Commerce's Determination to Countervail Kaptan's Benefits Under
                Law 27256 is Supported by Substantial Evidence...............................33

VII.    CONCLUSION....................................................................................................36

Ct. No. 24-00096                                    NON-CONFIDENTIAL VERSION

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017)..................................................................31, 32

*Ceramica Regiomontana, S.A. v. United States*,
    810 F.2d 1137 (Fed. Cir. 1987)..........................................................................12

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)..............................................................................................12

*CP Kelco US, Inc. v. United States*,
    24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) ...................................................12

*Dongtai Peak Honey Indus. Co. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)..........................................................................12

*Gov't of Quebec v. United States*,
    567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) ..................................................3, 16

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    413 F. Supp. 3d 1347 (Ct. Int'l Trade 2019) .................................................20

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .................................................19

*I.N.S. v. Elias-Zacarias*,
    502 U.S. 478 (1992)..............................................................................................12

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
    736 F. Supp. 3d 1318 (Ct. Int'l Trade 2024) .................................................15

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)............................................................................12

*Mosaic Co. v. United States*,
    589 F. Supp. 3d 1298 (Ct. Int'l Trade 2022) .................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................12

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)..................................................................3, 17, 20

Ct. No. 24-00096                                    NON-CONFIDENTIAL VERSION

*Ozdemir Boru San. Ve Tic. Ltd. Sti. v. United States*,
  273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ........................................28, 29

*Ozdemir Boru San. Ve Tic. Ltd. Sti. v. United States*,
  282 F. Supp. 3d 1352 (Ct. Int'l Trade 2018) ......................................29

*Peer Bearing Co.-Changshan v. United States*,
  587 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) ......................................15

*Rebar Trade Action Coal. v. United States*,
  389 F. Supp. 3d 1371 (Ct. Int'l Trade 2019) ......................................20

*Universal Camera Corp. v. N.L.R.B.*,
  340 U.S. 474 (1951) ....................................................................11

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
  37 CIT 1003, 929 F. Supp. 2d 1324 (2013) ......................................29

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .............................................................11

19 U.S.C. §§ 1677(5)(A)-(B) ...........................................................2, 5

19 U.S.C. § 1677(5)(D)(ii) ................................................................8

19 U.S.C. § 1677(5)(D)(iii) ...........................................................5, 21

19 U.S.C. § 1677(5A)(D)(i)-(iii) ......................................................16

19 U.S.C. § 1677e(a) .....................................................................17, 35

19 U.S.C. § 1677e(a)(2) ...................................................................3

19 U.S.C. § 1677e(b)(1) ................................................................3, 17

19 U.S.C. § 1677m(d) ...................................................................18, 19

**Regulations**

19 C.F.R. § 351.104(a)(2) ...............................................................34

19 C.F.R. § 351.309(c)(2) ...........................................................31, 33

19 C.F.R. § 351.511(a) ...................................................................21

19 C.F.R. § 351.511(a)(2) ................................................................6

19 C.F.R. § 351.511(a)(2)(i) ........................................................25, 26

19 C.F.R. § 351.511(a)(2)(i)-(iii)...................................................................................27

**Administrative Materials**

*Certain Softwood Lumber Products from Canada*,
    82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017)..............................................7

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    88 Fed. Reg. 85,234 (Dep't Commerce Dec. 7, 2023) ...........................................2

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    88 Fed. Reg. 34,129 (Dep't Commerce May 26, 2023) ..........................................4

*Steel Concrete Reinforcing Bar From the Republic of Türkiye*,
    89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) ...........................................1

*Truck and Bus Tires From the People's Republic of China*,
    82 Fed. Reg. 8,606 (Dep't Commerce Jan. 27, 2017) ..........................................19

## I.    INTRODUCTION

On behalf of the Rebar Trade Action Coalition ("RTAC"), we respectfully submit the following response to the opening brief filed by plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"). *See* Confid. Rule 56.2 Mot. for J. on the Agency R. of Pl. {Kaptan} (Nov. 18, 2024), ECF No. 23 ("Kaptan Br.").

## II.    RULE 56.2 STATEMENT

### A.    Administrative Determination Under Appeal

This action arises from the 2021 administrative review of the countervailing duty ("CVD") order on steel concrete reinforcing bar ("rebar") from Turkey. *See Steel Concrete Reinforcing Bar From the Republic of Türkiye*, 89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) (final results of countervailing duty admin. rev.; 2021), P.R. 249,[1] ECF No. 20-3 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. 247, ECF No. 20-4 ("IDM").

### B.    Issues of Law Presented

This appeal presents the following issues:

1. Whether substantial record evidence supports Commerce's

   a. determination that Bank and Insurance Transactions Tax ("BITT") exemptions were countervailable as *de jure* specific, and

   b. application of adverse facts available ("AFA") to determine the benefit that Kaptan received from this program;

2. Whether substantial record evidence supports Commerce's rejection of the Cushman & Wakefield report ("C&W report") as a benchmark for valuing the provision of land at less than adequate remuneration ("LTAR");

---

[1]    References made herein to the confidential administrative record ("C.R.") and public administrative record ("P.R.") correspond to the document numbers as filed by the U.S. Department of Commerce ("Commerce") with the Court on August 6, 2024. *See* Administrative Record Index (Aug. 6, 2024), ECF Nos. 20-1 and 20-2.

3. Whether substantial record evidence supports Commerce's use of AFA to determine the specificity and value of benefits that Kaptan received under Additional Article 4 of Law 4447; and

4. Whether substantial record evidence supports Commerce's determination to use AFA to determine the value of countervailable benefits that Kaptan received under Law 27256.

### C.      Request for Court Order and Relief Sought

RTAC respectfully requests that the Court deny Kaptan's motion for summary judgment and affirm Commerce's *Final Determination*.

## III.   LEGAL AND FACTUAL BACKGROUND

Commerce initiated the contested review on January 3, 2023. *See* Preliminary Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 85,234 (Dep't Commerce Dec. 7, 2023) (prelim. results of countervailing duty admin. rev. and rescission of admin. rev., in part; 2021) at 2, P.R. 229 ("PDM"). Commerce selected Kaptan for individual examination. *Id*. Commerce preliminarily determined that Kaptan benefited from countervailable subsidies arising from (1) exemptions from Turkey's BITT; (2) land provided by the Government of Turkey ("GOT") for LTAR; and (3) use of Social Security Support programs under Law 4447 and Law 27256. *Id*. at 14-17. Commerce continued to find that Kaptan benefitted from these subsidies in the *Final Determination*. IDM at 5-6. Ultimately, Commerce calculated a 5.54 percent subsidy margin for Kaptan. *Final Determination*, 89 Fed. Reg. at 35,072.

### A.      Exemptions from the BITT

A subsidy exists where a government authority provides a financial contribution that confers a benefit. 19 U.S.C. §§ 1677(5)(A)-(B). A subsidy is countervailable where it is "specific." *Id*. § 1677(5A). A subsidy may be specific as a matter of law or a matter of fact. *Id*. § 1677(5A)(D);

*see also Gov't of Quebec v. United States*, 567 F. Supp. 3d 1273, 1278-79 (Ct. Int'l Trade 2022) ("A subsidy that escapes *de jure* specificity may nevertheless be designated *de facto* specific.").

The Tariff Act of 1930, as amended, requires Commerce to rely on the facts otherwise available when a respondent or responding government (1) withholds information requested by Commerce; (2) fails to provide information in a timely manner or in the form requested; (3) significantly impedes a proceeding; or (4) provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2). In relying on the facts available, Commerce "may use an inference that is adverse to the interests" of the party providing deficient information if the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." *Id.* § 1677e(b)(1).

The "best of its ability" standard "assumes that {respondents} are familiar with the rules and regulations" and "does {not} require findings of motivation or intent." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003). Rather, Commerce must only find that (i) "a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations"; and (ii) that the respondent under investigation failed to cooperate by either "failing to keep and maintain all required records, or . . . failing to put forth its maximum efforts to investigate and obtain the requested information." *Id.* Commerce has discretion to apply adverse inferences "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully" and, in determining whether to apply such inferences, the agency considers "the extent to which a party may benefit from its own lack of cooperation." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. Where information is missing from the record based on a

respondent's failure to cooperate to the best of its ability—including failure to maintain proper records—applying AFA is appropriate.

The GOT normally imposes a tax, the BITT, on foreign currency transactions. PDM at 14. The GOT exempts certain transactions from the tax, including foreign exchange sales to companies that possess an industrial registry certificate or that are members of exporters' associations. *Id.* Kaptan reported that it availed itself of the BITT exemption during the 2021 period of review ("POR") by providing its banking institution with a copy of its exporters' association membership documents. *Id.*; Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Kaptan Initial Questionnaire Response* (May 26, 2023) at 52-53, C.R. 21-65, P.R. 59 ("Kaptan IQR"). In addition, Kaptan reported that it possessed an industrial registry certificate. Kaptan IQR at Exhibit 30.

Commerce preliminarily found that the BITT exemption constituted a financial contribution provided by a governmental authority. PDM at 14-15. It also found that the BITT exemption was *de jure* specific because Turkish law limited such exemptions to "firms that conduct certain types of foreign exchange transactions." *Id.* at 15. Commerce also used AFA to calculate the benefit Kaptan received from the BITT program because the agency found at verification that Kaptan had failed to report all benefits it received under the program during the POR. *Id.* at 9. Commerce applied an AFA rate of 0.89% to Kaptan's use of the program, based on the rate calculated for Kaptan's use of the same program in the immediately preceding administrative review. *Id.*; *see also* Issues and Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 34,129 (Dep't Commerce May 26, 2023) (final results of countervailing duty admin. rev. and rescission, in part; 2020) at 5 ("2020 IDM").

In its agency case brief, Kaptan argued that the BITT exemption was not *de jure* specific because "all manufacturers in Türkiye are required to have an industrial registry certificate." *See* Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Case Brief* (Jan. 8, 2024) at 25, C.R. 241, P.R. 235 ("Kaptan Case Br."). Kaptan further argued that Commerce could not apply AFA to determine the benefit that Kaptan received under this program because Commerce failed to provide the company with an opportunity to correct the record at verification. *Id.* at 33-38.

In the *Final Determination*, Commerce continued to find the BITT program *de jure* specific because it was available only to certain companies making foreign exchange transactions. IDM at 13. Specifically, Commerce explained that the fact that industry registration certificates could be obtained by all industrial enterprises did not demonstrate that all eligible enterprises actually applied for and obtained such certificates. *Id.* Commerce further explained that the universe of companies that benefitted from the program was limited to companies that made foreign exchange transactions. *Id.* Commerce also explained that it used AFA to calculate Kaptan's benefit under the BITT program because it found unreported transactions for which Kaptan received BITT exemptions at verification. *Id.* at 14. Commerce explained that it was not required to provide Kaptan with an opportunity to remedy its deficient reporting of benefits under the BITT because the deficiency was not discovered until verification. *Id.* at 15-16.

### B.    Selection of the Benchmark Used to Value Certain GOT-Provided Land

As noted above, a subsidy exists where a government authority provides a financial contribution that confers a benefit. 19 U.S.C. §§ 1677(5)(A)-(B). A "financial contribution" may take the form of a government's provision of an item or service. *Id.* § 1677(5)(D)(iii). Such a contribution provides a benefit to the extent that the government's price for the item or service is

**BUSINESS PROPRIETARY INFORMATION**
                                      **HAS BEEN DELETED**

inconsistent with prevailing market conditions in the subject country. *Id*. § 1677(5)(E)(iv).

Accordingly, to determine the benefit that results from the government's provision of the item or

service, Commerce compares the government price to a market-based benchmark price. *See, e.g.*,

19 C.F.R. § 351.511(a)(2).

Here, Kaptan reported that its cross-owned affiliate, Nur Gemicilik ve Tic. A.S. ("Nur"),

obtained rent-free land from the GOT. PDM at 16. In its preliminary determination, Commerce

found that this was a financial contribution. *Id*. To measure the benefit, Commerce "multiped the

area of land provided to Nur (in square meters) by the monthly cost per square meter benchmark

rate." *Id*. Commerce derived the benchmark rate from a report issued by global real estate firm

Colliers International regarding Turkish real estate values, including values for industrial

properties in various areas of the country, during 2021 (the "Colliers International report"). *Id*.;

*see also* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from*

*the Republic of Turkey: Submission of Benchmark Information* (July 20, 2023) at Exhibits 1-2,

P.R. 134 ("RTAC Benchmark"). Commerce based the specific benchmark rate on rental prices for

industrial properties in a region of Turkey, Cerkezkoy, with similar population density to the

region in which Nur's land was located. *See* PDM at 16; IDM at 11; *see also* RTAC Benchmark

at Exhibit 1, pp. 8-10.

Kaptan argued that Commerce should have instead derived the benchmark from the C&W

report, which provided information regarding [      ] rental rates (which were then [

                                      ]) for (1) land zoned for various purposes

in the region in which Nur's land was located and (2) [                         ]. IDM at 10-12; *see also*

Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete*

*Reinforcing Bar from Turkey; Kaptan Benchmark Submission* (July 20, 2023) at Exhibits 1-2, C.R.

138-146, P.R. 133 ("Kaptan Benchmark"). Kaptan argued that the Colliers International report was unreliable and distortive, and characterized the C&W report, which Kaptan had commissioned, as providing superior benchmark data. Kaptan Case Br. at 8-24.

Commerce continued to rely on the Colliers International report in the *Final Determination*. IDM at 10-12. Commerce explained that contrary to Kaptan's claims that the Colliers International report did not identify the source of its information, the report identified Colliers International itself as the source of the data. *Id*. at 10. Commerce also found that a liability disclaimer in the report posed no concern, and indeed strengthened the case that the report did not use secondary sources or compile sets of data from other sources. *Id*. Commerce also explained that the data upon which it relied in the Colliers International report was not distortive, as those data reflected industrial real estate rates in a Turkish province with similar population density to that of the area in which Nur's land was located. *Id*. at 11.

By contrast, Commerce noted that the C&W report was both non-public and was commissioned for the purposes of the administrative proceedings or related litigation. *Id.* at 11-12. Commerce explained that it was the agency's preference to use public benchmarks and that the agency had declined to use benchmarks based on data that had been commissioned solely for the purposes of CVD proceedings due to "the risk of litigation-inspired fabrication or exaggeration . . . intended to corroborate the party's story." *Id.* (quoting Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) (final affirm. countervailing duty deter., and final neg. deter. of critical circumstances) at 82 ("Softwood Lumber from Canada IDM")).

C.    **Law 4447**

A countervailable subsidy may exist when a government foregoes or does not collect revenue that is otherwise due, such as through the granting of tax credits or deductions from taxable income. 19 U.S.C. § 1677(5)(D)(ii). Under Additional Article 4 of Turkey's Law 4447, qualifying employers' share of unemployment insurance taxes are reduced from two to one percent if the employer, for the previous three years, reports no occupational accidents resulting in death or permanent incapacity. PDM at 17; Letter from Government of Türkiye to Sec'y Commerce, re: *Response of the {GOT} to the Second Supplemental Questionnaire in 2021 {CVD} Administrative Review on Imports of {Rebar} from Turkey* (Oct. 2, 2023) at 13-14, C.R. 184-192, P.R. 189-197 ("GOT 2SQR").

In its initial questionnaire, Commerce requested that that the GOT and Kaptan report under the "Other Programs" section any benefits provided during the POR that Commerce had not specifically asked about. *See* PDM at 7. Neither Kaptan nor the GOT reported Kaptan's use of Additional Article 4 of Law 4447's reduction in unemployment insurance taxes, or otherwise described the program, in response to their initial questionnaires. *See, e.g.*, Kaptan IQR at 56-60, Exhibit 31. However, the other mandatory respondent in the administrative review reported receiving such benefits. *See, e.g.*, GOT 2SQR at 13. Accordingly, Commerce requested information about benefits provided under Law 4447 in a supplemental questionnaire issued to the GOT. *See id.* at 13-22. The GOT provided an incomplete response, failing to clearly identify the industry in which respondent companies were classified or the usage codes each industry was

associated with, making it impossible for Commerce to perform a *de facto* specificity analysis. *See*

*id.* at 21, Exhibit 8; IDM at 17.[2]

Commerce preliminarily found that the Law 4447 reduction in taxes provided a financial

contribution in the form of revenue foregone and, relying on AFA, determined that the program

was specific. PDM at 7-9, 17. Before the agency, Kaptan argued that Commerce could not use

AFA to find that benefits provided under Additional Article 4 of Law 4447 were specific because

Commerce found the program non-specific in another proceeding. *See* Kaptan Case Br. at 40-45.

Kaptan also argued that it had reported benefits it received under the program in its initial

questionnaire response, albeit collectively with amounts received under Turkey's separate Law

6111 program. *Id.* at 42.

In the *Final Determination*, Commerce again found the provision of benefits under Law

4447 to be specific using AFA. IDM at 17-20. Commerce explained that while it had previously

found the benefits provided under Additional Article 4 of Law 4447 non-countervailable in another

proceeding, the law had not been analyzed in this proceeding. *Id.* at 18. Specifically, Commerce

explained that in a proceeding involving Turkish quartz, it determined that the program was not

*de facto* specific with respect to the quartz industry, but had not analyzed information regarding

usage of the program by the rebar industry. *Id.* Commerce also explained that in failing to provide

---

[2]     Following the GOT's deficient response, Kaptan attempted to supplement the record with additional information regarding the company's use of the program, but Commerce rejected Kaptan's submission as untimely. *See* Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey: Clarification of Response of Government of Turkey Second Supplemental Questionnaire Responses* (Oct. 12, 2023), C.R. 194, P.R. 199; Letter from John McGowan, Program Manager, to Law Offices of David L. Simon, PLLC, re: *Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from Turkey: Rejection of Untimely New Factual Information in October 12, 2023, Filing* (Oct. 16, 2023), C.R. 205, P.R. 210 ("Untimely NFI Rejection Letter"). Kaptan does not challenge this rejection on appeal. Kaptan Br. at 31-35.

complete responses to the agency's questions regarding the program's usage by the rebar industry, the GOT had withheld necessary information and significantly impeded the review. *See id.* at 18-19. In this regard, Commerce explained that it was not required to issue further supplemental questionnaires regarding Law 4447 prior to applying AFA to make its specificity finding, as the GOT had already been provided two opportunities to provide the requested information. *Id.* at 19. Finally, Commerce noted that Law 6111 and Law 4447 are distinct programs, and that Kaptan had not provided any affirmative information to support its claim to have reported benefits under these distinct programs collectively. *Id.* at 19-20.

###    D.    <u>Law 27256</u>

Neither Kaptan nor the GOT described any program arising out of Law 27256 or reported the provision of any benefits under that law in response to Commerce's initial questionnaires. *See generally* Kaptan IQR; Letter from Government of Türkiye to Sec'y Commerce, re: *Response of the {GOT} in 2021 {CVD} Administrative Review on Imports of {Rebar} from Turkey* (May 29, 2023), C.R. 77-130, P.R 60-113 ("GOT IQR"). However, in a filing that purported to rebut, clarify, or correct a supplemental questionnaire response filed by the GOT—which also made no mention of Law 27256 or any programs arising out of it—Kaptan stated that it had received benefits under Law 27256 during the POR. *See* IDM at 20-21; Untimely NFI Rejection Letter; *see also* GOT 2SQR. Commerce rejected Kaptan's submission as untimely, because (1) information on the program should have been provided in Kaptan's initial questionnaire response, and (2) the submission did not meaningfully serve to rebut, clarify, or correct the GOT's response to a questionnaire that made no mention of any program arising under Law 27256. *See* Untimely NFI Rejection Letter at 1-2. At verification, Kaptan again attempted to submit information regarding the benefits it received under the program. Memorandum from John McGowan, Program Manager,

and Nicholas Czajkowski, Int'l Trade Analyst, through Alex Villanueva, Senior Director, to The File, re: *Verification of the Questionnaire Responses of Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş: Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from Turkey.* (Nov. 2, 2023) at 9-10, C.R. 233, P.R. 222 ("Kaptan Verification Report"). Commerce explained that because it had previously rejected the data, it would not accept it at verification. *Id.*

In its preliminary determination, Commerce relied on AFA to determine that benefits provided under Law 27256 constituted a financial contribution and were specific, and to determine the benefit rate. PDM at 7-9, 17. Kaptan argued that Commerce could not countervail benefits received under Law 27256 because Commerce had rejected its untimely filing, and thus lacked any basis upon which to include the program in its calculations. Kaptan Case Br. at 46. In the *Final Determination*, Commerce again determined that the record, supplemented by the use of AFA, indicated that Kaptan benefitted from this program during the POR. IDM at 20-21. Commerce found unpersuasive Kaptan's argument that no record evidence indicated that it received benefits under Law 27256, as both its letter rejecting Kaptan's submission and the verification report for Kaptan reflected Kaptan's use of the program. *See id.*

## IV.   STANDARD OF REVIEW

The U.S. Court of International Trade reviews Commerce's decisions in countervailing duty proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). The courts have framed the substantial evidence standard as a review for "reasonableness," in which "{the} court's function is merely to ascertain 'whether there was evidence which could reasonably lead to the {agency's} conclusion.'" *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1344 (Ct. Int'l Trade 2014) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

The court does not re-weigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec.*, 750 F.2d at 933. Rather, factual findings by Commerce are afforded considerable deference. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). And the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

## V.    SUMMARY OF ARGUMENT

Commerce made no error in determining that the GOT's BITT exemption program is *de jure* specific. The exemption is available only to companies that meet certain criteria, and additionally make foreign exchange transactions. While Kaptan has argued that the exemptions are too broadly available to be specific as a matter of law, the agency reasonably found that this had not been established on the record. Likewise, Commerce's use of AFA to determine the benefit

that Kaptan received under the BITT program is supported by substantial evidence, as Kaptan failed to report all relevant foreign exchange transactions in its questionnaire responses, specifically, foreign-currency-to-foreign-currency exchange ("arbitrage") transactions.

Commerce also made no error in deriving the benchmark that it used to measure the benefit to Kaptan of its affiliate's rent-free use of GOT-owned land. Commerce reasonably chose to rely on information prepared and issued in the normal course of business by a disinterested third party over a proprietary study that Kaptan had commissioned for use in the administrative proceedings underlying this appeal. Contrary to Kaptan's claims, Commerce evaluated both potential benchmark sources, and reasonably concluded that a benchmark derived from the Colliers International report was more reliable and appropriate than a benchmark based on the C&W report.

Commerce's use of AFA to determine that the Law 4447 program was *de facto* specific and to determine the benefit Kaptan received under the program is supported by substantial evidence. As a preliminary matter, Kaptan failed to raise these arguments at the administrative level and, thus, have waived these arguments on appeal. Notwithstanding Kaptan's failure to exhaust its administrative remedies, Commerce made no error in using AFA to determine that the Law 4447 program was specific and to determine Kaptan's benefits. Kaptan failed to timely provide requested information regarding the benefits it received under this program. Likewise, the GOT failed to report this program at all in its initial questionnaire response, and failed to provide requested information necessary for Commerce to perform a *de facto* specificity analysis. As such, necessary information was missing from the record due to Kaptan and the GOT's failure to have acted to the best of their ability in responding to Commerce's questions.

Finally, Commerce's use of AFA to countervail benefits that Kaptan received under Social Security Support Law 27256 was supported by substantial evidence. The record demonstrates that

this program exists, was used by Kaptan, and that both Kaptan and the GOT failed to act to the best of their ability in providing Commerce with information regarding it.

## VI.    **ARGUMENT**

Commerce's *Final Determination* should be affirmed. As described below, there is no error in Commerce's specificity finding regarding the BITT program, its use of AFA in determining the benefit that Kaptan received under the BITT program, its selection of the benchmark for determining the benefit that Kaptan obtained through the GOT's provision of land to Nur, or its use of AFA to countervail Kaptan's use of the Law 4447 and 27256 programs.

### A.    **Commerce's Specificity and Benefit Findings Regarding the BITT Should be Affirmed**

#### i.    **The BITT Program is *De Jure* Specific**

Turkish law imposes a tax, the BITT, on foreign currency transactions. IDM at 13. Certain transactions are exempt from this tax, including foreign exchange sales to companies that are members of exporters' associations or have an industrial registry certificate. *Id.* Kaptan reported that it availed itself of this exemption during the POR by providing its banking institution with a copy of its exporters' association membership documents. Kaptan IQR at 52-53. Kaptan also reported that it possessed an industrial registry certificate. *Id.* at 52.

Commerce, consistent with its treatment of this program in previous reviews, determined that the exemption from payment of the BITT was *de jure* specific. IDM at 13. Kaptan challenges the agency's specificity finding as unsupported by substantial evidence. Kaptan Br. at 16-18. Kaptan argues that all "productive enterprises" in Turkey could theoretically avail themselves of the BITT exemption and, thus, the exemption does not apply to a "sufficiently small number of enterprises, industries, or groups" or "discrete segments of an economy" as required by statute to be found *de jure* specific. *Id.* at 17.

RTAC acknowledges that this Court remanded Commerce's determination that the BITT exemption was *de jure* specific in the 2020 administrative review for further consideration. *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, 1329-30, (Ct. Int'l Trade 2024). However, each administrative review has its own unique facts and stands on its own. *See, e.g.*, *Jiaxing Bro. Fastener Co. v. United* States, 822 F.3d 1289, 1299 (Fed. Cir. 2016); *Peer Bearing Co.-Changshan v. United States*, 587 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008). Based on the record of the review at bar, Commerce's specificity finding should be upheld.

In the *Final Determination*, Commerce found that exemptions from the BITT are limited to companies that satisfy one of five explicit conditions specified in Turkish law. IDM at 13. Those five conditions are (1) foreign exchange transactions among and between banks and authorized institutions; (2) foreign currency sales to the GOT's Ministry of Treasury and Finance; (3) foreign currency sales, by the lending local bank or the local bank that intermediates the loan, to the parties for repayment of their foreign currency-denominated loans; (4) foreign exchange sales to enterprises having an industrial registry certificate; and (5) foreign currency sales to export companies which are members of exporters' associations. *Id*. Commerce thus concluded that "the universe of companies that may benefit from the program is necessarily limited to companies that make foreign exchange transactions." *Id.* In other words, these eligibility criteria favor certain enterprises or industries that regularly engage in the identified foreign currency exchange sales.

In the past, Commerce has found subsidies that could theoretically be used by any industry to be *de jure* specific where the subsidy's availability was inherently linked with certain activities. For example, in its investigation into *Softwood Lumber from Canada*, Commerce determined that a tax exemption for certain fuel was *de jure* specific. *See, e.g.*, Softwood Lumber from Canada IDM at cmt. 73. While the tax exemption was theoretically available to anyone, the program could

only be accessed by companies that used the taxed fuel for specific activities. *Id*. Commerce further explained that such an exemption was specific because the respondents failed to "argue or cite evidence that broad segments of the economy are engaged in one of the narrow, limited activities for which a tax exemption certificate can be granted." *Id*.

Similar circumstances present themselves here. While the BITT exemption is theoretically available to any company that obtains an industrial registry certificate, Kaptan has failed to demonstrate that broad segments of the economy actually engage in the types of foreign exchange transactions that qualify for an exemption from the BITT. Because the express terms of the BITT statute limit the receipt of benefits to specific types of firms that make foreign exchange transactions, the subsidy is by law limited to a narrow category of firms (*i.e.*, large firms that engage in international trade). Given this limitation, Commerce's determination that the BITT subsidy exemption is *de jure* specific is supported by substantial evidence.

Finally, even if the BITT exemption program is not reasonably considered *de jure* specific, this would not end the specificity inquiry. Where a program is not *de jure* specific, it may nonetheless be *de facto* specific. 19 U.S.C. § 1677(5A)(D)(i)-(iii). The proper course of events where a subsidy is not *de jure* specific is for Commerce to proceed to the *de facto* inquiry. *See, e.g.*, *Gov't of Quebec*, 567 F. Supp. 3d at 1278-79 ("A subsidy that escapes *de jure* specificity may nevertheless be designated *de facto* specific."). Thus, even if this Court were to remand Commerce's *de jure* specific finding, that remand should be for further consideration of that finding and for the agency to conduct a *de facto* analysis if necessary.

ii.    **Commerce's Application of AFA to Determine the Benefit to Kaptan is Supported by Substantial Evidence**

Commerce was also justified in relying on AFA in determining the benefit that Kaptan received under the BITT program. IDM at 14-16. As Commerce explained in its preliminary

determination, the agency discovered at verification that Kaptan failed to report numerous arbitrage transactions between foreign currencies for which it received BITT exemptions. *See* PDM at 9; Kaptan Verification Report at 7.

Pursuant to 19 U.S.C. § 1677e(a), Commerce must rely on the facts available when information is not on the record or when a party withholds information that the agency requested, fails to provide information by Commerce's deadlines, impedes the proceeding, or provides information that cannot be verified. If a respondent fails to cooperate by not acting to the best of its ability to comply with Commerce's requests, the agency "may use an inference that is adverse to the interests" of the party providing the deficient information in selecting among facts available. 19 U.S.C. § 1677e(b)(1). To apply AFA, Commerce need only find that (i) "a reasonable and responsible {respondent} would have known that requested information was required to be kept and maintained under the applicable statutes, rules and regulations"; and (ii) that the respondent under review has failed to cooperate by either "failing to keep and maintain all required records, or . . . failing to put forth its maximum efforts to investigate and obtain the requested information from its records." *Nippon Steel*, 337 F.3d at 1382-83.

Here, Commerce reasonably determined that requested information regarding the benefit that Kaptan received under the BITT program was missing from the record because Kaptan failed to report all its exemption-qualifying foreign exchange transactions, including arbitrage transactions. IDM at 15. Kaptan nonetheless argues that Commerce could not lawfully apply AFA, for three reasons. Kaptan first claims that substantial evidence does not support the agency's determination that the BITT—and thus exemptions from the BITT—applies to arbitrage transactions. Kaptan Br. at 19-20. Kaptan next argues that Commerce could not lawfully apply AFA because the agency did not afford Kaptan an opportunity to remedy its failure to report all

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

foreign exchange transactions for which it received the BITT exemption. *Id.* at 18-21. Finally, Kaptan argues that Commerce has not justified its use of the highest AFA rate. *Id.* at 21. These arguments are unconvincing.

Kaptan first argues that substantial evidence does not support the conclusion that the BITT applies to arbitrage transactions. *Id.* at 19-20. However, as the agency's verifiers noted, there is nothing in the Turkish law establishing the BITT that indicates that the tax is imposed only on transactions involving Turkish lira ("TL"). *See* Kaptan Verification Report at 7; Kaptan IQR at Exhibit 30 (pp. 14-15, 21). More to the point, [

] that BITT exemptions applied to [   ] arbitrage transactions, thus indicating that the BITT applied to such transactions in the first instance. *See*  [

]. Accordingly, it was reasonable for Commerce to conclude that the BITT applies to these transactions such that, by failing to include arbitrage transactions when reporting its BITT benefits, Kaptan left the agency unable to verify the accuracy and completeness of Kaptan's BITT exemption reporting. IDM at 14.

Kaptan next argues that Commerce could not validly apply AFA without first notifying Kaptan, pursuant to 19 U.S.C. § 1677m(d), of its failure to report relevant transactions and providing an opportunity to remedy that failure. Kaptan Br. at 20-23. But Commerce only discovered Kaptan's deficient reporting at verification. *See, e.g.*, Kaptan Verification Report at 7; IDM at 14-16. As this Court has explained, 19 U.S.C. § 1677m(d)'s requirements are "inapplicable

at the verification stage." *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct.

Int'l Trade 2020). This is because:

> {v}erification—unlike Commerce's questionnaires sent to respondents at the beginning of an ... administrative review—does not entail a 'request for information under this subtitle.' Instead, verification entails 'verify{ing} information' previously provided by a respondent in its questionnaire answers.

*Id.* (citations omitted). Thus, Commerce was not required by 19 U.S.C. § 1677m(d) to notify

Kaptan of a deficiency in its questionnaire responses that was discovered at verification, or to

provide Kaptan with an opportunity to correct such a deficiency.

Similarly, Commerce was not required to accept at verification the very information that

the verification process revealed was missing. As this Court has recognized, "verification is not an

opportunity for a do-over." *Hung Vuong Corp.*, 483 F. Supp. 3d at 1349. Rather, "{t}he purpose

of verification is 'to verify the accuracy of information previously submitted to the record by the

respondent,' not to collect new information that had been previously requested but not reported."

Issues and Decision Memorandum accompanying *Truck and Bus Tires From the People's

Republic of China*, 82 Fed. Reg. 8,606 (Dep't Commerce Jan. 27, 2017) (final affirm.

countervailing duty deter., final affirm. critical circumstances deter., in part) at 61. Indeed,

Commerce so informed Kaptan in its verification outline, stating that "verification is not intended

to be an opportunity for the submission of new factual information." Letter from John McGowan

to Law Office of David L. Simon, PLLC, re: *Verification of the Kaptan Demir Celik Endustrisi ve

Ticaret A.S.'s Questionnaire Responses Submitted in the Countervailing Duty Administrative

Review of Steel Concrete Reinforcing Bar from Turkey* (Sept. 28, 2023) at 2, P.R. 187; *see also*

IDM at 16.

Finally, Kaptan does not persuade that Commerce failed, in selecting the AFA rate applied

to Kaptan's use of the BITT program, to appropriately evaluate the situation resulting in the use

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

of AFA. *See* Kaptan Br. at 21. Commerce explained that it selected the AFA rate—which had been calculated for Kaptan itself regarding the same program in the immediately preceding review—using step one of its hierarchy for making such selections (*i.e.*, the highest non-*de minimis* rate calculated for the identical program in any segment of the same proceeding). PDM at 9; 2020 IDM at 5. For that matter, Kaptan has failed to identify any specific, alternative non-*de minimis* rate that Commerce could have used. *See Rebar Trade Action Coal. v. United States*, 389 F. Supp. 3d 1371, 1380-81 (Ct. Int'l Trade 2019) (sustaining Commerce's selection of AFA rate where Commerce explained how it applied its "established hierarchy" and where plaintiff failed to identify any other rate Commerce could have used).

Commerce also responded to Kaptan's claims that its non-reporting of arbitrage transactions should be excused, given the company's apparent misunderstanding of the scope of the BITT exemption program. IDM at 15. Commerce explained that, per applicable judicial precedent, a party does not need to intentionally conceal information to fail to meet the best-of-its-ability standard. *Id.* (citing *Nippon Steel*, 337 F.3d at 1382-83). Further, Commerce explained that this missing information was "easily available" to Kaptan, and thus should have been reported. *Id.* And of course, [                                        ] indicates that the scope of the BITT exemption program was not esoteric knowledge that a company in Kaptan's position—and particularly a company that had been asked to report its usage of the program over multiple reviews—should not reasonably know. [                                ]; *see also Nippon Steel*, 337 F.3d at 1382-83 (noting that the best-of-its-ability standard "assumes that {respondents} are familiar with the rules and regulations that apply to the{ir} activities"). Commerce therefore appropriately evaluated the situation that resulted in its use of AFA. *See Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 413 F. Supp. 3d 1347, 1355

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

n.13 (Ct. Int'l Trade 2019) (explaining that Commerce had evaluated the situation that resulted in the application of AFA where it determined that "because {respondent} did not report {information regarding a program} until verification, it did not cooperate to the best of its abilities, meriting an adverse inference in the selection of facts otherwise available").

In sum, Commerce's application of AFA to determine the benefits Kaptan received under the BITT program is supported by substantial evidence. *See* IDM at 15. Kaptan's failure to report all of its foreign currency transactions created a gap in the record, preventing Commerce from verifying that Kaptan had fully reported the value of its BITT exemptions during the POR. By failing to provide requested information relating to its activities, Kaptan did not put forth maximum effort in responding to Commerce's requests for information. Commerce's application of AFA should therefore be affirmed.

### B.   Commerce's Selected Benchmark for Land is Supported by Substantial Evidence

Pursuant to 19 U.S.C. § 1677(5)(D)(iii), Commerce treats a government's provision of goods or services, including the provision of land, as a financial contribution. To measure the benefit provided, Commerce benchmarks the government price against a market-determined value. *See* 19 C.F.R. § 351.511(a). During the POR, Kaptan's affiliate, Nur, used GOT-owned land for free. PDM at 16. For Commerce's use in measuring the benefit received, RTAC submitted the Colliers International report while Kaptan submitted the C&W report. RTAC Benchmark at Exhibits 1-2; Kaptan Benchmark at Exhibit 1. The Colliers International report was a regularly issued public report prepared by a global real estate firm; it provided 2021 rental rates for industrial properties in Istanbul and surrounding regions. RTAC Benchmark at Exhibits 1-2. Among other data, the Kaptan-commissioned and confidentially-submitted C&W report, provided information regarding [

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED   **NON-CONFIDENTIAL VERSION**

]. Kaptan Benchmark at Exhibit 1,

pp. 28-29. The report also provided [

]. *See id*. at Exhibit

1, pp. 29-30. The report also [

]. *Id*. at Exhibit 1, p. 29.

Commerce calculated the benefit that Kaptan received from the GOT's free provision of land based on the Colliers International report's data for rental prices in Cerkezkoy, a district located within Turkey's Tekirdag province. IDM at 10-12; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Resubmission of Rebuttal Comments and Benchmark Information* (Aug. 18, 2023) at Attachment (Attachment 8B), P.R. 170-172 ("RTAC Rebuttal Benchmarks"). Commerce noted its preference for public benchmark data such as the Colliers International report, in contrast with Kaptan's confidential report. IDM at 11. Addressing arguments that Kaptan made in opposition to the Colliers International report, Commerce explained that the report adequately identified its sources and that a generalized disclaimer of liability within the report did not undermine its reliability for benchmarking purposes. *Id*. at 10. Commerce further explained that it only relied on the report's data regarding industrial rental prices in an area of Turkey with a population density similar to that of the area where Nur's land is located. *Id*. at 11. With respect to Kaptan's claims that the C&W report provided superior benchmarking data, Commerce noted that the C&W report had been specially commissioned for purposes of the review and/or related litigation, Kaptan appeared to have provided at least some data used in the report, and the report appeared to include data relating to non-private entities. *Id*. at 11-12. And while Kaptan argued that the properties covered by the

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

C&W report were more similar to Nur's than those in the Colliers International report, Commerce found these arguments insufficient to overcome the issues affecting the C&W report. *Id.*

Kaptan now challenges Commerce's reliance on the Colliers International report over the C&W Report. *See* Kaptan Br. at 25-30. Kaptan first argues that Commerce's rationales for rejecting the C&W Report are unsupported by substantial evidence and inconsistent with Commerce's practice. *Id.* at 25-28. Specifically, Kaptan avers that Commerce's preferences for benchmarks that are public and are not commissioned do not render the C&W Report unusable. *Id.* Kaptan next argues that the data in the C&W report are superior to the Colliers International data. *Id.* at 28-30. As explained below, these arguments are not compelling.

i.    **Commerce's Rationales for Declining to Use the C&W Report are Supported by Substantial Evidence**

For the agency's consideration in benchmarking the value of Nur's land, RTAC publicly submitted the entirety of the Colliers International report, which is a regularly issued report prepared by a disinterested third party with no connection to the proceeding. *See* RTAC Benchmark at Exhibit 1. Kaptan confidentially submitted the C&W report, which it had commissioned for use in benchmarking the value of Nur's land, while publicly identifying a range of benchmark prices derived from the study (i.e., 0.05 TL per square meter at the lower end, and 3.46 TL per square meter at the upper end). *See* Kaptan Benchmark at 1-2; *see also id.* at Exhibit 1, pp. 3, 29-32.[3] In declining to rely on the C&W report, Commerce explained that the agency prefers to rely on public data for benchmarking purposes. IDM at 11. Commerce also explained

---

[3]    RTAC notes that this range of values reflects, at one end, [

], and [

], on the other. Kaptan Benchmark at Exhibit 1, pp. 28-33.

that its preference was to not use benchmarks that had been commissioned for purposes of the administrative proceeding or related litigation, due to the potential for such data to be skewed to corroborate the commissioning party's arguments, rather than reflecting objective information. IDM at 11-12.

Kaptan argues that Commerce cannot use these preferences as rationales for rejecting the C&W report as a source of benchmarking information. Kaptan Br. at 25-28. Contrary to Kaptan's claims, however, these rationales are valid and Commerce's determination not to use the C&W report is supported by substantial evidence. First, Commerce provided a detailed explanation of why it views benchmark data that is specifically commissioned for use in administrative proceedings as unreliable. Commerce explained that benchmark information generated expressly for use in administrative proceedings poses a "risk of litigation-inspired fabrication or exaggeration which diminishes its weight and results in the evidence being unreliable." IDM at 12 (citations and internal quotations omitted). Indeed, this Court has upheld Commerce's practice of rejecting benchmarks derived from reports privately commissioned for the purposes of litigation, particularly where the "original documentation" underlying the report is not included. *See, e.g.*, *Mosaic Co. v. United States*, 589 F. Supp. 3d 1298, 1312-13 (Ct. Int'l Trade 2022).

Further to this point, Commerce noted that Kaptan submitted information suggesting that the C&W report "may have been partially based on prices {derived from} *Kaptan's own data*." IDM at 12 (emphasis added). Indeed, the C&W report notes that [

                                                                    ]. *See* Kaptan Benchmark at Exhibit 1, p. 32. The fact that the report incorporates such information underscores that risk that the benchmark data are skewed and unreliable. Too, as further discussed below, Commerce noted that the data in the C&W report appeared to be partially based on prices by non-

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

private entities. IDM at 12. In selecting a benchmark, it is Commerce's practice to use benchmark at prices from transactions between private parties, and not transactions with the government. *See* 19 C.F.R. § 351.511(a)(2)(i). Accordingly, the C&W report's inclusion of non-private prices was a further factor supporting Commerce's determination that the C&W report was unsuitable as a source of benchmarking data.

Kaptan argues that these issues do not matter because the benchmark it proposed for Commerce's use was based solely on values calculated exclusive of government properties or Nur's own rent. Kaptan Br. at 28. But Kaptan described its proposed benchmark "as ranging from TL 0.05 to TL 3.46 per square meter per month." Kaptan Benchmark at 2; *see also* Kaptan Case Br. at 23.[4] The lower of these values was calculated [

]. Kaptan Benchmark at Exhibit 1, pp. 32-33. Even if this [                                      ], the information regarding it was [                      ] and thus was "Kaptan's own data," as Commerce noted. IDM at 12. Further, the range of values that Kaptan provided covers both the [

]. Kaptan Benchmark at Exhibit 1, pp. 29-30.

Finally, Kaptan does not dispute that Commerce has a preference for public data, but argues that it does not preclude Commerce from relying on proprietary benchmark information where it is superior. Kaptan Br. at 26-27. But Commerce did not decline to use the C&W report merely on the basis that it was confidential. Rather, the agency noted that the C&W report was commissioned specifically for the purposes of the administrative proceedings, and appeared to contain

---

[4]    The values noted in Kaptan's case brief appear to reflect [                              ], unlike the values noted in the cover letter to its benchmark submission. *Compare* Kaptan Case Br. at 23, *with* Kaptan Benchmark at 2 and Exhibit 1, pp. 32-33.

information reflecting non-private transactions and Kaptan's own data. IDM at 11-12. On top of this, the data was confidential. *Id*. In other words, rather than declining to use the C&W report because of any one flaw, Commerce noted a number of significant flaws that undermined the report's reliability. *Id.* A reasonable mind could easily conclude, as Commerce did, that the C&W report displayed indicia of inappropriateness that detracted from its utility for benchmarking the value of Nur's land, and supported the use of only the Colliers International data as a benchmark.

      **ii.**    **Kaptan Does Not Persuade That Commerce Erred in Assessing the Reliability of the Two Benchmark Data Sources**

Kaptan next argues that Commerce failed to evaluate the merits of the C&W report and the Colliers International report, particularly with respect to the comparability of the properties discussed therein to Nur's property. Kaptan Br. at 28. Kaptan avers that, in relying on the Colliers International report, Commerce failed to adequately consider factors affecting the comparability of Nur's property with the properties covered by the report. *Id.* at 29; *see also* 19 C.F.R. § 351.511(a)(2)(i) (noting that, in a tier one benchmark analysis, Commerce will "consider product similarity; quantities sold, imported, or auctioned; and other factors affecting comparability.") Specifically, Kaptan avers that properties located in Cerzekoy (the sole region from which Commerce derived its benchmark) are not properly comparable with Nur's property located in Surmene, as the two areas have distinct per capita gross domestic product ("GDP"). Kaptan Br. at 29-30. Kaptan further reasons that had Commerce appropriately considered the merits of the C&W report's data, it would have used that report to derive its benchmark, given that Nur's property had greater geographic comparability with the properties considered in the C&W report than with the properties in the Colliers International report. *Id.*

These arguments are without merit. It is clear from Commerce's analysis that it did review the data in the two reports. The agency simply did not reach Kaptan's preferred conclusion regarding the data's merits. That reasonable conclusion is not something this Court can disturb.

As an initial matter, in relying on the Colliers International report, Commerce took into account Kaptan's arguments regarding the comparability of rental properties based on location. IDM at 11. Commerce specifically used only the Colliers International report's rental rates from Cerkezkoy, because this area had the most similar population density to that of the area where Nur's land is located. *Id.*

Nor was Commerce required to weigh the allegedly greater geographic comparability of the data in the C&W report more heavily than the data's overall reliability. Commerce found that Kaptan commissioned the C&W report for the specific purpose of the review and/or related litigation. *Id.* Looking to the substance of the report, Commerce noted that it also appeared to reflect "Kaptan's own data" as well as non-private prices. *Id.* at 12; *see also* Kaptan Benchmark at Exhibit 1, pp. 29-32. As Commerce explained, there is an inherent risk that benchmarking data that is commissioned by a party for use in the review, and which relies on information that the party provided, is skewed and unreliable. *See* IDM at 11-12. Likewise, the inclusion of government prices in the report's dataset also affects the reliability of those data for benchmarking purposes. Indeed, the entire reason for countervailing duty investigations is to guard against the subsidization of companies by foreign governments. Thus, unless a party can show that the government prices contained in their benchmark data are the result of "competitively run government auctions," reliance on such benchmark data is inappropriate. *See* 19 C.F.R. § 351.511(a)(2)(i)-(iii).

Beyond this, in arguing that the C&W report relates to properties uniquely comparable to Nur's property, Kaptan relies on multiple unsupported assumptions. For example, Kaptan assumes

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

that municipal or regional per capita GDP within Turkey drives rental rates, such that areas with the lowest GDP have the lowest rental rates or vice versa. Kaptan Br. at 29-30. But the record—inclusive of data that Kaptan itself submitted—indicates otherwise. *Compare* RTAC Benchmark at Exhibit 2 (providing industrial rental prices for specific areas of Turkey, derived from the Colliers International Report), *with* Kaptan Benchmark at Exhibit 3 (providing per capita GDP information). Kaptan also assumes that the properties covered by the C&W report are uniquely comparable to Nur's own, despite [

] the Colliers International report. Specifically, the C&W report provides data for [

]. *See* Kaptan Benchmark at Exhibit 1, pp. 29-30; RTAC Rebuttal Benchmarks at Attachment (Attachment 6).

Kaptan also fails to acknowledge that the C&W report reflects [

]. Kaptan Benchmark at Exhibit 1, pp. 28-29. While Kaptan simply assumes that these properties are uniquely comparable with Nur's industrial land because of geography, it provides no compelling basis for this assumption. Kaptan Br. at 28-30. Indeed, [

]. Kaptan Benchmark at Exhibit 1, pp. 28-30.[5]

Finally, in arguing for the superiority of its preferred benchmarking source, Kaptan relies on inapposite precedent. Kaptan Br. at 29-30. In the *Ozdemir* cases, the Court was not asked to

---

[5]    Kaptan suggests that Commerce's benchmark reflects the value of a single property in Cerzekoy, but provides no basis for this suggestion. Kaptan Br. at 29. In any event, the suggestion is not borne out by the Colliers International report, which provides average industrial rents for the area, not individual property values. RTAC Benchmark at Exhibit 1, pp. 8-10.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

review the agency's determination as to which of two potential sources of benchmark data was more reliable. *See Ozdemir Boru San. Ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1251 (Ct. Int'l Trade 2017). Rather, the agency relied on a single data source that presented prices for fourteen industrial-usage parcels in seven Turkish regions, and it averaged all fourteen prices together to create its benchmark. *Id.* On remand, Commerce removed two values before averaging the rest, to better tailor the benchmark to the region in which the relevant land was located. *See Ozdemir Boru San. Ve Tic. Ltd. Sti. v. United States*, 282 F. Supp. 3d 1352, 1352-53 (Ct. Int'l Trade 2018). Here, Commerce had two potential sources for benchmark data. It reasonably determined that one was not suitable for its purposes, and then, consistent with *Ozdemir*, tailored its use of the suitable source to the region in which the relevant land was located.

In *Zhaoqing New Zhongya Aluminum Co.*, the Court remanded Commerce's finding, based on a 2010 screenshot of a promotional website, that certain land purchased in 2006 was "comparable to a fully developed industrial park." *Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 CIT 1003, 1008, 929 F. Supp. 2d 1324, 1329 (2013). Commerce has not made a similar finding here. Rather, it has reasonably selected between two different data sources for benchmarking the benefit to Nur in 2021 of its rent-free, GOT-owned land. IDM at 10-12; PDM at 16-17. For that matter, to the extent that Kaptan argues that the C&W report is superior based on the degree of development (or non-development) of the properties surveyed in that study, the record is unsupportive of its claims. Indeed, of the [                    ] properties to which Kaptan alludes, Kaptan Br. at 30, [

                                              ]. Kaptan Benchmark at

Exhibit 1, pp. 28-29.

In sum, Kaptan does not persuade that there is any error in Commerce's decision to rely on the Colliers International report to derive its benchmark, rather than the report that Kaptan commissioned. While Kaptan would prefer that Commerce have reached a different result, the agency appropriately analyzed the merits of the data sources presented to it, and made a reasonable choice between them. This is all that the law requires.

### C.    Commerce's Determination to Countervail Kaptan's Benefits Under Law 4447 Is Supported by Substantial Evidence

Additional Article 4 of Turkey's Law 4447 provides qualifying companies with a reduction in unemployment insurance taxes. PDM at 17; *see also* GOT 2SQR at 14 and Exhibit 5. Commerce applied AFA to determine the benefits that Kaptan received from the program, after finding that Kaptan failed to provide relevant benefit data in response to the agency's initial questionnaire. *See, e.g.*, PDM at 6-8. Commerce also applied AFA to determine that the program was specific, after the GOT failed to provide requested information regarding industry usage in response to a supplemental questionnaire. *See, e.g., id.* at 6-7. On appeal, Kaptan argues that it reported the benefits received in its initial questionnaire response, such that there was no gap in the record justifying resort to AFA. Kaptan Br. at 35. Kaptan also avers that Commerce erred in using AFA to determine whether benefits received under Law 4447 were specific because the information that Commerce asserted was missing from the GOT's supplemental response had already been provided in response to an earlier questionnaire. *Id.* at 35-36. Kaptan's arguments fail.

Kaptan argues that it identified benefits that it received under "Law 4447/6645" in its initial questionnaire response. *Id.* at 31. This argument is unexhausted, as Kaptan did not raise it in its agency briefing. *See* Kaptan Case Br. at 40-45. Instead, Kaptan argued a different claim that it does not now raise to the Court. Specifically, Kaptan argued to Commerce that it reported benefits received under Additional Article 4 of Law 4447 collectively with benefits received under Law

6611, a statute that amended Law 4447 to create a distinct program unrelated to Additional Article 4's reduction in unemployment insurance taxes. *Compare* Kaptan IQR at 57 and Exhibit 31, *with* Kaptan Case Br. at 42. Kaptan never argued to Commerce that it had reported benefits received under Law 4447's Additional Article 4 unemployment insurance program under "Law 4447/6645." Kaptan Case Br. at 42-43. But to preserve this claim for judicial review, Kaptan was required to exhaust its administrative remedies by bringing it to Commerce in the first instance. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017).

Even if Kaptan had preserved this claim, it would fail. While Kaptan reported that it had received certain Social Security Incentives in its initial questionnaire response, it [

]. Kaptan IQR at 56-60 and Exhibit 31. Indeed, the connection between Law 4447 and Law 6645 appears nowhere in its initial questionnaire response. *See id.* The exhibit to which Kaptan points in its opening brief [                                    ], and its narrative description of the programs it used and the benefits it received does not mention Law 6645 or connect it in any way with Law 4447. *See* Kaptan Br. at 31; Kaptan IQR at 56-30 and Exhibit 31. Because Kaptan failed to identify any reported benefit arising under Article 4 of Law 4447 in its initial questionnaire response, there was a gap in the record with respect to the total benefits Kaptan received under Article 4 of Law 4447.

For similar reasons, Kaptan fails in its claim that Commerce's preliminary calculation memorandum recognizes that Kaptan reported benefits received under Article 4 of Law 4447 as part of Kaptan's reported Law 6645 benefits. *See* Kaptan Br. at 35. Kaptan made no such argument to the agency in its case brief. *Compare id.*, *with* Kaptan Case Br. at 40-45; *see also Boomerang Tube*, 856 F.3d at 912-13; 19 C.F.R. § 351.309(c)(2) (requiring parties to present all argument that

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

are relevant to the final results in their agency case brief). Because the argument is unexhausted, the Court may not now take it up.

The argument also mischaracterizes the preliminary calculation memorandum. Contrary to Kaptan's implication, Commerce did not recognize any reported benefit in its calculations for "Law 4447/6645." *Compare* Kaptan Br. at 32, *with* Memorandum from Nicholas Czajkowski, Int'l Trade Compl. Analyst, through John McGowan, Program Manager, to The File, re: *Preliminary Results Calculations for Kaptan Demir Celik Endustrisi ve Ticaret A.S.* (Nov. 30, 2023) at Attachment II (Tab "[            ]"), C.R. 238-39, P.R. 230 ("Prelim Calc. Memo"). Rather, consistent with Kaptan's failure to identify any connection between Additional Article 4 of Law 4447 and the benefits that it reported (with no narrative explanation) receiving under Law 6645, the calculation memorandum handles Additional Article 4 of Law 4447 and Law 6645 entirely separately. *See* Prelim Calc. Memo at Attachment II ([                              ]). As such, rather than support Kaptan's unexhausted claim, the preliminary calculation memorandum reflects the record gap that resulted from Kaptan's deficient reporting.

Kaptan also fails to persuade that Commerce erred in using AFA to determine that the unemployment insurance program under Additional Article 4 of Law 4447 was specific. Kaptan argues that while the GOT may not have provided a key to its industry categories in its second supplemental response, that information was provided in the GOT's IQR. Kaptan Br. at 35-36 (citing GOT IQR at Exhibit 3). Accordingly, Kaptan argues that the GOT's collective responses regarding industry codes and industry-specific usage of Law 4447 allowed Commerce to perform a specificity analysis. *Id.*

Kaptan's argument is, yet again, unexhausted. *Compare* Kaptan Br. at 35, *with* Kaptan Case Br. at 40-45. It thus cannot be considered by the Court. *See Boomerang Tube*, 856 F.3d at

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

912-13; 19 C.F.R. § 351.309(c)(2) (requiring parties to present all argument that are relevant to the final results in their agency case brief). Regardless, the argument is not compelling on its substance. Exhibit 8 of the GOT's second supplemental questionnaire response [

]

formatted [                                                                                    ],

but there is no [                                                          ]. GOT 2SQR at

Exhibit 8. Meanwhile, Exhibit 3 to the GOT's IQR provides certain information relevant to natural gas consumption in Turkey. GOT IQR at Exhibit 3. While it identifies certain industries as corresponding to various "NACE" codes, none of those codes [

]. *Id.* The inconsistency underscores the [

] "reflects consistent levels of industrial classification," and otherwise "clearly identif{ies} the industry in which the companies under review are classified." *Compare* GOT 2SQR at 21 and Exhibit 8, *with* GOT IQR at Exhibit 3.

As Commerce explained, this failure left it unable to determine which industry or industries received the largest amount of subsidies under Law 4447. *See* IDM at 19. This determination is supported by substantial evidence as the record does not clearly establish the [

] provided in Exhibit 8 refer. Accordingly, the Court should sustain Commerce's determination to countervail the GOT's provision of benefits to Kaptan under Additional Article 4 of Law 4447, applying AFA to make both its benefit and specificity analyses.

**D.    Commerce's Determination to Countervail Kaptan's Benefits Under Law 27256 is Supported by Substantial Evidence**

In its initial questionnaire, Commerce requested that Kaptan and the GOT identify any other subsidy programs that respondents used during the POR. *See, e.g.*, Kaptan IQR at 56; GOT

IQR at 109. No party identified any programs arising under Turkey's Law 27256. *See, e.g.*, Kaptan IQR at 56-60; GOT IQR at 109-119. Nonetheless, just a few days before verification, and nearly five months after submitting its initial questionnaire response, Kaptan attempted to submit information on its usage of such a program. *See* Untimely NFI Rejection Letter. After Commerce rejected the untimely data, Kaptan attempted to submit it at verification, where Commerce again rejected it. Kaptan Verification Report at 9-10. Ultimately, Commerce applied AFA to determine the benefits that Kaptan received through the program, and to find it specific. IDM at 19-20.

Kaptan now argues that Commerce cannot find that Kaptan received countervailable benefits under Law 27256 because, having rejected Kaptan's attempts to submit data regarding the program, the record contains no evidence that such a program exists. *See* Kaptan Br. at 39-42. Specifically, Kaptan argues that Commerce's regulations prevent it from using information that it has rejected in its determinations. *Id.* at 39-40. As explained below, Kaptan's arguments are unavailing.

First, Kaptan does not establish that the agency's regulations do more than prevent it from relying on the substance of rejected submissions in its determinations. Here, Commerce did not go beyond that. At most, it relied on its memorialization of its rejection, which naturally identified— in the briefest, non-substantive terms—the rejected information. Untimely NFI Rejection Letter at 1-2; *see also* 19 C.F.R. § 351.104(a)(2).

Moreover, despite Kaptan's protestations, the record indicates that Law 27256 exists, entirely apart from the agency's rejection memo. At verification, Commerce reviewed Kaptan's reported usage of a number of "Social Security Support" programs. *See* Kaptan Verification Report at 9. During verification of these programs, Kaptan officials attempted to provide information regarding benefits that Kaptan and certain cross-owned affiliates received under Law 27256. *Id.*

at 9-10. The verification report thus independently establishes that the program exists—and that Kaptan conceded to using it. To the extent that Kaptan argues that the verification report's mention of Law 27256 is "tainted" by Commerce's rejection of Kaptan's attempted pre-verification submission of the data, Kaptan Br. at 41, this argument is not compelling. After all, even if Kaptan were correct that the agency's regulations prevent it from relying on its rejection memo to find that the Law 27256 program exists, the verification report would not mention the law's existence absent Kaptan's independent attempt to provide information on it at verification.

As noted above, Commerce is required to make determinations on the basis of facts available whenever necessary information is not available on the record, or where an interested party withholds or fails to provide information in a timely manner or otherwise significantly impedes a proceeding. 19 U.S.C. § 1677e(a). The record confirms that a program exists under Law 27256 and that Kaptan used it. But both the GOT and Kaptan failed to provide substantive information on the program and Kaptan's usage of the program in a timely manner. Accordingly, the record contains a gap rendering use of facts available appropriate.

Furthermore, Commerce is authorized to use adverse inferences in selecting among the facts available where a party fails to act to the best of its ability to comply with Commerce's information requests. Here, Kaptan did not report usage of a program arising under Law 27256 until well after its initial questionnaire response was due. *See* Kaptan Verification Report at 1, 9-10. Thus, substantial evidence supports Commerce's determination to use AFA to countervail Kaptan's receipt of benefits under Law 27256, and the Court should sustain the *Final Determination* with respect to this issue.

## VII.    <u>CONCLUSION</u>

For the reasons detailed above, this Court should sustain Commerce's *Final Determination*.

Respectfully submitted,

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: February 21, 2025

**Ct. No. 24-00096**                                    **NON-CONFIDENTIAL VERSION**

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to the Standard Chambers Procedures ¶ 2(B)(1), the undersigned certifies that this

brief complies with the word limitation requirement. The word count for RTAC's Response to

Plaintiff's Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word

processing system (Microsoft Word 2019), is 11,028 words.

<u>*/s/ John R. Shane*</u>
(Signature of Attorney)

<u>John R. Shane</u>
(Name of Attorney)

<u>Rebar Trade Action Coalition</u>
(Representative Of)

<u>February 21, 2025</u>
(Date)

37

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| **KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.Ş.,**<br><br>          **Plaintiff,**<br><br>     **v.**<br><br>**UNITED STATES,**<br><br>          **Defendant,**<br><br>     **and**<br><br>**REBAR TRADE ACTION COALITION,**<br><br>          **Defendant-Intervenor.** |

**Before: Hon. Gary S. Katzmann,**
**Judge**

**Ct. No. 24-00096**

## PROPOSED ORDER

Upon consideration of the complaint and USCIT R. 56.2 motion filed in this matter challenging the final results of the United States Department of Commerce ("Commerce") regarding *Steel Concrete Reinforcing Bar From the Republic of Türkiye*, 89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) (final results of countervailing duty admin. rev.; 2021) ("*Final Results*"), and all other papers and pleadings in this action, it is hereby

ORDERED that that Commerce's *Final Results* are SUSTAINED.

SO ORDERED.


Date:_____, 2025          _____
     New York, New York                                    Hon. Gary S. Katzmann, Judge