**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş., <br><br>        Plaintiff, <br><br>    v. <br><br> UNITED STATES, <br><br>        Defendant, <br>   and <br><br> REBAR TRADE ACTION COALITION, <br><br>        Defendant-Intervenor. | **Court No. 24-cv-00096** <br><br> *NON-CONFIDENTIAL VERSION* <br><br> **Confidential information redacted at pages 5,6,9,11,12,14,15,19** |

**REPLY BRIEF OF PLAINTIFF KAPTAN DEMIR**
**ÇELIK ENDÜSTRISI VE TICARET A.Ş.**

David L. Simon, Esq.
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036
Tel.:  (202) 481-9000
Email:  DLSimon@DLSimon.com

Date:  March 31, 2025          *Counsel to Kaptan Demir Çelik End. ve Tic, A.Ş.*

**TABLE OF CONTENTS**

I.    The BITT Exemption Is Not Countervailable .................................................................. 2

II.    Commerce's Decision Regarding The Nur Land LTAR Benefit Is Not
Supported By Substantial Evidence .................................................................................. 6

III.    Commerce's Application Of AFA With Respect To Law 4447 Is
Unsupported By Substantial Evidence ............................................................................ 15

IV.    Commerce's Application Of AFA With Respect To Law 27256 Is
Unsupported By Substantial Evidence ............................................................................ 20

V.    Conclusions ........................................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Altx, Inc. v. United States,* 370 F.3d 1108 (Fed. Cir. 2004) ...........................................17

*Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017). ......................19

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962)..........................................................................................................5

*Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349  (Ct. Int'l Trade 2018)....................................................................................................................20

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F. Supp. 3d 1318, Slip Op. 24-116 (Ct. Int'l Trade 2024). ....................................................passim

*Mitsubishi Materials Corp. v. United States*, 17 C.I.T. 301, 820 F. Supp. 608 (1993) ...................................................................................................................17

*Nan Ya Plastics Corp. v. United States*, 906 F. Supp. 2d 1348 (Ct. Int'l Trade 2013).............................................................................................................6

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .........................17

*POSCO v. United States*, 296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018)............................5

*Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364 (Ct. Int'l Trade 2023)..........................2

*Sandt Tech. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344  (Fed. Cir. 2001)........................7, 9

*USX Corp. v. United States*, 11 CIT 82,  655 F. Supp. 487 (1987)..............................17

## STATUTES

19 U.S.C. § 1677e(a) ....................................................................................................20

19 U.S.C. § 1677m(d)......................................................................................................6

## REGULATIONS

19 C.F.R. § 351.104(a)(2)(i)...........................................................................................22

19 C.F.R. § 351.104(a)(2)(ii)..........................................................................................23

## ADMINISTRATIVE DETERMINATIONS

*Brass Rod From Israel: Final Affirmative Countervailing Duty Determination* 89 Fed. Reg.  63,410 (Dep't of Commerce Aug. 5, 2024) ............................................10

*Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2011*, 78 Fed. Reg. 64,916 (Dep't of Commerce Oct. 30, 2013)...................................................................10

*Common Alloy Aluminum Sheet From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review, 2020–2021*, 88 Fed. Reg. 75,274 (Dep't of Commerce Nov. 2, 2023)...........................................................................18

*Common Alloy Aluminum Sheet From the Republic of Turkey: Preliminary Results of the 2020–2021 Administrative Review*, 88 Fed. Reg. 30,092 (Dep't of Commerce May 10, 2023) .................................................................................................18

*Quartz Surface Products From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 Fed. Reg. 25,400 (Dep't of Commerce May 1, 2020) ........................................................................................................................18

*Quartz Surface Products From the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 84 Fed. Reg. 54,841 (Dep't of Commerce Oct. 11, 2019) ..............................................................................................18

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş., | |
| Plaintiff, | |
| v. | **Court No. 24-cv-00096** |
| UNITED STATES, | |
| Defendant, | *NON-CONFIDENTIAL VERSION* |
| and | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-Intervenor. | |

## REPLY BRIEF OF PLAINTIFF KAPTAN DEMIR ÇELIK ENDÜSTRISI VE TICARET A.Ş.

This is the reply brief of Plaintiff Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş. ("Kaptan") in Kaptan's appeal of the final results of the Commerce Department's 2021 administrative review of the countervailing duty ("CVD") order on steel concrete reinforcing bar ("rebar") from the Republic of Türkiye. In this brief, Kaptan replies to the arguments of Defendant United States in its Response to Plaintiff's Motion for Judgment on the Agency Record, ECF#30, and the Response to Plaintiff's Motion for Judgment on the Agency Record of Defendant-Intervenor Rebar Trade Action Coalition's ("RTAC"), ECF#38. This brief is submitted pursuant to the amended scheduling order herein, ECF#27.

## I.        The BITT Exemption Is Not Countervailable

In its Rule 56.2 Motion for Judgment (at 16-18), ECF#23,24, Kaptan argued that

Commerce's finding of *de jure* specificity was not supported by substantial evidence.  Kaptan

relied in part on this Court's decision on the identical issue in the appeal from the 2020 review of

the same CVD order, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 736 F.

Supp. 3d 1318, Slip Op. 24-116 (Ct. Int'l Trade 2024).  Kaptan explained that every industrial

enterprise in Turkey is entitled to receive the exemption, since every industrial enterprise must

have an Industrial Registry Certificate and all IRC holders are entitled to the exemption.  Kaptan

Motion at 16-18.

In its Response Brief (at 13) the government argues that—

> Kaptan fails to provide supporting evidence that every Turkish
> company is eligible for a certificate or show that every firm
> actually obtains such a certificate.

The government misstates the statutory test. 19 U.S.C. § 1677(5A)(D)(i) provides:

> Where the authority providing the subsidy, or the legislation
> pursuant to which the authority operates, expressly limits access to
> the subsidy to an enterprise or industry, the subsidy is specific as a
> matter of law.

In other words, to be *de jure* specific, the statute "must be limited to a specific business

organization or a limited group of businesses."  *Risen Energy Co. v. United States*, 658 F. Supp.

3d 1364 (Ct. Int'l Trade 2023).

Here, the BITT law exempts from the tax any foreign exchange sales to enterprises

having an Industrial Registry Certificate ("IRC"); see Kaptan Motion at 11.  Virtually every

productive enterprise in Turkey is required to register for and obtain an IRC.  *Id*.  The BITT

exemption is therefore *de jure* non-specific, since the BITT does not expressly limit access to an

enterprise or industry.

The government's position that "Kaptan fails to provide supporting evidence that every Turkish company is eligible for a certificate" is factually incorrect.  In fact, every industrial enterprise is not only eligible for, but is, in fact, *required* to have, an IRC. The IRC law defines industrial enterprises as:

> The places that produce or obtain a material continuously and in series by changing the characteristics, shape, precision or composition of a substance or by processing these substances with the help of machinery, equipment, looms, tools or other means and forces or only by manual labor and the places where the mines are extracted and processed by are considered industrial enterprise, the work done here are considered industrial works and those who run these are considered industrialist.
> …
> Establishments that carry out continuous and serial repairs and plants that produce electricity or other energy, large construction sites such as shipbuilding and enterprises that produce information technology and software are also included in this article.

Government of Turkey Initial Questionnaire Response ("GOT IQR") Exh. 36, CR119, PR102. Defendant United States does not point to a single type of enterprise that is not covered by this expansive definition.

The government's position that Kaptan must provide that "every firm actually obtains such a certificate" is irrelevant.  The BITT statute does not exempt any enterprise or industry, and the question of *actual usage* (*i.e.,* whether all firms actually have IRCs, or even whether all firms with IRCs actually buy or sell foreign exchange) is irrelevant to *de jure* specificity.

The government's quibble over Kaptan's driver's license analogy is ill-taken; Govt Resp.Brf. at 13. Kaptan's point was simply that one must have a driver's license to drive a car legally. Kaptan motion at 18. Here, again, the government confuses *eligibility* with *actual use*. Eligibility governs *de jure* specificity; actual use has nothing to do with *de jure* specificity.

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [    ]*

Ultimately, the Court has decided this issue in Slip Op. 24-116.  The facts are no different here, and the same outcome must follow. Neither the government nor the defendant-intervenors have shown any difference between this review and the 2020 review appealed in Slip Op. 24-116 that would warrant a different outcome.

There is a second BITT issue here that was not present in Slip Op. 24-116, namely, whether Kaptan's failure to report its "arbitrage" forex transactions (in which one foreign currency is exchanged for another foreign currency) warranted application of adverse facts available ("AFA"); *see*, Kaptan Motion at 18-22.  Kaptan argues that Commerce's interpretation of the BITT as applicable to arbitrage transactions constituted an issue of fact, and that this interpretation was not supported by a single fact of record.

The government responds by claiming that "Commerce's 'interpretation' of the program is irrelevant {because} Commerce requested Kaptan to report each benefit received under the program." Govt Resp.Brf. at 21.

The government response is tautological.  It goes without saying that Kaptan was required to report "each benefit received."  The issue remains, however, whether the BITT exemption on arbitrage transactions constitutes a "benefit received."  If arbitrage transactions do not provide a benefit, then they need not be reported. This, in turn, depends on whether the Turkish statute exempts arbitrage transactions from the tax.  If the BITT law only applies to exchanges between Turkish lira and other currencies, as Kaptan understood, then arbitrage transactions are simply not subject to the tax and therefore Kaptan had no obligation to report them. Thus, claiming that Kaptan was required to report "each benefit received" does not answer the underlying question of whether Kaptan received *a benefit* when making arbitrage transactions.

Case 1:24-cv-00096-GSK    Document 32    Filed 03/30/25    Page 9 of 30
*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [    ]*

The government further argues (Govt Resp.Brf. at 23, citation omitted):

> Kaptan argues that it was not obligated to report benefits received from the BITT for arbitrage transactions because Commerce has not included such transactions in past countervailability determinations. { } Again, this argument ignores Kaptan's duty to report all benefits received under the program, even those accrued from arbitrage.

Here again the government *assumes* the proposition to be decided, *i.e.*, engages in a tautology. If the BITT does not apply to arbitrage transactions, then Kaptan did not receive any "benefits accrued from arbitrage," since arbitrage, itself, is not taxable. The core issue therefore remains whether the BITT covers or does not cover arbitrage transactions.  This is an issue of Turkish law, which arises as an issue of fact in this proceeding (a proposition that the government accepts – *see*, Govt Resp.Brf. at 21), and there is simply no evidence to support Commerce's interpretation.

Defendant-intervenors RTAC argue that arbitrage exchanges are subject to reporting under the BITT exemption because "[

] that BITT exemptions applied to [    ] arbitrage transactions, thus indicating that the BITT applied to such transactions in the first instance." RTAC Resp.Brf. at 18.  However, one respondent's interpretation of the Turkish statute does not bind Kaptan and cannot constitute record evidence as to the correct interpretation of the Turkish statute. Moreover, Commerce never cited such evidence in its IDM, and RTAC may not invent a *post hoc* justification beyond what Commerce, itself, adduced in its IDM.  "The court may not accept '*post hoc* rationalizations for agency action' and may only sustain the agency's decision 'on the same basis articulated in the order by the agency itself.'"  *POSCO v. United States*, 296 F. Supp. 3d 1320, 1360 n.58 (Ct. Int'l Trade 2018), citing *Burlington Truck*

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [    ]*

*Lines, Inc. v. United States*, 371 U.S. 156, 168-69, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962); *Nan Ya Plastics Corp. v. United States*, 906 F. Supp. 2d 1348, 1354  (Ct. Int'l Trade 2013).

RTAC also asserts that Commerce was not obliged to notify Kaptan of the alleged deficiency in its BITT reporting because "Commerce only discovered Kaptan's deficient reporting at verification." RTAC Resp.Brf. at 18.  This argument cannot stand.  According to RTAC's theory, Commerce was aware that the BITT applied to arbitrage transactions when [

] RTAC  Resp.Brf. at 18. The Kaptan verification occurred on October 17-20, 2023.  PR222.  Therefore, Commerce had five months in which to ask Kaptan to include arbitrage transactions in its response, but, instead, Commerce sat on the information until verification.  The statute requires notification of deficiencies in a response, 19 U.S.C. § 1677m(d), and Commerce should not be permitted knowingly to withhold such notification when it was clearly aware of the facts at a time when the deficiency – if any – could have been remedied.

In any event, if the Court determines that the BITT exemption is not countervailable, then the issue of BITT as to the reporting of the BITT exemption is moot.

## II.    Commerce's Decision Regarding The Nur Land LTAR
## Benefit Is Not Supported By Substantial Evidence

In its Rule 56.2 motion, Kaptan argued that (1) Commerce's outright rejection of Kaptan's proffered Cushman and Wakefield  ("C&W") report was unlawful in that the agency applied an unlawful evidentiary standard (*id*. at 25-28) and that (2) Commerce's selection of rental rates in Çerkezköy was unsupported by substantial evidence (*id*. at 28-30).

In Slip Op. 24-116, this Court found that Commerce's evidentiary standard for rejecting the C&W report outright was unlawful.

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets,  [     ]*

The government largely repeats arguments from the 2020 appeal, which the Court has already addressed in Slip Op. 24-116.  Kaptan would point out one new error in the government's argument.  The government states, "Commerce also considered that the Cushman & Wakefield report was commissioned by Kaptan for the purpose of this administrative review, as Kaptan admits." Govt Resp.Brf. at 16.  In truth, Kaptan admits no such thing.  Kaptan acknowledges that it retained C&W to provide a valuation report for the Nur property, but the use to which Kaptan intended to put the report appears nowhere on the record, and, certainly as far as C&W was concerned, the report was for Kaptan's internal use. See, Kaptan's Benchmark submission, Exh. 1 (C&W report) at 5, stating, "[     ]" Emphasis added.  PR133/CR138-46.  There is no reason to believe that C&W's report was anything other than what it purports to be, namely, an objective and expert valuation of the Nur lease.

The government also errs in suggesting that Kaptan is arguing that "trade cases have a lower evidentiary standard than other cases, like patent cases, which is simply untrue." Govt Resp.Brf. at 17. Kaptan is not making any such argument.  The fact is that patent litigation has its own set of evidentiary rules, because of the unique circumstances surrounding inventions and patentability.  These are clear in *Sandt Tech. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001), where the Court provides a fulsome explanation of the particular evidentiary rules in patent cases, many of which are irrelevant to international-trade cases.  Thus:

> The presumption of validity {of patents}, 35 U.S.C. § 282 (1994), requires those challenging validity to introduce clear and convincing evidence on all issues relating to the status of a particular reference as prior art.

264 F.3d at 1350.  There is no "presumption of validity" in trade law. Similarly,

> It is well-established in our case law that a party claiming his own prior inventorship must proffer evidence corroborating his testimony.

*Id*. In trade law, there is no concept of "prior inventorship" and no precedent requiring either party to "proffer evidence corroborating his testimony." Indeed, there is not even any oral testimony in trade cases. The *Sandt Tech.* Court goes on to detail an evidentiary dialectic that is unique to patent law:

> Although each case must be decided in view of its own facts, the determination is not utterly unstructured. Rather, our court has provided considerable guidance on the standards by which to judge whether or not an inventor's testimony has been sufficiently corroborated. Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated. {…} Because documentary or physical evidence is created at the time of conception or reduction to practice, the risk of litigation-inspired fabrication or exaggeration is eliminated. Circumstantial evidence about the inventive process, alone, may also corroborate. {…} Additionally, oral testimony of someone other than the alleged inventor may corroborate an inventor's testimony. {…} In contrast to contemporaneous documentary evidence, however, post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate. {…} This court has articulated the following illustrative factors that may be useful in guiding the determination of whether a witness' testimony provides sufficient corroboration: 1) the relationship between the corroborating witness and the alleged prior user; 2) the time period between the event and trial; 3) the interest of the corroborating witness in the subject matter in suit; 4) contradiction or impeachment of the witness' testimony; 5) the extent and details of the corroborating testimony; 6) the witness' familiarity with the subject matter of the patented invention and the prior use; 7) probability that a prior use could occur considering the state of the art at the time; and 8) impact of the invention on the industry, and the commercial value of its practice.

264 F.3d at 1350-51 (citations omitted). Without belaboring the point, it is clear that the evidentiary structure in patent cases is largely irrelevant to trade cases, where there are no

inventors, no "time of conception," no "reduction to practice," no contemporaneity with the "inventive process," no "post-invention oral testimony," and so forth. Kaptan denies the government's assertion that Kaptan suggests that "trade cases have a lower evidentiary standard than other cases, like patent cases" (Govt Resp.Brf. at 17); trade cases, like patent cases, must follow a "rule of reason" regarding evidence (*see, Sandt Tech.*, 264 F.3d at 1350), but in neither type of case is there a *per se* rule rejecting reports prepared by third parties. It is not a matter of "higher" or "lower" evidentiary standards; it is simply that patent cases have a different subject matter than trade cases, and therefore different evidentiary considerations.

The government also misstates the issue concerning "non-private" leases in the C&W report.  Govt Resp.Brf. at 16. The situation is this:  C&W prepared tables showing lease rates for commercial leases in Trabzon and, separately, for certain government leases, specifically for "coastal and filled areas rented by the government." C&W Report at 7 (PDF-8), where C&W gave the following table:

[




                                                                                            ]

Why would C&W provide this information?  Because the Nur property consists of coastal landfill rented by the government, so this figure enabled Kaptan to compare the lease value of its landfill property to figures for similar types of leases.  C&W clearly considered that

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets,  [     ]*

this might be useful for Kaptan's "internal purposes." [1]  However, what is important is this: C&W kept the "coastal and filled areas rented by the government" entirely separate from the figures that Kaptan submits as LTAR benchmarks, namely, the figures for commercial "land rent comparables in Trabzon." The government cites the foregoing as evidence that the C&W report is "unreliable," asserting that "the comparison rates being unreliable is still a consideration Commerce must account for when determining the reliability of the report as a whole."  Govt Resp.Brf. at 17. But the government's words do not make sense: the fact that the C&W report has a table entry for coastal and filled lands rented by the government does not render the report "unreliable." There is no reason to believe these rates are inaccurate, and they are clearly segregated from the rates that are of interest to a CVD LTAR inquiry.  The government's argument is without merit.

In any event, this Court has found, in Slip Op. 24-116, that Commerce's grounds for rejecting the C&W report were unsustainable on appeal, and the government has not shown any evidence in the present review to controvert the Court's decision.

Defendant-intervenor RTAC's arguments concerning the inclusion of Kaptan's own properties and of government properties in the C&W report, RTAC Resp.Brf. at 25, fare no better.  RTAC asserts (citations omitted):

> Kaptan described its proposed benchmark "as ranging from TL 0.05 to TL 3.46 per square meter per month." {  } The lower of these values was calculated [     ]. {   } Even if this [     ], the

---

[1]  The fact that C&W prepared a table for coastal and filled areas rented by the government shows that C&W had no idea that its report would be used in a CVD LTAR proceeding; otherwise, it would not have gone to the trouble of finding the information for a rate that could not be used as a benchmark. *See*, *Brass Rod From Israel: Final Affirmative Countervailing Duty Determination* 89 Fed. Reg.  63,410 (Dep't of Commerce Aug. 5, 2024), ID memo at comment 3; *Circular Welded Carbon Steel Pipes and Tubes From Turkey: Final Results of Countervailing Duty Administrative Review; Calendar Year 2011*, 78 Fed. Reg. 64,916 (Dep't of Commerce Oct. 30, 2013) and accompanying IDM.

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [    ]*

information regarding it was [    ] and thus was "Kaptan's own data," as Commerce noted. IDM at 12. Further, the range of values that Kaptan provided covers both the [    ]. { }

We address these assertions sequentially.

Kaptan's summary of its benchmark range as 0.05 to 3.46 TL/m$^2$ is just that – a summary in a cover letter, and does not replace the actual figures in the C&W report. We have provided the C&W report's "land rent comparables in Trabzon," and it is this figure that Kaptan proposed should actually be used as the benchmark.

Furthermore, the "land rent comparables in Trabzon" are fully supported by detailed parcel-specific information. C&W's starting point was actual lease values of comparable properties in Trabzon, C&W report at 28:

[




















]

This table reflects rentals in 2022, and so C&W deflated the figure to account for inflation between the POR (2021) and 2022:

[

]

The figure that RTAC focuses on has nothing to do with the "land rent comparables" that Kaptan proposes as the benchmark; instead, it is part of a separate analysis representing possible benchmarks calculated under a different methodology.  As explained above, Kaptan did not propose using the benchmarks calculated under the methodology for "coastal and filled lands." Even so, RTAC misstates the record in claiming that this rate was "Kaptan's own data," RTAC Resp.Brf. at 25.  RTAC is referring to the following statement in the C&W report (at 33):

[

]

The C&W report is discussing an alternative methodology for calculating the fair-market value for [     ], in which the rents were based on the [     ].  Kaptan had told C&W's valuer that there were [     ] in Sürmene for which the rentals were calculated in this way.  This entire section of the C&W report, while possibly useful for Kaptan's corporate purposes, was irrelevant to the CVD LTAR benchmarking analysis.  RTAC's attempt to undermine the C&W report as having included "Kaptan's own data" is thus ill-founded.

Thus RTAC's efforts to controvert the reliability of the C&W report by claiming that it was contaminated by data provided by Kaptan are without merit.

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [     ]*

The second issue in Kaptan's motion was whether the data point for land valuation in Çerkezköy was supported by substantial evidence. Kaptan claims it is not.  The government asserts that substantial evidence supports the selection of Çerkezköy based on Çerkezköy's *population density* relative to that of Sürmene, where Nur is located:

> From the Colliers Report, Commerce relied on the benchmark data from one region in Turkey – Cerkezhoy{*sic*}, Tekirdag – because it had the most similar population density to Surmene, Trabzon, where the land in question is located. IDM at 11…. Given that *population density is the most relevant and quantifiable metric available on the record*, Commerce reasonably valued population density when determining that the Cerkezhov {*sic*}, Tekirdag benchmark is comparable.

Govt Resp.Brf. at 18 (emphasis added).

The government's claim that the population density of Çerkezköy is similar to that of Sürmene is unsupported by the record because *there is no evidence whatsoever of population densities of either Çerkezköy or Sürmene anywhere in the record.* The government cites the Issues and Decision Memo at 11 to support its claim as to population densities.  There, Commerce states:

> {W}e made an adjustment to the data in this {Colliers} report to use a comparable benchmark for industrial land based on *population density* information,… We therefore chose Colliers as the most suitable benchmark on the record and limited our comparability analysis based on the most relevant and quantifiable metric available on the record, which is *population density*.

IDM at 11, PR247. The IDM does not contain a footnote showing the source of the supposed "population density" information. The Preliminary Decision Memo does not contain a single reference to "population density."  PR229. Likewise, RTAC's Submission of Benchmark information, PR134, does not contain a single mention of "population density" nor a single statistic relating thereto. RTAC's Benchmark Rebuttal Submission, PR170, contains a few references to "population density," but none them pertain either to Çerkezköy or to

Sürmene/Trabzon.  RTAC's Attachment 1 at 3/3 discusses population density for Turkey overall and for Istanbul, Izmir, Kocaeli, Tunceli, Ardahan, Erzincan, and Konya, none of which comprise either Çerkezköy or Trabzon.  RTAC's Attachment 6 at 1 gives population density for [      ]; RTAC's Attachment 7A at 4 gives the population density of Istanbul; Attachment 7B gives that of Ankara at 1; Attachment 7E at 2 gives that of Antalya (PR171); Attachment 7F at 1 again gives the population density of Izmir, Bursa, and Antalya.  *Nowhere in RTAC's Benchmark Rebuttal Submission is there any mention at all of the population density of either Çerkezköy or Sürmene*.

In short, the factual basis for the Çerkezköy-Sürmene population density comparison is utterly lacking on the record of the review under appeal.

Commerce's use of a *nonexistent statistic* as the basis for the most critical benchmarking decision – the selection of the Çerkezköy benchmark as *most comparable* to Sürmene/Trabzon – undermines Commerce's entire approach to the benchmarking exercise and presents a compelling justification for a remand.

RTAC similarly cites Commerce's selection of the Çerkezköy property "because this area had the most similar population density to that of the area where Nur's land is located." RTAC Resp.Brf. at 27.  Like the government, RTAC predicates its comparability argument entirely on this supposed statistic, which, as explained above, appears nowhere on the record.

RTAC also faults the C&W report for including properties that are not specifically "zoned for industrial use." RTAC Resp.Brf. at 28.  However, RTAC's argument fails to address the more pressing issue of comparability between Trabzon and Çerkezköy. In any event, the typology of the individual parcels is nowhere near as significant as their Trabzon location.

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets,  [      ]*

Kaptan therefore asks the Court to remand the issue with an instruction to apply a proper evidentiary standard to its consideration of the C&W report and to either provide support for its proposition that Çerkezköy is similar to Sürmene in population density or to reconsider *ab initio* the benchmark selection in light of the economic differences between Trabzon and the Greater Istanbul Industrial Area from which all the Colliers' figures are taken.

## III.      Commerce's Application Of AFA With Respect To Law 4447 Is Unsupported By Substantial Evidence

In its Rule 56.2 motion at 31-36, Kaptan explained that Commerce's application of adverse facts available ("AFA") to Kaptan's receipt of benefits under Law 4447 was unsupported by substantial evidence because Kaptan had, indeed, reported its benefits under that law.  Initially, Kaptan reported its Law 4447 benefits in the section of the response concerning "Other Programs" under the rubric of Law 6645, because Law 6645 was the implementing statute for law 4447. Thus, in Exhibit 31 of its Initial Questionnaire Response ("IQR") of May 26, 2023, CR76, Kaptan reported:

[



                                                                                                        ]

Commerce did not address this program in its sole supplemental questionnaire concerning Kaptan's IQR; *see*, PR143.  However, Commerce did address this program in a supplemental questionnaire to the Government of Turkey; *see*, GOT's Supplemental

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [    ]*

Questionnaire Response ("SQR") of October 2, 2023 (CR184, PR189), where the GOT

explained that the relevant provision of Law 4447 operates within Law 6645:

> Title of the program is Unemployment Insurance Premium Incentive under Law No. 4447. The program is established by the Law No. 6645, which added a provision to the Law 4447 (Additional Article 4) on April 4, 2015.
>
> Unemployment insurance premiums are paid by all covered parties, including the insured, employers, and the state, in order to cover the costs associated with service and administrative costs. Unemployment insurance premium is taken as 1% of the insured's, 2% of the employer's, and 1% of the state's share of the insured's monthly gross earnings subject to premium.
>
> This program aims to reduce occupational accidents in workplaces with more than ten employees that fit into the highly hazardous class covered by the Occupational Health and Safety Law by lowering the employer's share of employee unemployment insurance to 1% for three years.

As we explained in our R.56.2 motion (at 32-33), Commerce included the benefit Kaptan

received in its preliminary calculations (CR239), finding the benefit amount under 0.0025% and

hence "not measurable." However, in its PDM – issued at the same time as the preliminary

calculations – Commerce asserted that Kaptan had not reported any benefits under this program

and proceeded to apply AFA. PR229 at 7. In its final results, Commerce faulted the GOT for

failing to provide information concerning the industries that benefited from this program and

applied AFA insofar as it was unable to conduct a *de facto* usage analysis. IDM at 17-18,

PR247.

In its Response brief, at 32, the government acknowledges that, "In its supplemental

response, the GOT linked Law 4447 and Law 6645 (Law 6645 is the implementing legislation

for Law 4447)…." Thus, the record, by the government's own admission, reflects that Kaptan

reported receipt of benefits under Law 6645, and that this is the implementing law for Law 4447.

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [     ]*

Thus, there was no gap with respect to its reporting under this law.  The government asserts that

Kaptan's failure to connect its reporting under law 6645 to Law 4447 constitutes a gap in the

record to be filled with Facts Available ("FA") and that, because this was a failure on Kaptan's

part, the appropriate remedy was an AFA rate.  Kaptan asks this Court to find that there was no

gap in the record.  While Kaptan's initial reporting admittedly failed to disclose the numbers of

the two interlinked laws, the record as a whole discloses this connection, and Commerce cannot

lawfully ignore it.  In determining whether substantial evidence supports the agency's

determination, the court must consider "the record as a whole, including evidence that supports

as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel

Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United

States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)); *Mitsubishi Materials Corp. v. United States*, 17

C.I.T. 301, 304, 820 F. Supp. 608, 613 (1993). Commerce cannot cherry-pick the evidence on

which it bases its determinations. *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487,

489 (1987).

Moreover, Commerce was already well aware of Law 4447.  In its SQR, at 13, the GOT

specifically cited the "Decision Memorandum for the Preliminary Results of the 2020-2021

Countervailing Duty Administrative Review of Common Alloy Aluminum Sheet from the

Republic of Turkey, dated April 28, 2023," for the proposition that benefits under law 4447 are

not countervailable.  PR189.  In its case brief, Kaptan relied on this precedent, arguing:

> Commerce cannot resort to AFA in relation to Law 4447
> because the program has been found not countervailable and the
> Government of Turkey reported in this review that since then there
> have been no changes to Law 4447.  Commerce found benefits
> under Law 4447 not specific, and thus not countervailable, in the
> investigation of quartz surface products from Turkey.

Public (Non-Confidential) Version
Confidential information redacted in brackets, [    ]

Kaptan case brief, PR235, at 44-45, citing *Common Alloy Aluminum Sheet From the Republic of Turkey: Preliminary Results of the 2020–2021 Administrative Review*, 88 Fed. Reg. 30,092 (Dep't of Commerce May 10, 2023), Dec. Mem. at 25 (noting no change since *Quartz Surface Products from Turkey*, "We have no new information on the record of this proceeding to warrant a reconsideration of Commerce's prior findings."), *unchanged in Common Alloy Aluminum Sheet From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review, 2020–2021*, 88 Fed. Reg. 75,274 (Dep't of Commerce Nov. 2, 2023); *see also, Quartz Surface Products From the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 84 Fed. Reg. 54,841 (Dep't of Commerce Oct. 11, 2019), and accompanying Dec. Mem. at 19-20 (finding Law 4447, appended by Law 6111, not specific, thus not countervailable), unchanged in *Quartz Surface Products From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 Fed. Reg. 25,400 (Dep't of Commerce May 1, 2020).

Thus, Commerce was well aware of Law 4447, having found it non-countervailable as far back as 2019 and as recently as 2023.

In sum, there was no gap in the record: Kaptan reported its benefits under Law 6645 and Law 6645 is categorically connected to Law 4447.

Defendant-intervenor RTAC argues that Kaptan failed to exhaust its administrative remedies in regard to its reporting of Law 4447: "Kaptan argues that it identified benefits that it received under 'Law 4447/6645' in its initial questionnaire response. *Id*. at 31. This argument is

unexhausted, as Kaptan did not raise it in its agency briefing." RTAC Resp.Brf. at 30.  RTAC

errs.  In its case brief at 42 (footnote omitted), Kaptan argued:

> Commerce's decision contains a factual error when stating that Kaptan did not provide information about benefits received under these Social Security programs: Kaptan did report Law 4447 – which Kaptan noted had been amended by Law 6111 – with Kaptan's reporting of other Social Security Incentive (SSI) programs, and Kaptan's observation that all the SSI have been found not countervailable. Although Kaptan highlighted that this program had been found non-countervailable, Kaptan also reported amounts received under this programs, despite the fact that, as not-countervailable, amounts received under this program are irrelevant.

Thus, the issue of Kaptan's reporting of Law 4447 was squarely before the agency during the

proceedings below. The underlying amounts were of record, and Kaptan's case brief argued that

these amounts should have been used for the final results. Thus, Kaptan did not fail to exhaust its

administrative remedies; *see*, *Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir.

2017).

RTAC similarly errs in asserting that "Commerce did not recognize any reported benefit

in its calculations for 'Law 4447/6645.'" RTAC Resp.Brf. at 32.  In fact, Commerce's

preliminary calculation worksheet explicitly calculates a benefit for "Law 6645," CR238-39,

PR230:

[



                                                                                ]

As explained above, Commerce was well aware that Law 6645 was nothing more than the

implementing statute for Law 4447.

Hence, RTAC's argument that Commerce did not include this program in its preliminary calculations is unavailing.

There is a second issue regarding the application of AFA to Law 4447/6645, namely, whether the GOT adequately reported the actual usage of the program for Commerce to make its *de facto* specificity analysis.  See Kaptan Rule 56.2 Motion at 35-6, and the Govt Resp.Brf. at 25-27. The government asserts (at 26) that, "it was impossible for Commerce to determine the significance of the NACE codes provided for Social Security Support Under Law 4447…."

Ewen if the government's argument prevails in the face of Commerce's earlier findings, *supra*, that Law 4447 is not countervailable, the remedy is not to apply AFA to Kaptan who, after all, did report its benefits under the program.  Rather, the remedy is to find, as a matter of AFA, that the program fails the test of *de facto* specificity, and is therefore countervailable, and then to calculate a benefit rate for Kaptan.  As the Court explained in *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1361 (Ct. Int'l Trade 2018), 19 U.S.C. § 1677e(a) "provides Commerce with a methodology to fill informational gaps when necessary or requested information is missing from the administrative record." Thus, the statute has an intrinsic limitation: The facts-available information cannot be broader than the gap in the record. Here, the gap consists of the GOT's failure to establish usage by sector; therefore, the solution lies not in applying an AFA rate to Kaptan but, rather, in finding the program countervailable as AFA, then applying the Kaptan-specific rate to Kaptan.

## IV.     Commerce's Application Of AFA With Respect To Law 27256 Is Unsupported By Substantial Evidence

In its Rule 56.2 motion, Kaptan explained that there is no evidence on the record that Kaptan received any benefits under a so-called Law 27256, and that Commerce's application of

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [     ]*

AFA as to that program was therefore unlawful.  The facts are set forth in Kaptan's motion at 37.

Briefly, the only reference to such a law was in an October 12, 2023, letter from Kaptan (CR194,

PR199) that Commerce rejected from the record as untimely comment (CR205, PR210), and

which therefore cannot be cited as record evidence (*see*, 19 CFR § 351.104(a)(2)(ii), precluding

use of rejected submissions for any substantive purpose).  The only other reference to a Law

27256 is in the Kaptan verification report, PR222, at 9-10, where Commerce says, "{C}ompany

officials attempted to provide information for benefits {Kaptan and its affiliates} received under

laws 4447 and 27256."

　　　　Neither a rejected letter nor a verification report prepared by Commerce's own personnel

and lacking any accompanying exhibit or corroboration constitutes substantial evidence. As

Kaptan explained in its Rule 56.2 motion, Commerce's own rules prohibit Commerce's use of

rejected submissions for any substantive purpose, while the reference in the verification report is

unaccompanied by any exhibit or other corroboration and thus is no more than an unsupported

statement.

　　　　The government argues that –

>　　　　the lack of evidence on the record is precisely why Commerce was
> justified in using AFA: the information is missing on the record
> because parties failed to timely submit it, and Commerce therefore
> reasonably relied on other information on the record, with the use
> of an adverse inference, to make a determination regarding this
> program.

Govt Resp.Brf. at 27.  The government's premise is that Commerce "relied on *other information*

*on the record.*"  However, as Kaptan has explained, this "other information" was *not* on the

record; by rejecting Kaptan's October 12 letter, Commerce put that submission in the dustbin of

materials that cannot be considered as evidence in a proceeding.

*24-096- Kaptan reply brief PUB.docx*

The government acknowledges that "information regarding … Law 27256 was not available on the record." Govt Resp.Brf. at 28. The government understates the situation; in fact, the very existence of law 27256 was not on the record.

The government asserts that –

> Kaptan informed Commerce of the existence of Social Security
> Support Under Law 27256, but failed to do so in a way that
> preserved that information on the record.

Govt response at 29. This assertion does not hold up to scrutiny. If information was not "preserved on the record," then how can Commerce rely on it to find a gap in the record? In any event, Commerce, itself, could have "preserved" the information concerning Law 27256 by accepting Kaptan's October 12 submission as fair comment on the GOT's SQR of October 2, 2023 (CR184-92, PR189-97). Having chosen, instead, to reject Kaptan's October 12 letter as untimely, Commerce foreclosed its own use of the information in that letter *for any purpose.* The government may not now invoke the "purpose of the AFA statute" (Govt response at 29) when it was Commerce, itself, that removed Kaptan's October 12 submission from the substantive record.

Defendant-intervenor RTAC argues that –

> Kaptan does not establish that the agency's regulations do more
> than prevent it from relying on the substance of rejected
> submissions in its determinations. Here, Commerce did not go
> beyond that. At most, it relied on its memorialization of its
> rejection, which naturally identified – in the briefest, non-
> substantive terms – the rejected information.

RTAC Resp.Brf. at 34. RTAC's argument is unavailing. The regulation is perfectly clear:

> The Secretary, in making any determination under this part, will
> not use factual information, written argument, or other material
> that the Secretary rejects.

19 C.F.R. § 351.104(a)(2)(i). Furthermore,

*Public (Non-Confidential) Version*
*Confidential information redacted in brackets, [    ]*

> The official record will include a copy of a rejected document, *solely for purposes of establishing and documenting the basis for rejecting the document*, if the document was rejected because: (A) The document, although otherwise timely, contains untimely filed new factual information …

19 C.F.R. § 351.104(a)(2)(ii) (emphasis added).  The regulation does not differentiate between the "substance" of rejected submissions and some supposedly insubstantial aspect of a rejected submission.  Either the submission is rejected or it is not; the regulation gives no middle ground.

In any event, Commerce did not make the argument in its IDM that the regulation differentiates between substantial and insubstantial information, and RTAC may not introduce *post hoc* rationales on appeal.  *POSCO, supra*, 296 F. Supp. 3d at 1360 n.58.

RTAC also claims that "the record indicates that Law 27256 exists, entirely apart from the agency's rejection memo," citing the language in the verification report.  RTAC Resp.Brf. at 34.  However, the verification report contains no *evidence* that Law 27256 exists; the mere statement in the verification report that "company officials attempted to provide information for benefits it … received under laws 4447 and 27256" (CR233, PR222, at 9-10) does not constitute *evidence* of the existence of such a program.

Finally, the government sidesteps Kaptan's argument that the very definition of "evidence" as "something legally submitted to a tribunal to ascertain the truth of a matter" (Kaptan brief at 40) precludes Commerce's use of Kaptan's October 12 letter or of Commerce's allusion to Law 27256 in its verification report, stating (Govt Resp.Brf. at 30):

> Regardless of the dictionary definition of "evidence," Commerce's awareness of Law 27256 resulted from Kaptan's actions during the proceeding,…

But this Court cannot make a judgment that is without regard for the meaning of words; law is embodied in words, and it is wrong to argue "regardless of the dictionary definition" as if

the meaning of the words does not matter.  It does.  Commerce cannot convert a rejected letter and a comment in its own verification report into evidence simply by repeatedly referring to "evidence," as if such evidence existed.  It does not.  The government's suggestion that "dictionary definitions" are irrelevant to judicial decision-making is unsupported and without merit.  Notably, defendant-intervenors RTAC make no arguments in this regard.

In sum, Commerce erred in finding that there exists a program under a Law 27256 and then applying AFA to the benefit under that program.  Commerce's determination is unsupported by the facts and, insofar as it ignores the meaning of "evidence," is otherwise unlawful.

## V.    Conclusions

For the reasons set forth above, Kaptan asks the Court –

1.  To find that the BITT exemption lacks *de jure* specificity and to remand accordingly;

2.  If Commerce continues to claim that the BITT exemption is countervailable, then to find that Commerce's interpretation of the BITT law as applying to arbitrage transactions was unsupported by substantial evidence and to remand with an instruction to calculate a benefit according to the benefits as reported by Kaptan, namely, the taxes foregone on Kaptan's exchanges between Turkish lira and foreign currencies;

3.  To find that Commerce's rejection of the C&W report as unreliable was unsupported by substantial evidence and to remand with an instruction that Commerce undertake an *ab initio* analysis of the reliability of the C&W report;

4.  To find that Commerce's selection of Çerkezköy as the LTAR benchmark was unsupported by substantial evidence, and to remand with an instruction to use the valuation in the C&W report as the benchmark;

5.   To find that the application of AFA as to Law 4447 was unsupported by substantial evidence and to remand with an instruction to calculate a benefit based on the actual amount reported by Kaptan; and finally

6.   To find that the application of AFA as to Law 27256 was unsupported by substantial evidence and to remand with an instruction either (i) to find no evidence that such a program exists or (ii) to accept Kaptan's October 12, 2023 letter into the record and to calculate a benefit under Law 27256 as reported therein.

Respectfully submitted,

/s/ *David L. Simon*

David L. Simon
LAW OFFICES OF DAVID L. SIMON, PLLC
1025 Connecticut Ave., N.W., Ste. 1000
Washington, D.C. 20036
Tel.:  (202) 481-9000
Email:  DLSimon@DLSimon.com

Date:  March 31, 2025                        *Counsel to Kaptan Demir Çelik End. ve Tic, A.*

*24-096- Kaptan reply brief PUB.docx*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the guidelines set forth in the Standard Chambers Procedures. The confidential version of this brief contains 6,731 words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, the Table of Authorities, and this Certificate).

/s/ *David L. Simon*
David L. Simon

Date:  March 30, 2025

*Counsel to Kaptan Demir Çelik Endüstrisi ve Ticaret A.Ş.*