C-489-819
Remand
Slip Op. 25-131
POR: 01/01/2021 – 12/31/2021
**Public Document**
E&C/OI:  Team

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*
**Court No. 24-00096; Slip Op. 25-131 (CIT October 6, 2025)**
**Steel Concrete Reinforcing Bar from the Republic of Türkiye**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion of the U.S. Court of International Trade (the

Court) in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Consol. Court No. 24-

00096, Slip Op. 25-131 (October 6, 2025) (*Remand Order*).[1]  These final results of

redetermination concern the *Final Results* of the 2021 administrative review of the

countervailing duty (CVD) order on steel concrete reinforcing bar (rebar) from the Republic of

Türkiye (Türkiye).[2]  In the *Remand Order*, the Court remanded Commerce to reconsider or

further explain its determinations: (1) that the Banking and Insurance Transactions Tax (BITT)

tax exemption is specific as a matter of law, (2) to use the Colliers report to calculate a

benchmark for the Nur rent-free lease without adequately addressing Kaptan Demir Celik

Endustrisi ve Ticaret A.S.'s (Kaptan) critiques of the report, and (3) to apply adverse facts

available (AFA) to determine Kaptan's subsidy benefit under Turkish Law 27256.

---

[1] *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Court No. 24-00096, Slip Op. 25-131 (CIT October 6, 2025) (*Remand Order*).
[2] *See Steel Concrete Reinforcing Bar from the Republic of Türkiye:  Final Results of Countervailing Duty Administrative Review; 2021*, 80 FR 35071 (May 21, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

Pursuant to the *Remand Order*, Commerce has reconsidered our position on BITT, reconsidered the benchmarks for Turkish land, and further explained our decision to use AFA available to determine a subsidy benefit for Kaptan under Turkish Law 27256. Regarding the BITT program, we determine it is appropriate to find the program countervailable based on a finding of export specificity. Further, we are making no changes to the land benchmark or application of AFA to Turkish Law 27256 following our reexamination of these issues.

## II.     BACKGROUND

On January 3, 2023, Commerce initiated an administrative review of rebar from Türkiye for nine producers and exporters of the subject merchandise for the period of review (POR) of January 1, 2021, through December 31, 2021.[3] On March 28, 2023, Commerce selected Colakoglu Metalurji A.S. (Colakoglu) and Kaptan as the mandatory respondents in this CVD administrative review.[4] On April 3, 2023, Commerce released the initial CVD questionnaire to the Government of Türkiye (the GOT) and informed the GOT that it was responsible for forwarding it to the mandatory respondents.[5] Between April and May 2023, the GOT and respondents timely filed their responses to Sections II and III of the initial questionnaire, respectively.[6]

With respect to the BITT program, in its initial questionnaire response, the GOT reported that there had been no changes since Commerce had previously found this program countervailable.[7] Therefore, absent any program changes impacting countervailability, the GOT

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 50 (January 3, 2023); *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 15642, (March 14, 2023).
[4] *See* Memorandum, "Respondent Selection; 2021," dated March 28, 2023.
[5] *See* Commerce's Letter, "Initial Questionnaire in Countervailing Duty Administrative Review for 2021," dated April 3, 2022.
[6] *See* Kaptan's Letter, "Initial Questionnaire Response," dated May 26, 2023 (Kaptan's IQR); Colakoglu's Letter, "Response to Section III," dated May 26, 2023 (Colakoglu's IQR); and GOT's Letter, "Response of the Government of Türkiye," dated May 29, 2023 (GOT's IQR).
[7] *See* GOT's IQR at 30-31.

2

did not provide a Standard Questions Appendix or Income Tax Appendix response.[8]  In a
supplemental questionnaire, we requested that the GOT coordinate with the respondent
companies to determine whether either used the BITT program during the POR.[9]  The GOT
replied that due to tax secrecy provisions in Türkiye, we should obtain information regarding
program non-use directly for the respondent companies' records.[10]

In its Section III Response, Kaptan reported that it had benefited from the BITT program
during the POR.[11]  Colakoglu also reported receiving a benefit from the program in its initial
questionnaire response.[12]  In a supplemental questionnaire, we requested that Kaptan confirm its
reporting of benefits received under this program by providing additional documentation.[13]
Kaptan replied by providing sample bank statements confirming amounts reported for several
BITT transactions during the POR.  It also explained that it "identified the transactions for which
BITT was exempted," and had accurately calculated the program benefit by taking the "amount
exempted for each transaction by multiplying the amount of the transaction times the appropriate
percentage."[14]

On September 28, 2023, Commerce released the verification agenda to Kaptan in which
we explained that we intended to verify its reporting of the BITT program.[15]  The agenda
explained the verifiers intended to:  (1) discuss the program and its eligibility criteria; (2)

---

[8] *Id.*
[9] *See* Commerce's Letter, "Second Supplemental Questionnaire," dated September 18, 2023.
[10] *See* GOT's Letter, "Response of the Government of Türkiye to the Second Supplemental Questionnaire," dated October 2, 202,3 at 12-13.
[11] *See* Kaptan's IQR at 50-55 and Exhibit 30.
[12] *See* Colakoglu's IQR at 54-57 and Exhibit 19.
[13] *See* Commerce's Letter, "Second Supplemental Questionnaire," dated August 2, 2023, at 3.
[14] *See* Kaptan's Letter, "Second Supplemental Questionnaire Response," dated August 18, 2023, at 6-7 (citing to Exhibit 30 of the Section III Response) and Exhibit 9.
[15] *See* Commerce's Letter, "Verification of Kaptan Demir Celik Endustrisi ve Ticaret A.S.'s Questionnaire Responses Submitted in the Countervailing Duty Administrative Review of Steel Concrete Reinforcing Bar from Turkey," dated September 28, 2023 (Kaptan's Verification Agenda), at 7.

examine source documents, including those demonstrating the amount of benefit received; (3) review how the company records benefit in its accounting system; and (4) examine accounts to confirm that all benefits received under the program were reported.[16]  At verification, we discovered that Kaptan had not reported "numerous arbitrage transactions" for which it had received BITT exemptions during the POR.[17]  Further, we explained in Kaptan's Verification Report that company officials had attempted again later during verification to provide the arbitrage transactions discovered at verification as new information to Commerce officials.[18]  In response, we explained that we could not take this information as it was new information discovered at verification, not previously reported.[19]

We issued the *Preliminary Results* of the administrative review on November 30, 2023, and preliminarily found the BITT program to be *de jure* specific because it is limited to firms that conduct certain types of foreign exchange transactions that were exempted by Law 6802 (Article 33) (The Expenditure Expenses Law).[20]  The GOT had previously reported that the specific transactions and sales that qualify for a BITT exemption include:  (1) foreign exchange transactions among and between banks and authorized institutions; (2) foreign currency sales to the Ministry of Treasury and Finance; (3) foreign currency sales, by the lending local bank or the local bank that intermediates the loan, to the parties for repayment of their foreign currency-denominated loans; (4) foreign exchange sales to enterprises having an industrial registry certificate; and (5) foreign currency sales to export companies which are members of an

---

[16] *Id*.
[17] *See* Memorandum, "Verification of the Questionnaire Responses of Kaptan Demir Celik Endustrisi ve Ticaret A.S.:  Countervailing Duty Administrative Review of Steel concrete Reinforcing Bar from Turkey," dated November 2, 2023 (Kaptan's Verification Report), at 7.
[18] *Id*.
[19] *Id*.
[20] *See Steel Concrete Reinforcing Bar from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review and Rescission of Administrative Review, in Part; 2021*, 88 FR 85234 (December 7, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 14.

exporters' associations.[21]  Further, we explained that we were applying AFA to Kaptan's reporting of benefit under this program because we discovered at verification that it had failed to report all benefits received under this program during the POR.[22]

Interested parties commented on Commerce's *de jure* specificity finding on the BITT program in their case and rebuttal briefs.  In its case brief, Colakoglu argued that the BITT exemption is available to any company with an industrial registry certificate or that is a member of an exporter association.[23]  It explained that all manufacturing companies must have an industrial registry certificate.[24]  As such, the exemptions cannot be specific since they are widely available.[25]  Kaptan raised the same arguments in its case brief.[26]  It claimed that BITT exemptions are widely available throughout the Turkish economy and that exporters and manufacturers (other than handicraft and domestic crafts and small repair shops) all qualify for exemptions by being part of an exporter association or having an industrial registry certificate.[27]  Kaptan also claimed that Commerce had improperly applied AFA to its reporting of benefits under the BITT program.[28]  In its case brief, Kaptan claimed:  (1) the additional arbitrage transactions discovered at verification were subject to a 0 percent BITT rate during the POR – meaning there was no benefit; (2) verifiers were required to verify the newly discovered arbitrage transactions and accept all documents regarding them; (3) Commerce must afford

---

[21] *See Preliminary Results* PDM at 14 (citing to *Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind in Part; 2020,* 87 FR 73750 (December 1, 2022) (*Rebar from Türkiye 2020 AR Preliminary Results*), and accompanying PDM at 11, unchanged in *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2020,* 88 FR 34129 (May 26, 2023) (*Rebar from Türkiye 2020 AR Final Results*), and accompanying IDM at 5).
[22] *Id*. at 9.
[23] *See* Colakoglu's Letter, "Case Brief," dated January 8, 2024, at 1-2.
[24] *Id*.
[25] *Id*.
[26] *See* Kaptan's Letter, "Case Brief," dated January 8, 2024 (Kaptan's Case Brief), at 24-33.
[27] *Id*.
[28] *Id*. at 33-40.

Kaptan an opportunity to remedy or explain a deficiency; and (4) Commerce should apply a lower AFA rate using facts available without an adverse inference because Commerce interpreted the law as applying BITT exemptions to arbitrage transactions.[29]

The Rebar Trade Action Coalition (RTAC or the petitioner) in its rebuttal brief stated that Commerce should continue to find the program *de jure* specific because the universe of companies that may benefit from the program is limited to those engaging in foreign currency transactions.[30]  Further, the petitioner contended that just because all companies may obtain an industrial registry certificate does not demonstrate that all eligible enterprises applied for one.[31] According to the petitioner, Commerce properly applied AFA to Kaptan's reporting of benefit under the BITT program because it found at verification that Kaptan had failed to correctly report benefit, which significantly impeded the proceeding and created a gap in the record.[32]  The petitioner also cited to a CIT decision where the Court explained that the requirement under section 782(d) of the Tariff Act of 1930, as amended (the Act), is inapplicable at verification and that "verification is not the opportunity for a do-over…"[33]

In the *Final Results*, Commerce continued to find the BITT program to be *de jure* specific under section 771(5A)(D)(i) of the Act because we found that it applied to a limited number of companies that make foreign exchange transactions.[34]  On that basis, we continued to apply an AFA rate of 0.89 percent due to Kaptan's failure to accurately report the benefits received under the BITT program.  We further explained that because Kaptan did not provide complete or accurate information and because verification is not an opportunity to submit new

---

[29] *Id*.
[30] *See* RTAC's Letter, "Rebuttal Brief," dated January 18, 2024 (RTAC's Rebuttal Brief), at 18-19.
[31] *Id*. at 19-21.
[32] *Id*. at 22-28.
[33] *See* RTAC's Rebuttal Brief at 25-26 (citing *Hung Vuong Corp. v. United States*, 483 F.Supp.3d 1321, 1349 (CIT 2020) ).
[34] *See Final Results* IDM at Comment 3.

factual information (NFI), that Commerce appropriately applied facts available to this program because necessary information was not on the record, that Kaptan withheld information requested of it, and provided information that could not be verified.[35]  Further, Commerce appropriately found that Kaptan failed to act to the best of its ability because it did not provide information that was complete, accurate, and verifiable, and that therefore an adverse inference in applying facts otherwise available was warranted.[36]

Following the Court's *Remand Order*, on January 13, 2026 we issued a supplemental questionnaire to the GOT requesting further information regarding the BITT program, to which we received a timely response.[37]  Subsequently, we issued a second supplemental questionnaire to the GOT on January 26, 2026.[38]  The GOT provided a timely response to this supplemental questionnaire on February 2, 2026.[39]

Regarding the appropriate benchmark for the land for LTAR, under Law 5084, on July 20, 2023, the petitioner and Kaptan timely filed factual information to measure the adequacy of remuneration under 19 CFR 351.511(a)(2).[40]  The petitioner provided a report from Collier's International (Collier's Report), which covered the second half of the POR and contained lease rates for industrial land in Türkiye.[41]  Kaptan provided a report from Cushman & Wakefield (C&W Report) that contained rental rates for land located in areas similar to where Nur

---

[35] *Id.* at Comment 4; and section 776(a) of the Act.
[36] *Id.* at Comment 4; section 776(b) of the Act; and *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).
[37] *See* Commerce's Letter, "Supplemental Questionnaire," dated January 13, 2026 (*De Facto* Supplemental Questionnaire); and GOT's Letter, "Response of the GOT to Supplemental Questionnaire," dated January 20, 2026 (Response to *De Facto* Supplemental Questionnaire).
[38] *See* Commerce's Letter, "Second Supplemental Questionnaire," dated January 26, 2026 (Second *De Facto* Supplemental Questionnaire).
[39] *See* GOT's Letter, "Response of the GOT to Second Supplemental Questionnaire," dated February 2, 2026 (Second Response to *De Facto* Supplemental Questionnaire).
[40] *See* RTAC's Letter, "Submission of Benchmark Information," dated July 20, 2023 (RTAC's Benchmark Submission); and Kaptan's Letter, "Benchmark Submission," dated July 20, 2023 (Kaptan's Benchmark Submission).
[41] *See* RTAC's Benchmark Submission.

Gemicilik A.S. (Nur), Kaptan's cross-owned affiliate, acquired rent free land for 49 years under this LTAR program.[42]  Kaptan also provided public information (*i.e.*, gross domestic product (GDP) per capita information, screenshots four prices for parcels of land in Türkiye, and a copy of the Royal Institution of Chartered Surveyor's Valuation Standards – which were adhered to in compiling the C&W report) as support for the figures in the C&W report.[43]

Kaptan and the petitioner submitted timely rebuttal benchmark comments on July 31 and August 18, 2023, respectively.[44]  In its comments, Kaptan provided information to substantiate that the C&W report contained data more economically comparable to the land Nur acquired.[45]  In comparison, the petitioner provided information (*e.g.*, population growth figures and economic data) to justify the selection of the Colliers report.[46]

On November 2, 2023, Commerce verified Kaptan's reporting of Nur's land for LTAR.[47]  In the *Preliminary Results*, we explained that in 2014 Nur entered into a lease and investment agreement with the local government in the Surmene district to use a state-controlled area of land free of rent.[48]  We determined to use the Collier's report as the benchmark to value Nur's rent-free land.[49]  Further, we explained that, consistent with the prior administrative review, we

---

[42] *See* Kaptan's Benchmark Submission.  Kaptan also provided a second C&W Report that contained rental rates for land located in areas similar to where Martas Marmara Ereglisi Liman Tesisleri A.S. (Martas), Kaptan's cross-owned affiliate, acquired land under a 49-year lease.  However, we determined not to countervail this land based on a review of Kaptan's IQR.  As such, this land acquisition and corresponding benchmark are not at issue in this remand.
[43] *Id*. at Exhibits 3 and 4.
[44] *See* Kaptan's Letter, "Benchmark Rebuttal," dated July 31, 2023 (Kaptan's Rebuttal Benchmark Comments); and RTAC's Letter, "Resubmission of Rebuttal Comments and Benchmark Information," dated August 18, 2023 (RTAC's Rebuttal Benchmark Comments).
[45] *See* Kaptan's Rebuttal Benchmark Comments at 1-3 and Exhibits 1, 2, and 3.
[46] *See* RTAC's Rebuttal Benchmark Comments at Attachments 1-9.
[47] *See* Kaptan's Verification Report at 6.
[48] *See Preliminary Results* PDM at 16.
[49] *Id*.

calculated a land benchmark to only include Colliers report rental prices from Cerkezkoy, Tekirdag.[50]

In its case brief, Kaptan argued that Commerce erred in relying on the Colliers report for several reasons. These included: (1) the Colliers report disclaimed liability and did not identify the underlying data; (2) the Collier's report only related to improved industrial and logistics properties around Istanbul; and, (3) Commerce ignored the benchmark provided by Kaptan, which contained rates for industrial leases in the same province where Nur acquired land.[51] In its rebuttal brief, the petitioner argued that Commerce should continue to use the Collier's report because Commerce found the Colliers report reliable in the three previous reviews; (2) the Colliers report is based on actual transactions between private parties; (3) Commerce reviewed the data to make sure Cerkezkoy, Tekirdag, and Surmene, Trabzon had similar population densities; (4) the Collier's report was based on data compiled directly by Collier's; (5) the C&W report does not include prices for industrial land; (6) Kaptan incorrectly claimed the CIT recognized that land prices near Istanbul are inappropriate for use a benchmarks for less developed areas; and, (7) the C&W report was commissioned for the purposes of the administrative review and contained certain government set prices.[52]

In the *Final Results*, Commerce determined that the Colliers report constituted the best benchmark on the record, pursuant to 19 CFR 351.511. We explained that Kaptan's arguments regarding the reliability and usability of the Colliers report were not persuasive. Specifically, we stated that disclaimer of liability does not disqualify the report but strengthens it because the data

---

[50] *See Preliminary Results* PDM at 16 (citing *Rebar from Türkiye 2020 AR Preliminary Results* PDM at 14, unchanged in *Rebar from Türkiye 2020 AR Final Results*).
[51] *See* Kaptan's Case Brief at 8-24.
[52] *See* RTAC's Rebuttal Brief at 31-37.

is compiled directly by Colliers rather than secondary sources.[53]  Further, Colliers described the scope of the industrial market and information examined in compiling the report.[54]  Commerce also analyzed and found that its evaluation of population density demonstrated that the land in the Colliers report was comparable to the land Nur acquired in Trabzon.[55]

Regarding the C&W report, Commerce determined in the *Final Results* that the data provided did not constitute a useable benchmark.  First, the C&W report was business proprietary in its entirety.[56]  In addition, Commerce explained that it previously avoided utilizing reports which were commissioned explicitly for the purpose of a review and its associated litigation due to the "risk of litigation-inspired fabrication or exaggeration" as determined in *Softwood Lumber from Canada Investigation*.[57]  We also noted that the C&W report was based partly on non-private data and Kaptan's own data, which would diminish the veracity of the data used in compiling the C&W report.[58]  Considering the above factors, Commerce upheld its decision in the preliminary results to continued utilizing the Collier report.[59]  On this basis, for this program, we calculated a net subsidy rate of 0.74 percent *ad valorem* for Kaptan in the *Final Results*.

Following the publication of the *Remand Order*, on January 26, 2026, Commerce invited Kaptan to submit the C&W report as a public document on the record of this remand, should it

---

[53] *See Final Results* IDM at 10.
[54] *Id*.
[55] *Id*.
[56] *Id*. at 11.
[57] *See Final Results* IDM at 11-12 (citing *Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber from Canada Investigation*), and accompanying IDM at 82 (citing *Sandt Tech. v. Resco Metal & Plastics Cor.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001) (*Sandt Tech*) (quotations omitted); *see also Coated Free Sheet Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007) (*Coated Free Sheet from Indonesia*), and accompanying IDM at Comment 12).
[58] *See Final Results* IDM. at 11-12.
[59] *Id*. at 12.

choose to do so.[60]  On January 30, 2026, Kaptan filed a different version of the C&W report as a public document on the record of this proceeding, which Commerce rejected. [61]  On February 5, 2026, Kaptan resubmitted the correct benchmark publicly.[62]

Regarding Turkish Law 27256, Kaptan did not report benefiting from this program in its initial questionnaire response.[63]  Instead, while Commerce was conducting verification in Türkiye,[64] on October 12, 2023, Kaptan disclosed, for the first time, that it had benefitted from three additional subsidy programs during the POR, including Social Security Support under Law 4447 and Turkish Law 27256.[65]  Commerce rejected this NFI because it did not directly rebut factual information provided by another party and the deadline to submit NFI had passed on October 3, 2023.[66]

Kaptan attempted to provide information regarding Social Security Support under Law 4447 and Turkish Law 27256 a second time during verification.  Specifically, while discussing other grant programs originally reported in its initial questionnaire response, company officials attempted to provide benefit information for Kaptan and its cross-owned affiliates (*i.e.*, Martas Marmara Ereglisi Liman, Nur Gemicilik, and Kaptan Geri Dönüşüm Teknolojileri).[67]  Further,

---

[60] *See* Commerce's Letter, "Provision of Cushman & Wakefield Benchmark," dated January 26, 2026.
[61] *See* Commerce's Letter, "Rejection of New Factual Information in Benchmark Resubmission as a Public Filing," dated February 4, 2026; and Kaptan's Letter, "Provision of Cushman & Wakefield Benchmark," dated February 5, 2026 (Kaptan's Public Benchmark Submission), at Exhibit 1.
[62] *See* Kaptan's Public Benchmark Submission Exhibit 1.
[63] *See generally* Kaptan's IQR.
[64] *See* Memorandum, "Verification of Questionnaire Responses of the Government of Turkey," dated November 2, 2023; Memorandum, "Verification of the Questionnaire Responses of Colakoglu Metalurji A.S.," dated November 3, 2023; and Kaptan's Verification Report (explaining that Commerce officials conducted verification of the Government of Türkiye on October 10 and 11, 2023; Colakoglu on October 12-13, and 16; and Kaptan on October 17-20, 2023).
[65] *See* Commerce's Letter, "Rejection of Untimely New Factual Information on October 12, 2023, Filing," dated October 16, 2023 (Rejection Letter).
[66] *Id*.
[67] *See* Kaptan's Verification Report at 9-10.

we reiterated that Turkish Law 27256 had not been listed as a program in the verification outline, because it had not been reported prior to October 12, 2023.[68]

In the *Preliminary Results*, we explained that Commerce could not consider information provided on October 12, 2023 regarding Social Security Support under Law 4447 and Turkish Law 27256, when such information should have been provided five months earlier in Kaptan's IQR.[69] In addition, we noted that Kaptan had again attempted to provide information regarding this program at verification, but Commerce could not review this information because Kaptan had failed to report it in response to our initial questionnaire questions.[70]

In its case brief, Kaptan claimed that Commerce: (1) improperly rejected Kaptan's October 12, 2023, letter; (2) refused to accept information provided at verification; (3) failed to notify Kaptan of a reporting deficiency; (4) may not apply AFA to Law 27256 because there is no record evidence identifying that Kaptan benefitted from the program; and (5) failed to evaluate whether Kaptan cooperated to the best of its ability, and thus cannot apply AFA to Law 27256.[71] In its rebuttal brief, the petitioner argued that Commerce: (1) correctly rejected Kaptan's October 12, 2023 filing because it contained untimely filed NFI; (2) had no obligation to accept untimely filed NFI just because it was provided before the preliminary determination deadline; (3) appropriately applied AFA to Law 27256 because the record established Kaptan failed to report this program in the Rejection Letter and in Kaptan's Verification Report; and (4) selected an AFA rate for Law 27256 in accordance with law.[72]

---

[68] *Id*.
[69] *See Preliminary Results* PDM at 7-8.
[70] *Id*. at 7-8.
[71] *See* Kaptan's Case Brief at 46-50.
[72] *See* RTAC's Rebuttal Brief at 12-18.

In the *Final Results*, we determined the record demonstrates that Kaptan used Law 27256 during the POR and that the program is countervailable, based on the application of AFA. Specifically, we explained that the Rejection Letter and Kaptan's Verification Report each established that Kaptan benefited from this program.[73]  Regarding the application of AFA, we rejected Kaptan's argument that its October 12, 2023 submission only contained information to clarify the GOT questionnaire response.[74]  As explained in the Rejection Letter, the information provided about Law 27256 did not rebut, clarify, or correct anything in the GOT's questionnaire response.  Instead, it provided untimely NFI that Kaptan had failed to disclose in its initial questionnaire response.[75]  Further, we explained that Commerce had conducted a separate analysis before resorting to applying AFA to this program, and that we had selected an AFA rate pursuant to our established practice.[76]  On this basis, we assigned a rate, based on AFA, of 1.81 percent *ad valorem* to Kaptan.

## III.     REMAND OPINION AND ORDER

In the *Remand Order*, the Court ordered Commerce to reconsider or further explain its determinations:  (1) that the BITT tax exemption is specific as a matter of law, (2) to use the Colliers report to calculate a benchmark for the Nur rent-free lease without adequately addressing Kaptan's critiques of the report, and (3) to apply AFA to determine Kaptan's subsidy benefit under Turkish Law 27256.  As ordered, we addressed each of the specific circumstances outlined by the Court for each of these issues.  Regarding the BITT program, our analysis below supports finding that the program is export specific, and thus countervailable.  For the land benchmark, Commerce has considered Kaptan's arguments and continues to find it appropriate

---

[73] *See Final Results* IDM at 20-21.
[74] *Id*. at 22-23.
[75] *Id*.
[76] *Id*.

to use the Colliers report as the benchmark for land for LTAR.  With respect to Law 27256, we have further explained why it is appropriate to apply AFA available to calculate the program benefit for Kaptan.

## IV.     ANALYSIS

### A.  Specificity of the BITT Program

In the *Final Results*, we determined that the BITT program was *de jure* specific pursuant to section 771(5A)(D)(i) of the Act because the GOT, via legislation, limits access to the program to a cross-section of companies that fulfill one of the five requirements and make foreign exchange transactions.[77]  In the *Remand Order*, the Court explained that Commerce's *de jure* specificity analysis is not supported by substantial evidence if it rests only on factors that are unrelated to the construal of law of the foreign jurisdiction, and that Commerce failed to make an adequate finding that Turkish law "expressly limits access to {the BITT exemption} to an enterprise or industry."[78]  Further, the Court explained that it remanded Commerce on this same issue in the *Rebar from Türkiye 2020 AR Final Results* and that Commerce failed to proffer any facts that would distinguish the present administrative review.[79]  On this basis, the Court remanded Commerce to consider whether the record supported a *de facto* specificity determination under section 771(5A)(D)(iii) of the Act or, alternatively, to further explain why the BITT program is *de jure* specific.[80]  We revisited our specificity analysis of the BITT

---

[77] *See Final Results* IDM at 13.

[78] *See Remand Order* at 15-16, citing section 771(5A)(D)(iii) of the Act.

[79] *See Remand Order* at 16 (citing *Kaptan Demir Celik Endustrisi v. Ticaret A.S. v. United States*, 736 F.Supp. 1318 (CIT 2024) (*Kaptan III*).  Under protest, Commerce subsequently determined in the remand redetermination of *Kaptan III* that the BITT program was not specific.  *See Final Results of Redetermination Pursuant to Court Remand, Kaptan Demir Celik Endustrisi ve Ticaret A.S., et al. v. United States*, Court No. 23-00131; Slip Op. 24-116, dated January 21, 2025 (*2020 Remand Redetermination*) available at https://access.trade.gov/public/FinalRemandRedetermination.aspx.  This analysis was sustained in *Kaptan Demir Celik Endustrisi v. Ticaret A.S. v. United States*, Court No. 23-00131, Slip Op. 25-130 (CIT October 6, 2025) (*Kaptan IV*).

[80] *Id*. at 17-18.

program, and we find that the BITT program is export specific.  Thus, we continue to find the program countervailable.

Pursuant to sections 771(5A)(A) and (B) of the Act, a subsidy is specific if it is an export subsidy, in law or in fact, that is contingent upon export performance, alone or as one of two or more conditions.  Further, with respect to specificity under section 771(5A)(D) of the Act, the analysis of a domestic subsidy is to be based on the jurisdiction of the authority providing the subsidy.  This jurisdictional criterion is not an issue regarding finding a subsidy export specific, pursuant to sections 771(5A)(A) and (B) of the Act.  As such, we have re-examined whether the BITT program is export specific, below.

For BITT, under the Expenditure Expenses Law, one of the criteria is that transactions and sales exempted from BITT include foreign currency sales to export companies that are members of exporters' associations.[81]  Therefore, consistent with *Large Diameter Welded Pipe from Türkiye* and *Common Alloy Aluminum Sheet from Türkiye*,[82] we re-examined the eligibility criteria for receipt of assistance under this program and note that criterion (5) identifies foreign exchange sales to exporters which are members of Exporters' Associations as covered transactions subject to a zero percent BITT rate.[83]  Accordingly, we find that the BITT program is export specific, in accordance with sections 771(5A)(A) and (B) of the Act, because it applies to foreign exchange sales to exporters which are members of Exporters' Associations.

---

[81] *See Final Results* IDM at 13.
[82] *See Large Diameter Welded Pipe from the Republic of Türkiye:  Preliminary Results and Rescission, in Part, of Countervailing Duty Administrative Review; 2023*, 90 FR 44019 (September 11, 2025) (*Large Diameter Welded Pipe from Türkiye*), and accompanying PDM at 12-13; *see also Common Alloy Aluminum Sheet from the Republic of Türkiye:  Preliminary Results of the Countervailing Duty Administrative Review; 2023*, 90 FR 38453 (August 8, 2025) (*Common Alloy Aluminum Sheet from Türkiye*), and accompanying PDM; and subsequent Memorandum, "Post-Preliminary Analysis for the Countervailing Duty Administrative Review of Common Alloy Aluminum Sheet from the Republic of Türkiye; 2023," dated January 16, 2026 at 4-5 (available under ACCESS Barcode 4867318-01).
[83] *See Final Results* IDM at Comment 3 (citing to *Preliminary Results* IDM at 14-15).

As part of this remand, Commerce also issued supplemental questionnaires regarding *de facto* specificity to the GOT and received timely questionnaire responses.[84]  After a review of the information available on this record regarding the BITT program, Commerce finds that the program is export specific, pursuant to sections 771(5A)(A) and (B) of the Act.

### B.  Benchmark for the Provision of Land

Pursuant to the Court's order, we reconsidered the record of this review to evaluate the Colliers report and the benchmarks at issue, incorporating Kaptan's furnishing of the C&W report as a public document.[85]  However, we made no changes to our determination from the *Final Results*, as discussed below.

As noted above, the Court directed Commerce to "fully address the arguments presented by Kaptan regarding possible deficiencies in the Colliers report."[86]  Kaptan has indicated:  (1) the Colliers report is unusable because it is not for comparable land while the C&W report is for comparable land, (2) the C&W benchmark was created to international standards, (3) the C&W report reflects actual transactions while the Colliers report is unreliable because Colliers does not provide or describe its sources, (4) that the C&W report included a monetary penalty if it was inaccurate while the Colliers report included a disclaimer, (5) that no *per se* rule exists to disqualify the C&W report, and (6) that the C&W report is sufficiently public.[87]  As an initial matter, we note that the C&W report is now provided as a public document,[88] and, consequently, the business proprietary element of the benchmark on the record of the underlying review is now

---

[84] *See De Facto* Supplemental Questionnaire; *see also* Response to *De Facto* Supplemental Questionnaire; Second *De Facto* Supplemental Questionnaire; and Second Response to *De Facto* Supplemental Questionnaire.
[85] *See* Kaptan's Public Benchmark Submission.
[86] *See Remand Order* at 24.
[87] *See* Kaptan's Case Brief at 10-23.
[88] *See* Kaptan's Public Benchmark Submission.

moot.  However, we address all other arguments related to the Colliers report below pursuant to the Court's *Remand Order*.

In general, we find that the Colliers report on the record of this review is broadly analogous to the Colliers report previously analyzed in the 2020 Remand Redetermination,[89] and, consistent with similar analysis sustained by the Court in *Kaptan IV*,[90] we find that the Colliers report on this record is usable as a benchmark for Nur's rent-free land.  In addition, we find that the C&W report submitted on the record of this review contains multiple flaws that are similar to those identified in the C&W report in the 2020 Remand Redetermination,[91] including that the C&W report is not as contemporaneous as the Colliers report.  Consequently, consistent with the analysis sustained by the Court in *Kaptan IV*,[92] we continue to find it to be inappropriate to incorporate the C&W report as a benchmark in this redetermination pursuant to remand.

Regarding the initial concern raised by Kaptan regarding comparability, we further reviewed the Colliers report benchmark.  As discussed in the 2020 Remand Redetermination,[93] pursuant to 19 CFR 351.511(a)(2)(i), Commerce selects a "market-determined price for the good or service resulting from actual transactions in the country in question."  Ideally, assuming the market is not distorted and there are no other issues, Commerce would seek to use a respondent's own private purchases of the same good in question.  For example, in *Softwood Lumber from Canada 2021 AR*, Commerce used a respondent's own purchases of stumpage from private sources over survey data that it otherwise used for other respondents.[94]  Even within this context,

---

[89] *See* 2020 Remand Redetermination.
[90] *See Kaptan Demir Celik Endustrisi v. Ticaret A.S. v. United States*, Court No. 23-00131, Slip Op. 25-130 (CIT October 6, 2025) (*Kaptan IV*).
[91] *See* 2020 Remand Redetermination.
[92] *See Kaptan IV*.
[93] *Id*. at 14-15.
[94] *See Certain Softwood Lumber Products from Canada:  Final Results and Final Rescission, in Part, of the Countervailing Duty Administrative Review; 2021*, 88 FR 50103 (August 1, 2023) (*Softwood Lumber from Canada 2021 AR*), and accompanying IDM at Comments 8 (using the 2017-2018 Private Market Survey for other

we may select, average, or otherwise adapt data within a respondent's own purchases if we deem the comparison preferable.[95]  Thus, in this instance, Commerce would ideally use the purchases of land by Kaptan and its affiliates and, even within that context, Commerce might use only a specific portion of the purchased land transactions if record evidence indicated that the comparison with a limited subset of transactions would be more applicable.

Regarding the Colliers report on the record of this review, we find that it contains:  a cover page indicating that the data is for the second half of 2021,[96] a general discussion and forecast of Türkiye's economic outlook;[97] broad economic indicators for Türkiye;[98] narrative descriptions and analysis of the office, industrial, retail, residential, and hotel real estate markets within the greater Istanbul area;[99] rent, vacancy, and related statistics sourced by either Colliers International's own work or other identified entities for the greater Istanbul area in the various types of markets;[100] closing page with a legal disclaimer,[101] and two pages of access information with contacts for Colliers.[102]  The relevant portion for the benchmark is the "Greater Istanbul Area Industrial Market," which provides rental data in the second and fourth quarters of 2021 for

---

respondents) and 15 (using a respondent's own purchases over the 2017-2018 Private Market Survey); *see also Citric Acid and Certain Citrate Salts:  Final Results of Countervailing Duty Administrative Review; 2012*, 79 FR 78799 (December 31, 2014), and accompanying IDM at Comment 11.  "Under 19 CFR 351.511(a)(2)(iv), when measuring the adequacy of remuneration under tier two, {Commerce}will adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, including delivery charges and import duties. This means that, whenever possible, it is {Commerce's} preference to use a respondent's own purchase information.").

[95] *See Truck and Bus Tires from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review in Part, 2022*, 89 FR 10034 (February 13, 2024), and accompanying PDM at 34-35 (dividing a respondent's private purchases of synthetic rubber into various different grades for comparison to similar grades purchased from government sources), unchanged in *Truck and Bus Tires from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2022*, 89 FR 42450 (May 15, 2024).

[96] *See* Petitioner's Benchmark Submission Exhibit 1 at 1.

[97] *Id*. at 2.

[98] *Id*. at 3.

[99] *Id*. at 4-5, 8-9, 11-12, 14-15, and 17-19.

[100] *Id*. at 6-7, 10, 12-13, 15-16, and 18-19.

[101] *Id*. at 20.

[102] *Id*. at 21-22.

three provinces of Türkiye (Istanbul, Tekirdağ, and Kocaeli) divided into eight areas (Dudullu, Tuzla, Silivri, Esenyurt- Kiraç, Gebze, Dilovasi, Çerkezköy, and Çorlu).[103]  The Colliers report does not contain an explanation of how other provinces are affected by the Istanbul market, or, relatedly, a quantification of how various factors, such as GDP, distance from the center of Istanbul, or level of development of the property, affect rental rates.[104]  We note that this summary is nearly identical to the Colliers report as described in the *2020 Remand Redetermination*.[105]

In addition, there is no information on the record that indicates that the Colliers report is not comparable to Kaptan's Trabzon land purchases.  While Kaptan argued in the underlying administrative proceeding that the "per-capita GDP of the areas included in Petitioner's benchmark submission are disqualifying when compared to the per-capita GDP of Trabzon,"[106] there is no record evidence for this claim (*e.g.*, a comparison of rent across all provinces with their corresponding GDPs) that indicates that rent is strictly correlated with GDP in a one-to-one fashion.  Rather, there is only information regarding each province's respective GDPs.[107]  Thus, while we agree that GDP is a factor that affects comparability, there is no evidence of a strict, quantifiable link between a province's GDP and its industrial rent that would indicate a difference sufficient to be "disqualifying."

Similarly, Kaptan raises concerns over the level of development of the land, the levels of competition and market size, and the physical distance between Trabzon and Istanbul,[108] but Kaptan provides no record information to quantify the proportional effect of these concerns.  For

---

[103] *Id*. at 10.
[104] *Id*. at 1-19.
[105] *See 2020 Remand Redetermination* at 15-16.
[106] *See* Kaptan's Case Brief at 11.
[107] *See* Kaptan's Rebuttal Benchmark Submission at Exhibit 1.
[108] *See* Kaptan's Case Brief at 13.

example, there is no evidence that Istanbul being located some 1,000 kilometers (km) from

Trabzon means that it is proportionally any less representative than land 500 km or 100 km from

Trabzon.  Furthermore, the Colliers report meets the standard of 19 CFR 351.511(a)(2)(i)

because it contains actual prices from the private market in Türkiye based upon Colliers

International's market research.  Similar logic is likewise applicable to Kaptan's arguments

regarding population, level of development, or status as a logistics hub.[109]

As noted above, we further analyzed the C&W report and Colliers report for

contemporaneity consistent with the analysis in the *2020 Remand Redetermination*.[110]  Under

section 771(5)(E)(iv) of the Act, when considering benchmarks for goods or services provided

for LTAR, Commerce is instructed to consider the prevailing market conditions for the goods

being purchased or services being provided in the country subject to the investigation or review.

As such, Commerce views contemporaneity as a key factor in evaluating the prevailing market

conditions.[111]  Regarding land benchmarks, Commerce has explained to the Court that when

considering contemporaneity, the relevant period to consider is the year or years in which the

respondent purchased land use rights, rather than the POR.[112]

In this review, Nur acquired its land use rights in 2014.  With regard to the C&W report

land valuation data, we find that while the report was carried out for 2021 (*i.e.*, the POR), a

substantial portion of the data relied on is from 2022.[113]  Specifically, in "Section E. Valuation"

of the C&W report, the comparable list of rental land includes transactions from 2022; the data

---

[109] *Id*. at 12-14.
[110] *See 2020 Remand Redetermination* at 18-19.
[111] *See, e.g.*, *Brass Rod from Israel:  Final Affirmative Countervailing Duty Determination*, 89 FR 63410 (August 5, 2024) (*Brass Rod from Israel*), and accompanying IDM at Comment 1.
[112] *See Jiangsu Zhongji Lamination Materials Co., Ltd.; Jiangsu Zhongji Lamination Materials Co., (HK) Ltd.; Shantou Wanshun Package Material Stock Co., Ltd.; Jiangsu Huafeng Aluminum Industry Co., Ltd.; Anhui Maximum Aluminum Industries Company Limited v. United States*, Court No. 21-00133, Slip Op. 24-128 (CIT November 22, 2024) (*Zhongji*) at 13.
[113] *See* Kaptan's Benchmark Submission at Section E. Valuation.

are then adjusted (*i.e.*, "{i}n order to find the equivalent price for 2020 and 2021, we made a calculation using annual inflation rate of 2020 and 2021") to calculate an "estimated average unit price."[114]  In comparison, the Colliers report data are from the second half of the POR,[115] and, consequently, the Colliers report is more contemporaneous with Nur's 2014 land use rights acquisition than the C&W report.  Therefore, consistent with case precedent,[116] we find that the Colliers report constitutes a stronger benchmark than the C&W report for this factor because it more accurately reflects prevailing market conditions at the time of the provision of the land at issue.

We further note that 19 CFR 351.525(a)(2)(i), while directing Commerce to consider issues affecting comparability, does not provide a prescribed list of factors or require Commerce to disavow a benchmark past a certain threshold of development, population, or other related factors.  Rather, Commerce evaluates benchmarks on a record-specific basis.  If provided other benchmarks, Commerce might consider a variety of factors in either selecting a different benchmark or choosing to average benchmarks,[117] including GDP, level of development, levels of competition, market size, or physical distance.  In the instant remand, however, there is no evidence on the record for many of these factors indicating how they might impact rental prices.

As stated above, we would prefer to use a benchmark based upon Kaptan's own private purchases, and we would rely on such purchases, or a subset of those purchases, if they were on the record.  However, such information is not available, including the Colliers report or C&W

---

[114] *Id.*
[115] *See* Petitioner's Benchmark Submission at Exhibit 1.
[116] *See, e.g.*, *Zhongji* at 11 (citing *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 76 FR 18521 (April 4, 2021), and accompanying IDM at Comment 24).
[117] *See Özdemir Boru San. ve Tic. Ltd. Sti v. United States,* Court No. 16-00206, Slip Op. 18-6 (CIT February 1, 2018) (*Özdemir*).  Commerce notes that, in *Özdemir*, benchmark information was otherwise provided that allowed for the removal of Istanbul prices.

report.[118]  However, unlike the Colliers Report, Commerce has a preference against selecting

benchmarks like the C&W report, which was prepared for the purposes of the proceeding, as

Commerce strongly disfavors benchmarks that are created solely for the purpose of the

proceeding.[119]  As we stated in the *2021 AR Final Results*:

> In past proceedings, Commerce has declined to use benchmarks commissioned
> solely for the purposes of countervailing duty proceedings due to "the risk of
> litigation-inspired fabrication or exaggeration that may come from later-developed
> evidence, intended to corroborate the party's story."  As we explained in {*Softwood
> Lumber from Canada Investigation*}, the Federal Circuit, in evaluating whether a
> party's claim had been sufficiently corroborated with evidence in a patent case,
> opined that "contemporaneous documentary evidence provides greater
> corroborative value" in determining whether a party's litigation "story is credible."
> We continue to find that the Federal Circuit's concerns are equally applicable to
> evidence created for the purpose of an adjudicatory administrative proceeding, such
> as this one.  Although we consider all evidence on the record of a proceeding, in
> determining the weight to be accorded to a particular piece of evidence, we consider
> whether the evidence in question was prepared in the ordinary course of business,
> or for the express purpose of submission in the ongoing administrative proceeding.
> When evidence has been generated expressly for the purpose of an administrative
> proceeding, we find that said evidence is at "risk of litigation-inspired fabrication
> or exaggeration," which diminishes its weight and results in the evidence being
> unreliable.[120]

Consequently, we are disinclined to use the C&W report for the purposes of measuring

Kaptan's land grants because we continue to find it incorporates a "risk of litigation-inspired

fabrication or exaggeration"[121] that otherwise does not exist in the Colliers report.  Thus, given

the information available on the record, the Colliers report represents the best available

benchmark.  Because the Colliers report is at least produced by an independent source and

contemporaneous, we find it preferable to the C&W report.

---

[118] *See* Kaptan's Public Benchmark Submission at Exhibit 1.  Commerce further notes that the C&W report appears
to contain benchmark information in part based upon non-private purchases.
[119] *See Softwood Lumber from Canada Investigation* IDM at 99.
[120] *See Final Results* IDM at 11-12 (citing *Softwood Lumber from Canada Investigation* IDM at 82; *Sandt Tech*;
*Coated Free Sheet from Indonesia* IDM at Comment 12; and *Transweb, LLC v. 3M Innovative Properties Company*,
812 F.3d 1295, 1301-02 (Fed. Cir. 2016) (*Transweb*).
[121] *See Coated Free Sheet from Indonesia* IDM at Comment 12.

Moreover, in the underlying review, Commerce selected the most similar of the possible benchmarks in the Colliers report to account for the issue of comparability.[122]  Commerce selected Çerkezköy based off the population density, consistent with the prior review where complete information was provided.[123]  We further note that the record contains population density information for the three provinces considered (*i.e.*, Istanbul, Kocaeli, and Tekirdag) and that information indicates that Tekirdag has the lowest population density.[124]  Thus, in considering both our prior determinations and record evidence, we find it reasonable to continue to select Çerkezköy as the benchmark because it is the most comparable portion of the Colliers report in terms of population density.

Regarding Kaptan's other arguments that relate to the underlying reliability of the Colliers report *vis-à-vis* the C&W report,[125] we continue to find that Kaptan's arguments are unavailing.  In relation to the C&W report's use of international standards in compilation and use of actual transactions as compared to the Colliers report's unknown standards, we continue to find that the Colliers report represents original research (*i.e.*, data compiled by Colliers International itself) regarding land market prices (*i.e.*, an average of observed rents) in Türkiye in 2021, which we find preferable to the C&W report's information compiled from unknown sources.[126]  In other words, because the Colliers report represents original research with known

---

[122] *See Final Results* IDM at 11.

[123] *See Preliminary Results* PDM at 16 (citing *Rebar from Steel Concrete Reinforcing Bar from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind in Part*; *2020*, 87 FR 73750 (December 1, 2022), and accompanying PDM at 14, unchanged in *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review and Rescission, in Part; 2020*, 88 FR 34129 (May 26, 2023).

[124] *See* Petitioner's Rebuttal Benchmark Submission Attachment 6 at 1 (providing population density for Istanbul) 28 (providing population density for Kocaeli) and Attachment 8B (providing population density for Tekirdag).

[125] These include:  (1) that the C&W report was developed to international standards, (2) that the C&W report is based upon actual transactions, (3) that the C&W report includes a guarantee of accuracy, and (4) that the law does not support the disqualification of the C&W report because it was commissioned.

[126] *See* Petitioner's Benchmark Submission Exhibit 1 at 10, indicating the source as Colliers International; *see also* Kaptan's Benchmark Submission Exhibit 1 at 2, indicating unidentified sources (referencing a "most commonly

sources for the data presented in the report, rather than data from unknown sources found in the C&W report, we find the Colliers report to be preferable as a benchmark. Commerce previously stated its support for Colliers International as a source in other, non-Turkish proceedings. In *OTR Tires from India*, Commerce used land valuation reports by Colliers International, noting that the reports were generated by an "independent third {party}."[127]

We find that Kaptan's argument regarding the C&W report's guarantee of accuracy in contrast to Colliers report's liability warning is unpersuasive. The guarantee of accuracy does not resolve Commerce's concerns regarding the potential for bias as a commissioned benchmark. As Commerce addressed in the *Final Results*:

> The Colliers report provides a description of the scope of the industrial market and information examined. Additionally, the notice of liability does not pose concern, but rather strengthens the case to use the Colliers report as it proves that it does not use secondary sources or compile sets of data from other sources.[128]

In addition, in *Softwood Lumber from Canada 2021 AR*, Commerce rejected arguments that a benchmark, Washington Department of Natural Resources (WDNR) prices, should be excluded because it, among other issues, included a disclaimer.[129] Rather, Commerce continued to use the WDNR prices over another benchmark, Forest2Market (F2M) price tables, because the F2M price tables were "strongly disfavored as a source because they were created for the purposes of {*Softwood Lumber from Canada 2021 AR*} proceeding."[130]

---

[127] used website for commercial real estate transactions and well recognized real estate advisory in the region") or, more concerningly, the client (*i.e.*, Kaptan) itself.

[127] *See Certain New Pneumatic Off-the-Road Tires from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination with Final Antidumping Determination*, 81 FR 39903 (June 20, 2016) (*OTR Tires from India*), and accompanying PDM at 32. In the *Countervailing Duty Investigation of Certain New Pneumatic Off- the-Road Tires from India: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 82 FR 2946 (January 10, 2017), Commerce found the program not countervailable for reasons of specificity but did not reevaluate the benchmarks selected.

[128] *See Final Results* IDM at 10.

[129] *See Softwood Lumber from Canada 2021 AR* IDM at Comment 17.

[130] *Id*. at 99. Commerce further noted that the F2M price tables did not incorporate the underlying data used to construct the tables.

Lastly, we have not preemptively excluded or disqualified the C&W report as a benchmark based solely upon the circumstances of its creation. Rather, we have incorporated the fact that the C&W report was commissioned as one factor – albeit an important one – among multiple that were evaluated for both the C&W report and the Colliers report, including the importance and quantifiability of the geographical concerns raised by Kaptan, the contemporaneousness of the benchmark to the time Nur obtained the land, and the reliability of the sources. In reviewing all these factors, Commerce continues to find that the Colliers report, as independent, third-party research regarding applicable prices in Türkiye pursuant to 19 CFR 351.511(a)(2), is strictly preferable to the C&W report, and, consequently, we made no changes for this issue for these final results of redetermination.

### C. Application of AFA to Law 27256

In the *Final Results*, Commerce determined that application of AFA to Kaptan's reporting of Law 27256 was warranted based on the record. We explained that Kaptan first attempted to provide information about this program in its October 12, 2023 filing, rather than in response to the initial CVD questionnaire pursuant to 19 CFR 351.301(c)(5), which it submitted approximately five months earlier on May 26, 2023.[131] Further, contrary to Kaptan's claim, we found that the October 12, 2023 submission, filed pursuant to 19 CFR 351.301(c)(1)(v), failed to rebut, clarify, or correct factual information provided by the GOT.[132] Instead, we determined that Kaptan's October 12, 2023 filing meant to clarify or correct its own response, and, therefore, constituted NFI within the meaning of 19 CFR 351.102(b)(21)(v).[133] We explained the deadline to provide such information under 19 CFR 351.301(c)(5) was "30 days before the scheduled date

---

[131] *See Final Results* IDM at Comments 6 and 7; *see also* Kaptan's IQR.
[132] *See Final Results* IDM at Comment 7.
[133] *Id*.

of the preliminary results in an administrative review, or 14 days before verification, whichever is earlier."[134]  Regarding our AFA analysis, we clarified that Commerce had (1) conducted this analysis in the *Preliminary Results* and determined that a gap existed due to Kaptan's failure to provide necessary information on the record, and (2) applied its AFA hierarchy to determine an appropriate AFA rate for this program (*i.e.*, the 1.18 percent rate applied in the *Final Results*).[135]

In the *Remand Order*, the Court explained that Commerce's regulations preclude it from considering rejected evidence in evaluating whether there is a gap in the record and prevent it from referencing rejected information.[136]  As such, the Court remanded this issue to Commerce.[137]  Commerce has re-evaluated its decision regarding Law 27256 and finds that application of AFA is appropriate.

Regarding rejecting Kaptan's October 12, 2023 filing, we find that Commerce did not violate its regulations by considering rejected evidence no longer available on the record.  As an initial matter, the basis for Commerce's rejection of the October 12, 2023 filing was Commerce's regulation under 19 CFR 351.104(a)(2)(iii) (*i.e.*, Commerce found it appropriate to reject and remove the filing from the record because it was an untimely document that contained untimely filed NFI).[138]  Therefore, Commerce's rejection of the October 12, 2023 filing complied with our regulations under 19 CFR 351.104(a)(2)(iii).

Meanwhile, 19 CFR 351.302(d), which requires Commerce to reject untimely filed factual information, does not preclude Commerce from using rejected information (*i.e.*, the October 12, 2023 filing) as the basis for the application of AFA to Law 27256 for several

---

[134] *See Final Results* IDM at Comment 7; *see also* Rejection Letter.
[135] *See Final Results* IDM at Comment 7; *see also Preliminary Results* IDM at 7-9 and 17.
[136] *See Remand Order* at 35.
[137] *Id.* at 36.
[138] *See* Rejection Letter.

reasons. First, the basis for the application of AFA was Commerce's Rejection Letter, not Kaptan's untimely submission, where we articulated that we must reject and remove untimely information from the record of the review under 19 CFR 351.104(a)(2)(iii), as discussed above. Commerce is not required to ignore the fact that the untimely submission was, in fact, submitted. Rather, 19 CFR 351.104(a)(2)(iii) merely requires that Commerce not consider the contents of the rejected submission, which we did not do here. Second, we note that Kaptan has not disputed the accuracy of contents of the Rejection Letter (*i.e.*, that Kaptan's untimely submission contained NFI regarding three subsidy programs, including Law 27256).

Third, even if the Court agrees that Commerce cannot rely on the information in the Rejection Letter to apply AFA to Law 27256, Kaptan attempted on a second separate occasion (*i.e.*, at verification) to present untimely NFI regarding this program.[139] As such, the Rejection Letter was not the sole basis for applying AFA to this program. While Commerce first learned of this program due to information provided in its October 12, 2023 filing, Commerce has a long-established practice of rejecting or not accepting NFI provided at verification regardless of whether there was pre-existing knowledge or program usage.[140] The CIT and Federal Circuit have held that Commerce "need not seek corrective substantive information" regarding erroneous or deficient responses discovered at verification; and that verification "is not an

---

[139] *See* Kaptan's Verification Report at 9-10; *see also Preliminary Results* PDM at 7; and *Final Results* IDM at Comment 7.

[140] *See* Kaptan's Verification Agenda at 2 (explaining that "verification is not intended to be an opportunity for the submission of new factual information.). *See also e.g.*, *Hard Empty Capsules from India: Final Affirmative Countervailing Duty Determination*, 90 FR 60618 (December 29, 2025), and accompanying IDM at Comment 2 (explaining Commerce declined to accept a minor correction involving significant changes in sales value reporting); *Hard Empty Capsules from Brazil: Final Affirmative Countervailing Duty Determination*, 90 FR 60607 (December 29, 2025), and accompanying IDM at 4-5 (explaining that verification is not an opportunity for respondents to provide new factual information); and *Thermoformed Molded Fiber Products from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 90 FR 46787 (September 30, 2025), and accompanying IDM at 22 (explaining that Commerce could not accept new factual information regarding 60 instances of government subsidies found at verification that had not previously been reported).

opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by the respondent in response to Commerce's requests for information."[141]

In this proceeding, Commerce discovered at verification that Kaptan had failed to report additional BITT program benefits, and declined to accept any NFI concerning the program and applied an AFA rate of 0.89 percent.[142]  As such, the basis for the application of AFA to this program was the information contained in the verification report.[143]  Moreover, our decisions to reject the additional information discovered for the BITT program and the NFI provided regarding Law 27256 at verification were informed by Commerce's longstanding practice of not accepting NFI at verification and the Court decisions cited above.

In Commerce's verification agenda and decision documents, we have routinely explained that "verification is not intended to be an opportunity for the submission of new factual information."[144]  This statement was also included in Kaptan's Verification Agenda.[145]  The CIT has sustained Commerce's decision to apply AFA in *Pasta from Italy*, when Commerce officials discovered and declined to accept any information regarding certain undisclosed affiliates

---

[141] S*ee Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2022-2023*, 90 FR 22240 (May 27, 2025), and accompanying IDM at Comment 9 (citing *Hung Vuong Corp. v. United States*, 483 F.Supp.3d 1321, 1349 (CIT 2020) (*Hung Vuong*) ("More importantly, the Court construes § 1677m(d) as inapplicable at the verification stage…. Thus, insofar as a respondent's questionnaire answers on their face comply with Commerce's information requests, § 1677m(d) does not apply if Commerce, upon verification, determines that those questionnaire answers are inaccurate."); *see also Dalian Meisen Woodworking Co. v. United States*, No. 20-00109, Slip. Op. 23-60, at *4 (CIT April 24, 2023) (Commerce "need not seek corrective substantive information when verification responses are deficient."); *Goodluck India v. United States*, 11 F.4th 1335, 1342–43 (Fed. Circ. 2021) (upholding Commerce's practice "to accept corrective information at verification only for minor corrections to information already on the record") (cleaned up); and NTN Bearing Corp. of America v. United States, 186 F.Supp.2d 1257, 1332 (CIT 2002) ("Commerce's verification of the data {} falls within Commerce's discretion.").
[142] *See* Kaptan's Verification Report at 7-8; *see also Preliminary Results* PDM at 9; and *Final Results* IDM at Comment 4.
[143]  *See, e.g.*, *Final Results* IDM at Footnote 85.
[144] *See, e.g.*, Kaptan's Verification Agenda at 2.
[145] *Id*.

28

discovered for the first time at verification.[146]  Specifically, the CIT explained that the respondent had failed to cooperate to the best of its ability by providing Commerce with full and complete answers to all of Commerce's inquiries.[147]  As such, the basis for AFA in that proceeding was also the reference in the verification report regarding the discovery of undisclosed affiliates.[148]

Based on our evaluation of our regulations and the case facts discussed above, we continue to find that the application of AFA to Law 27256 is appropriate.  Specifically, we find that Commerce complied with its regulations under 19 CFR 351.104(a)(2)(iii) to reject and remove untimely filed NFI from the proceeding record.  We also find that the basis for applying AFA to the program was not Kaptan's October 12, 2023 filing.  Rather, there were two documents that Commerce evaluated in determining whether to apply AFA to Kaptan.  The first is Commerce's Rejection Letter, which contains a detailed description of the NFI Kaptan tried to place on the record.  No party has argued that Commerce's description of the contents of Kaptan's filing in the Rejection Letter is inaccurate.  The second is the verification report, which establishes that Kaptan tried on a second occasion to present NFI about a program not reported in Kaptan's IQR and not listed in Kaptan's verification agenda.  For this final remand, we thus continue to find that the Rejection Letter and the Verification report establish the existence of a program for which Kaptan did not provide information.  Therefore, we continue to find that the appropriate rate, as AFA, to apply to this program is 1.81 percent.

---

[146] *See Pastificio Gentile S.R.L. v. United States*, Court No. 24-00037, Slip Op. 25-115 (CIT August 27, 2025) (*Pastificio Gentile*) at 7-11; *see also Certain Pasta from Italy:  Final Results of Countervailing Duty Administrative Review; 2021*, 89 FR 3382 (January 18, 2024) (*Pasta from Italy*), and accompanying IDM at Comment 1.
[147] *See Pastificio Gentile* at 9 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013); and *Nippon* Steel, 337 F.3d 1373, 1383 (Fed. Cir. 2003)).
[148] *See Pasta from Italy* IDM at Comment 1.

## V.    INTERESTED PARTY COMMENTS

On February 11, 2026, we released our Draft Remand to interested parties.[149]  On

February 23, 2026, we received comments from the petitioner, Kaptan, and the GOT.[150]

**Comment 1:   Commerce's Determinations Regarding the Countervailability of the BITT
Program**

*Kaptan's Comments:*

The following is a verbatim summary of arguments submitted by Kaptan.  For further details, *see*
Kaptan's Draft Remand Comments at 6-11.

> The CIT has now on three occasions found that the BITT is not countervailable
> because 1) it is not *de jure* specific and 2) the record does not contain substantial
> evidence that it is *de facto* specific.  Following the CIT's remand of the 2020
> {POR}, Commerce conceded that the BITT Exemption is not de jure specific and
> that the record did not contain sufficient factual information to establish de facto
> specificity.  Commerce has not identified, and Kaptan has not seen, any evidence
> that the BITT Exemption is contingent upon export performance as a matter of fact.

*GOT's Comments:*

The following is a verbatim summary of arguments submitted by GOT.  For further details, *see*
GOT's Case Brief at 3-10.

> BITT is legally imposed on banks and other financial institutions, which are
> explicitly designated as taxpayers under Law No. 6802.  Any exemption from BITT
> therefore accrues, as a matter of law, to financial institutions—not to exporters or
> producers of the subject merchandise.  Accordingly, there is no subsidy program
> provided to exporters within the meaning of section 771(5) of the Act.  Even
> assuming arguendo that a financial contribution exists, as the alleged BITT
> exemption is an integral part of the general tax framework applicable to financial
> institutions and applies broadly to multiple categories of foreign exchange
> transactions, it is not specific under section 771(5A) of the Act.  Commerce's draft
> finding of export specificity is inconsistent with the record evidence, prior
> determinations in this proceeding, and binding guidance from the U.S. Court of
> International Trade (CIT), which has already determined that the BITT exemption
> on foreign exchange transactions is generally available and not countervailable.

---

[149] *See* Draft Results of Redetermination Pursuant to Court Remand, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Consol. Court No. 24-00096, Slip Op. 25-131 (October 6, 2025), dated February 11, 2026(Draft Remand).

[150] *See* Petitioner's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated February 23, 2026 (Petitioner's Draft Remand Comments); *see also* Kaptan's Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated February 23, 2026 (Kaptan's Draft Remand Comments); *and* GOT's Letter, "Case Brief," dated February 23, 2026 (GOT's Draft Remand Comments).

*Petitioner's Comments:*

The following is a verbatim summary of arguments submitted by the petitioner.  For further details, *see* Petitioner's Draft Remand Comments at 2-6.

> In the final remand determination, {Commerce} should continue to find that the BITT program is countervailable.  The program is both an export subsidy and *de facto* specific.  The program is export specific because one of the ways in which companies qualify for an exemption from payment of the BITT is by being an exporter that is a member of an exporters' association, thus conditioning the receipt of benefits on exporting products.  Too, {Commerce} should apply AFA to find that the program is de facto specific because the Government of Turkey ("GOT") failed to cooperate to the best of its ability in providing information regarding use of the BITT program that has resulted in an inability by {Commerce} to conduct its *de facto* specificity analysis.

**Commerce's Position:**

We continue to find that the BITT program is export specific, and thus countervailable based on record evidence.  Below, we address the points raised by Kaptan, the GOT, and the petitioner regarding the specificity of the BITT program.

In its comments, Kaptan argues that the BITT program is not *de jure*, *de facto*, or export specific.[151]  As support, Kaptan explains that the Court has previously rejected Commerce's findings that the program is *de jure* specific because the fact that a company is required to have an industrial registry certificate does not, by itself, limit eligibility for the program to certain enterprises or industries.[152]  Regarding *de facto* specificity, Kaptan claims that the record evidence collected by Commerce as part of the remand also demonstrates the program is not specific on this basis.[153]  For export specificity, Kaptan addressed Commerce's analysis in the Draft Remand.[154]  Specifically, Kaptan argues that BITT is not export specific for the same

---

[151] *See* Kaptan's Draft Remand Comments at 6-11.
[152] *Id*. at 6-8.
[153] *Id*. at 7-8.
[154] *Id*. at 8-11.

reasons it is not *de jure* specific (*i.e.*, the exemption is available to anyone with an industrial registry certificate and essentially every company in Türkiye besides a few small shops are eligible to participate in the program).[155]  Kaptan further explains that the program is not continent upon export performance because there is, *e.g.*, no net export quota a company must meet in order to benefit from the program.[156]  As a threshold matter, Kaptan alternatively claims that Commerce cannot raise the issue of export specificity for the first time on remand when it did not make this finding or argument in the administrative review or earlier in the Court proceedings.[157]  In its comments, the GOT argues that the BITT program is not *de jure* or *de facto* specific and that Commerce has not explained why the same legal framework for finding *de jure* specificity is appropriate to now find export specificity.[158]  The GOT raises additional arguments regarding whether the BITT program provides a financial contribution, however, those claims are not at issue in this remand.[159]  As such, we have not evaluated them.

In its comments, the petitioner argues that the BITT program is export specific and also *de facto* specific, as AFA.[160]  The petitioner explains that under section 771(5A)(B) of the Act, "an export subsidy is a subsidy that is, in law of in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."[161]  In this case, this criteria is met because one criteria for receiving benefits under the program is becoming a member of an exporters' association – and record evidence demonstrates Kaptan was part of an exporters' association during the POR. Further, the petitioner explains that Commerce has found this program to be export specific using the same reasoning in *Large Diameter Welded Pipe from Türkiye* and *Common Alloy*

---

[155] *Id.* at 9-10.
[156] *Id.* at 9-10.
[157] *Id.* at 8-9.
[158] *See* GOT's Draft Remand Comments at 6-10.
[159] *Id.* at 4-6.
[160] *See* Petitioner's Draft Remand Comments at 2-6.
[161] *Id.* at 2-3.

*Aluminum Sheet from Türkiye*.[162]  Alternatively, the petitioner contends that Commerce should

apply AFA to find the BITT program *de facto* specific because the GOT failed to provide

complete responses to our questions concerning usage of this program as a matter of fact.[163]  As

such, due to the gap created in the record by the GOT's failure to fully respond to Commerce's

questions, the petitioner argues that AFA is appropriate to fill the gaps in the record and ensure

the GOT does not achieve a more favorable result by failing to cooperate.[164]

Regarding Kaptan's claim that Commerce's finding of export specificity is waived, we

disagree.  The Court ordered Commerce to reconsider or further explain its determination of *de

jure* specificity for the BITT program.[165]  We chose the former option.  In the *Draft Remand*, we

explained that we revisited our specificity analysis, which included re-evaluating the record

evidence and considering whether the BITT program is specific, including on grounds other than

those the Court rejected.[166]  Following this analysis, we determined the BITT program met the

criteria for export specificity under sections 771(5A)(A) and (B) of the Act.[167]  Therefore, we

have complied with the Court's *Remand Order* to reconsider the specificity finding.

With respect to Kaptan and the petitioner's claims regarding *de facto* specificity, while

we solicited and received additional information concerning specificity as a matter of fact, we

did not conduct a separate analysis of specificity on this basis in the *Draft Remand* because we

find the program to be export specific.[168]  Further, as explained below, we continue to find for

these final results of redetermination that the BITT program is export specific.  As such, we are

---

[162] *See* Petitioner's Draft Remand Comments at 2-3 (citing *Large Diameter Welded Pipe from* Türkiye PDM at 12-13; and *Common Alloy Aluminum Sheet from Türkiye* (ACCESS Barcode 4867318-01), at 4-5).
[163] *Id*. at 2-6.
[164] *Id*.
[165] *See Remand Order* at 35.
[166] *See* Draft Remand at 14-15.
[167] *Id*. at 15.
[168] *Id*. at 16.

not addressing the comments raised concerning *de facto* specificity, since we find this program specific on a different basis.

For export specificity, we continue to find that the BITT program meets the criteria listed under sections 771(5A)(A) and (B) of the Act. In evaluating whether a program is *de jure* or export specific, we examine different criteria. As a result, contrary to Kaptan's claim, finding a program is not *de jure* specific under section 771(5A)(D)(i) of the Act does not preclude us from considering other types of specificity findings (*e.g.*, export specificity under section 771(5A)(A) and (B) of the Act).

To evaluate whether the BITT program is export specific, we conducted a separate analysis under sections 771(5A)(A) and (B) of the Act in the Draft Remand (*i.e.*, whether "an export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more condition.").[169] One of the criteria for eligibility for BITT exemptions in The Expenditure Expenses Law is foreign currency sales to companies which are members of exporters' associations.[170] The record indicates that Kaptan made numerous export sales and exchanges between foreign currencies during the POR.[171] Further, Kaptan explained that the applicability of the BITT exemption to manufacturing companies, excluding small handicraft companies, and exporting companies (*i.e.*, those exporting companies that are part of exporters' associations) is intended to enable manufacturers and exporters to purchase foreign currency to meet their business needs.[172] As such, a consideration of this record evidence weighs in favor of finding the program export specific.

---

[169] *See* Draft Remand at 14-15.
[170] *See Preliminary Results* PDM at 14.
[171] *See* Kaptan's Verification Report at 6-10.
[172] *See* Kaptan's IQR at 52.

We next considered Kaptan's argument that the BITT program is not contingent upon export performance because there is no net export quota that an exporter must meet to benefit from the program.  In evaluating the record, we note that Kaptan belonged to two exporters' associations during the POR.[173]  Moreover, Kaptan reported that as a member of these associations, it was required each time it exports to pay fees to the associations proportionate to the value of the export (*i.e.*, "the charge incurred by the exporter association for exports is a factor of 5 over 10,000").[174]

In other proceedings, Commerce has articulated that a subsidy program is export contingent where various types of export obligations (*e.g.*, value or volume) are met, not just quotas.[175]  For example, in *Steel Nails from India*, we explained that the Merchandise Export from India Scheme (MEIS) is export specific under section 771(5A)(B) of the Act, because the Government of India provides scrips to exporters worth a certain percentage of the value of exports.[176]  As such, the only way an exporter may participate in this scheme is if it meets its export obligations.  Like how the eligibility of the subsidy in *Steel Nails from India* is contingent on the export of the subject merchandise, here, eligibility for the BITT exemption program is contingent upon membership in an export organization, which itself requires exportation and the payment of fees proportionate to the value of the exported goods.  Additionally, in *CORE from*

---

[173] *See* Kaptan's Verification Report at 6-7.
[174] *Id*. at 6-7 and VE-9.
[175] *See e.g.*, *Certain Steel Nails from India:  Preliminary Affirmative Countervailing Duty Determination*, 87 FR 34654 (June 7, 2022), and accompanying PDM at 13-14, unchanged in *Certain Steel Nails from India:  Final Affirmative Countervailing Duty Determination*, 87 FR 51333 (August 22, 2022) (*Steel Nails from India*), and accompanying IDM; *Melamine from India:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination*, 89 FR 55055 (July 22, 2024), and accompanying PDM at 16-17, unchanged in *Melamine from India:  Final Affirmative Countervailing Duty Determination and Critical Circumstances Determination*, 90 FR 9413 (February 12, 2025); and *2,4-Dichlorophenoxyacetic Acid from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 90 FR 14957 (April 7, 2025), and accompanying IDM at Comment 4 (explaining that the Export Buyer's Credit program is export specific because the only criteria is the recipient must be a foreign customer of a Chinese exporter).
[176] *See Steel Nails from India* IDM at Comment 4.

*Brazil*, Commerce similarly determined that the REINTEGRA program was contingent upon export performance, pursuant to section 771(5A)(B) of the Act, because the program enabled exporters of certain eligible products to request a refund of certain value-added taxes (VAT), if the cost of the imported inputs on the listed exports did not exceed 40 percent of the export value.[177]  We find that the way in which the BITT program operates is similar to the REINTEGRA program in *CORE from Brazil*.  Specifically, for an exporter to be eligible for BITT exemptions it should join an exporter association and then pay the association fees on every export transaction.  As such, the BITT program is contingent upon export performance (*i.e.*, the exporter meeting its obligation to join the exporters' association and paying all related export fees), and thus countervailable.

Kaptan's citations to CIT precedent are also misplaced.  In *GGB Bearing*, the Court found that the record of that proceeding was missing certain evidence that could have proven export specificity.[178]  By contrast, here, no further evidence is required given that the language of the BITT exemption specifically addresses members of exporters' associations.  Further, Kaptan cites to *Kumho Tire*, for the proposition that "specificity does not exist per se but must be determined by Commerce under the provisions of {Section 771}(5A)(D)."[179]  Critically, we are not determining specificity under section 771(5A)(D).  Rather, we are finding that the BITT

---

[177] *See Certain Corrosion-Resistant Steel Products from Brazil:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 90 FR 9228 (February 10, 2025) (*CORE from Brazil*), and accompanying PDM at 9-10, unchanged in *Certain Corrosion-Resistant Steel Products from Brazil:  Final Affirmative Countervailing Duty Determination*, 90 FR 42204 (August 29, 2025).  *See also e.g.*, *Honey from Argentina: Final Results of Countervailing Duty Administrative Review*, 69 FR 29518, and accompanying IDM at 5 (explaining that the Factor de Convergencia program provides honey exporters assistance based on a percentage of the FOB value of the exports from the Government of Argentina).
[178] *See* Kaptan's Draft Remand Comments at 10 (citing *GGB Bearing Technology (Suzhou) Co., Ltd. v. United States*, 279 F.Supp.3d 1233, 1240 (CIT 2017) (*GGB Bearing*).
[179] *See Kumho Tire (Vietnam) Co., Ltd. v. United States*, 741 F.Supp.3d 1277, 1332 (CIT 2024).

exemption is an export subsidy under section 771(5A)(B).  As such, Kaptan's quoted dicta is inapplicable.

For the reasons discussed, we determine that the BITT exemption is specific under section 771(5A)(B) of the Act.  This analysis is distinct and separate from the analysis Commerce conducts under section 771(5A)(D) of the Act to evaluate whether a subsidy program is *de jure* or *de facto* specific.  For export specificity, we find that the BITT program is an export subsidy because it is, in law or in fact, contingent upon export performance, alone or as 1 or 2 or more conditions.  As such, we have made no changes to this issue for this final redetermination and continue to find the BITT program countervailable because it is export specific.

**Comment 2:  Regarding Commerce's Decision to Use the Collier's Report Rather Than the Cushman & Wakefield Report**

*Kaptan's Comments:*

The following is a verbatim summary of arguments submitted by Kaptan.  For further details, *see* Kaptan's Draft Remand Comments at 11-23.

> Kaptan maintains that Commerce must use the {C&W report} rather than the Colliers {report} to value the Nur Leasehold, as the {C&W report} is the only document that: 1) is a valuation at all and 2) analyzes the actual value of the property at issue, rather a trend analysis for property located 750 miles away, on a different continent, in the largest city in Europe.

*Petitioner's Comments:*

The following is a verbatim summary of arguments submitted by the petitioner.  For further details, *see* Petitioner's Draft Remand Comments at 7-8.

> {Commerce} should continue to use the Colliers {r}eport as the benchmark for measuring the subsidy for the provision of land for LTAR in its final determination. The data provided in the Colliers {r}eport is reliable and its use is consistent with the {Commerce's} practice.  {Commerce} has fully addressed Kaptan's arguments with respect to {Commerce's} use of the Colliers {r}eport in accordance with the court's remand order.  {Commerce} again correctly recognizes that there are serious problems with Kaptan's proffered benchmark, the {C&W report}.  In particular, the C&W {r}eport was prepared for purposes of this countervailing duty proceeding and thus

"incorporates a 'risk of litigation-inspired fabrication or exaggeration'" that does not exist in the Colliers {r}eport.

**Commerce's Position:**

Consistent with our finding in the Draft Remand and similar arguments addressed in the 2020 Remand Redetermination,[180] we disagree with Kaptan's arguments that we should favor the C&W report over the Colliers report.  As an initial matter, Kaptan argues that Commerce's use of land from 750 miles away is *per se* unreasonable and not supported by substantial evidence. However, as Commerce previously noted in the Draft Remand and the 2020 Remand Redetermination, the standard for a tier one benchmark is a "market-determined price for the good or service resulting from actual transactions *in the country in question*."[181]  Commerce's regulation does not differentiate by distance in such a way that would render use of Istanbul area land prices *per se* unreasonable.  Rather, Istanbul area land prices are explicitly relevant, tier one benchmarks.

Moreover, Commerce has previously used sources from distances further than 750 miles away as benchmarks, such as for the provision of stumpage in Canada.[182]  Specifically, Commerce used the Deloitte report for harvest data from Nova Scotia as the benchmark for Ontario and, even further, Alberta stumpage.[183]  In evaluating this argument, the North American Free Trade Agreement (NAFTA) Panel noted "that Commerce is to consider prevailing market conditions in the country subject to investigation, which, here, is Canada, not a particular province"[184] and that, while the Canadian parties had pointed to multiple differences between

---

[180] *See 2020 Remand Redetermination* at 29-36.
[181] *See* 19 CFR 351.511 (emphasis added).
[182] *See In the Matter of Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination*, USA-CDA-2017-1904-02 (May 6, 2024) at sections III.2.B.2 and III.3.B.
[183] *Id.*
[184] *Id.* at 21 (quotations omitted).

Nova Scotian timber and those in other provinces, Commerce's decision was supported by substantial evidence.[185]

In this proceeding, we find that the Colliers report regarding Istanbul area prices for rent are appropriate for other Turkish rents, including those located a great distance away, similarly to how we found that the Deloitte report regarding Nova Scotian prices for stumpage were appropriate for other Canadian stumpage, including those located a great distance away.  Further, we find that the Colliers report is preferable to the C&W report because it is both more contemporaneous, as described below, and because Colliers International is the source of its own data,[186] as opposed to the C&W report, which relies upon:  (1) an unknown website and real estate advisory for "Comparison Method (Based on the Land for Rent Currently Market)"; (2) other government prices for "Comparison Method (Based on Leasehold Lands by Government)"; and (3) the client *i.e.*, Kaptan for the two remaining methods.[187]  As previously noted, Kaptan did not provide record information (*e.g.*, information regarding distance from Istanbul, distance, total population, etc.) that would indicate some strict, quantitative factor demonstrating differing rent in the Istanbul area and Surmene such that the Istanbul area cannot be used for a benchmark beyond providing an alternative benchmark of its own.[188]

Kaptan's citations to other cases involving land-use rights are also unavailing.  Commerce notes that, in *Özdemir*,[189] benchmark information was otherwise provided that

---

[185] *Id*. at 22-23.
[186] *See* Petitioner's Benchmark Submission Exhibit 1 at 10.
[187] *See* Kaptan's Public Benchmark Submission Exhibit 1 at 2.  Commerce notes that other government prices are not "market-determined" and cannot be used to measure the adequacy of remuneration pursuant to 19 CFR 351.511(a)(2)(i).
[188] *See generally* Kaptan's Public Benchmark Submission; *see also generally* Kaptan's Rebuttal Benchmark Submission.
[189] See *Özdemir Boru San. ve Tic. Ltd. Sti v. United States*, 273 F.Supp.3d 1225, 1249-53 (CIT 2017), sustained on remand in *Özdemir Boru San. ve Tic. Ltd. Sti v. United States*, Court No. 16-00206, Slip Op. 18-6 (CIT February 1, 2018) (*Özdemir*).

allowed for the removal of Istanbul area prices.[190]  This is not the case here, where there are only

either Istanbul area prices or the C&W report.  Moreover, there is no quantifiable evidence

provided indicating that the Istanbul area prices are unreliable beyond the C&W report, which

Commerce itself finds unreliable.  Likewise, in *CS Wind*,[191] Commerce found both land

benchmarks reliable and relied upon both.  In this instance, the only evidence that the Colliers

report is unreliable is an alternative benchmark that Commerce, as previously noted, finds

unreliable itself.  Further, where record information existed allowing Commerce to more

accurately select within the Colliers report (*i.e.*, for population density), we modified our

benchmark selection where available to account for what factors were available.[192]  Thus, we

continue to find that use of the Colliers report is not *per se* unreasonable.

      Kaptan next claims that the Colliers report is not a valuation based upon a disclaimer

included at the conclusion of the Colliers report along with contacts for further information.

Specifically, Kaptan notes that the Colliers report states that it "must not be treated as  . . .

valuation."[193]  However, Kaptan's quotation is selective – referencing only the adjective,

"valuation," – and belies the intent of the disclaimer.  Rather, the Colliers report states that it

"must not be treated as . . . valuation *advice*."[194]  Read fully, Colliers International's intention is

clear:  to "{give} information based primarily on Colliers International data" and to protect itself

from legal liability regarding its forecasts, which are not provided on an individualized,

---

[190] *Id*. ("Commerce reasonably determined that . . . the prices of these parcels deviate substantially from other prices in the dataset" (quotations omitted).  In this instance, there are no other reliable prices from which the Istanbul area prices greatly deviate).

[191] *CS Wind Malaysia Sdn. Bd. v. United States*, Court No. 24-00079, Slip Op. 25-149 (CIT December 5, 2025) (*CS Wind*).

[192] *See* Petitioner's Rebuttal Benchmark Submission Attachment 6 at 1 (providing population density for Istanbul) 28 (providing population density for Kocaeli) and Attachment 8B (providing population density for Tekirdag).

[193] *See* Kaptan's Draft Remand Comments at 15 (quoting Petitioner's Benchmark Submission Exhibit 1 at 20).

[194] *See* Petitioner's Benchmark Submission Exhibit 1 at 20.

customer-specific level.[195]  The point is not that the Colliers report is not data regarding the

Istanbul area property market, but that it is not "advice or an offer to buy or sell property."[196]

Indeed, Kaptan fails to provided evidence indicating that the Colliers report does not contain

"market-determined price{s} for the good{s} . . . resulting from actual transactions in the

country in question."[197]  Instead, Kaptan demonstrates that Colliers International does not want

to be found legally liable if those prices are wrong.

Moreover, as addressed above,[198] Commerce previously rejected arguments in *Softwood*

*Lumber from Canada 2021 AR* that a benchmark, Washington Department of Natural Resources

(WDNR) prices, should be rejected because it, among other issues, included a disclaimer.[199]

Rather, Commerce continued to use the WDNR prices over another benchmark, Forest2Market

(F2M) price tables, because the F2M price tables were "strongly disfavored as a source because

they were created for the purposes of {*Softwood Lumber from Canada 2021 AR*} proceeding."[200]

Thus, our finding here with regard to the disclaimer is supported by the record when read fully

and is consistent with our practice.

Regarding Kaptan's concerns with the absence of the underlying data collected from

Colliers International, we disagree that the omission renders the data unreliable.  Again, we find

that Colliers International being the source of its own data in the Colliers report is preferable to

those referenced in the C&W report because the Colliers report thus represents independent,

original research,[201] and Kaptan does not provide any information indicating that Colliers

International itself is unreliable or that the data is skewed.  By contrast, as described above, for

---

[195] *Id*.
[196] *Id*.
[197] *See* 19 CFR 351.511(a)(2)(i).
[198] *See supra* at 24; *see also* 2020 Remand Redetermination at 13-14.
[199] *See Softwood Lumber from Canada 2021 AR* IDM at Comment 17.
[200] *Id*. at 99.
[201] *See* Petitioner's Benchmark Submission Exhibit 1 at 10.

the only methodology in the C&W report upon which Commerce could rely, "Comparison

Method (Based on the Land for Rent Currently Market"),[202] the data is at best second-hand to

C&W and collected from an unknown website and an unknown real estate advisory.[203]

Additionally, Kaptan cites to several Court decisions to support its claim that valuation reports

should disclose its underlying data.[204]  However, these decisions are not binding on this Court,

and do not interpret Commerce's statutory duty to measure the adequacy of remuneration under

section 771(5)(E)(iv) of the Act.

Further, Commerce's purpose in this analysis is not to say that the Colliers report is

unimpeachable or that it could not be improved upon.  As previously noted, our first preference

for benchmarking Kaptan's land would be non-government purchases by Kaptan itself in the

area at issue,[205] and, in this instance, we would prefer to have the underlying data from Colliers

International.  We would likewise prefer that the data be for an area closer to Surmene or that

parties provided quantifiable support for how to adjust the Istanbul area data to be more

reflective of Kaptan's purchase.  However, such information is not on the record, and we do not

find that the absence of such data renders the entire Colliers report unreliable because it was

produced for standard, business purposes independent of this proceeding using original data and

covering a more contemporaneous period, which favors it over the C&W report.

Kaptan next argues that the C&W report incorporates pricing "from 2021 through early

2022,"[206] which would render the C&W report, at least partially, equivalent in

---

[202] *See* Kaptan's Public Benchmark Submission Exhibit 1 at 2 (indicating that the other three data sources are either, for the second methodology, government prices or, for the third and fourth methodologies, investment data.  Both types of sources are not consistent with "market-determined price{s}" pursuant to 19 CFR 351.511(a)(2)(i) because they are either (1) explicitly a government price or (2) not a price at all but a justification for the investment).
[203] *Id*.
[204] Kaptan's Draft Remand Comments at 16.
[205] *See supra* at 17-18,
[206] *See* Kaptan's Draft Remand Comments at 19 (citing exclusively Kaptan's Public Benchmark Submission Exhibit 1 at 28-29).

contemporaneousness to the Colliers report.  However, Kaptan's argument is plainly incorrect by the text of the C&W report.[207]  For the first methodological option "Comparable Approach (for Rental Land in Trabzon),"[208] C&W lists under a subheading that the information is "Comparable List of Rental Land in Trabzon (*2022*)."[209]  C&W makes no other references to the period analyzed on the page,[210] and, on the ensuing page, explicitly discusses how it adjusted the data for inflation backwards to both 2020 and 2021.[211]  C&W's last part of the methodology is to provide a table indicating "2022 Average Unit Price for Land Rent in Trabzon" in comparison to "2020 *Estimated* Average Unit Price for Land Rent in Trabzon" and "2021 *Estimated* Average Unit Price for Land Rent in Trabzon."[212]  Thus, Kaptan's statement that the C&W report incorporates pricing "from 2021 through early 2022" is plainly incorrect.  The underlying data provided by C&W makes no reference to any purchase being for 2021, and, while at various other points, C&W discusses purchases in 2021,[213] such information is not reconcilable to Kaptan's own proposed benchmark.[214]

As discussed in the *2020 Remand Redetermination*,[215] Commerce's practice is to prefer a benchmark that is as contemporaneous to the date of the original purchase as possible.  Specifically, we explained that:

> {I}n identifying a land for LTAR benchmark, Commerce's practice is to look to the year in which the land-use rights were acquired from the government, and the terms of the acquisition (reflecting land values and prices for the year) were set, to

---

[207] *See* Kaptan's Public Benchmark Submission Exhibit 1 at 28-29.

[208] Previously referenced in the C&W report's summary as "Comparison Method (Based on the Land for Rent Currently Market)."  *Id*. at 2.

[209] *Id*. at 28 (emphasis added).

[210] *Id*.

[211] *Id*. at 29 ("In order to find the equivalent price for 2020 and 2021, we made a calculation using annual inflation rate (connected with consumer price index) of 2020 and 2021.  The inflation rate for 2020 is %14.60 and for 2021 is %36.08").

[212] *Id*. (emphasis added).

[213] *Id*. at *e.g.*, 25 (discussing major transactions in the "3PL, cargo, and e-commerce categories").

[214] Commerce again repeats that the second, third, and fourth methodologies considered in the C&W report are not usable because they do not contain market prices consistent with 19 CFR 351.511(a)(2)(i).

[215] *See 2020 Remand Redetermination* at 34-35.

determine the appropriate time period for calculating the land benchmark. The Court has acknowledged this practice. Thus, for purposes of identifying a land value for LTAR benchmark in China, under Commerce's regulations and practice, we must determine when the producer/exporter acquired the land-use rights from the GOC and seek benchmark information that is contemporaneous with the year(s) of acquisition. In other words, the appropriate methodology for calculating land benchmark is to index a land price to the date of the purchase of the land-use right (*e.g.*, 2018) rather than to the period of review (*e.g.*, 2019).[216]

Thus, the appropriate benchmark is the one that is the more contemporaneous to the time Kaptan acquired the land-use rights because that benchmark reflects what Kaptan would have paid on its long-term lease had it signed a comparable commercial lease instead of having received the subsidized land. Consequently, the Colliers report is favorable for this issue to the C&W report because the Colliers report contains data for 2021 while the C&W report contains data for 2022.

Regarding the absence of evidence of "litigation-inspired exaggeration," Kaptan's argument is misplaced. If there was concrete proof of exaggeration, Commerce would not even consider the C&W report and would disqualify it offhand. Rather, pursuant to the Court's *Remand Order*, we have fully evaluated the C&W report and found that it is not preferable to the Colliers report because, among other factors, it appears to be commissioned for this proceeding, which strongly disfavors it.[217] Moreover, Commerce's concerns as discussed in the *2020 Remand Redetermination* remain in this remand proceeding:

As an initial matter, the Court acknowledged that Commerce is entitled to broad discretion when selecting from alternative options available on the record.

---

[216] *Id.* (citing *Risen Energy Co., Ltd., et al. v. United States*, 658 F.Supp.3d 1364 (CIT 2023); *Final Results of Redetermination Pursuant to Court Record, Risen Energy Co., Ltd., et al. v. United States*, Slip Op. 23-148, dated January 1, 2024 (citations omitted) at 8. This approach is comparable to Commerce's practice regarding long-term interest rate loans in which the recurring interest payment is compared to a benchmark that would have been available at the time of the agreement. *See* 19 CFR 351.505(a)(2)(iii), which states Commerce "normally will use a loan the terms of which were established during, or immediately before, the year in which the terms of the government-provided loan were established." In the program at issue, rent-free land is provided on a 49-year basis, equivalent to an interest-free loan.). *See also Preliminary Results* PDM at 16, unchanged in *Final Results*.

[217] *See Final Results* IDM at 11-12 (citing *Softwood Lumber from Canada Investigation* IDM at 82; *Sandt Tech*; *Coated Free Sheet from Indonesia* IDM at Comment 12; and *Transweb*).

Commerce has a stated preference not to use benchmarks commissioned for a proceeding because such information incorporates a "risk of litigation-inspired fabrication or exaggeration." This preference has been articulated in the {prior administrative review *Final Results*}, other administrative proceedings, and before the Federal Circuit. However, although Commerce is concerned that documents prepared for the purposes of an AD or CVD proceeding may be tailored to reach specific results, Commerce does not dismiss such documents outright on that basis alone. Rather, Commerce considers additional factors in determining the weight to accord such documents prepared for the purposes of a proceeding. Such factors may include whether the methodology underlying a particular study or report is clearly articulated, and whether the assertions in reports and studies are supported by citations to data, other third-party studies, or otherwise corroborated by additional record evidence.[218]

In this proceeding, as described at length above, Commerce has considered other factors, including whether the methodology underlying the study is clearly articulated or corroborated by other sources and evidence. Given that C&W's data is secondhand, its sources are unknown, and no other data on the record corroborates C&W's analysis,[219] we find that the C&W report is unreliable. For example, while C&W lists 13 comparable land purchases, it is unclear whether this represents a small, self-selected example or a complete data set.

Further, despite Kaptan's claims that C&W was an objective valuator, we find similarly to the 2020 Remand Redetermination that Kaptan paid for the creation of the C&W report, which calls into question the objective and independent nature of the report,[220] and that, while the stated purpose of the C&W report is "internal purposes,"[221] record information suggests that the intended purpose is to provide ongoing benchmark information for this proceeding. This raises concerns for Commerce about the nature of Kaptan's agreements with C&W and the nature and

---

[218] *See 2020 Remand Redetermination* at 30 (citing *Timken Co. v. United States,* 788 F.Supp. 1216, 1220 (1992) ("When Commerce is faced with the decision to choose between two alternatives and one alternative is favored over the other in {its} eyes, then {it has} the discretion to choose accordingly if {its} selection is reasonable"); *Softwood Lumber from Canada Investigation* IDM at 82; *Sandt Tech*; *Coated Free Sheet from Indonesia* IDM at Comment 12; and *Softwood Lumber from Canada 2021 AR* IDM at Comment 2.
[219] *See* Kaptan's Public Benchmark Submission Exhibit 1 at 2 and 28-29.
[220] *Id*. at 5.
[221] *Id*.

purpose of the benchmark commission itself.  Thus, we do not have visibility into the process of

the C&W report creation, and we continue to be concerned about the potential lack of objectivity

and neutrality concerning this benchmark information due to the benchmark being commissioned

by Kaptan specifically for the purposes of this proceeding.  While Kaptan argues that the C&W

report was prepared pursuant to clear valuation standards and provided underlying transactions,

these factors, even if supported by facts on the record, do not fully address or resolve

Commerce's concerns (*i.e.*, that the C&W report was commissioned for the purpose of this

proceeding and may thus contain inherent bias).  By contrast, the Colliers report was created

wholly independent of this proceeding, which strongly favors its neutrality and independence.

Lastly, Kaptan reiterates arguments that the C&W report is the only benchmark on the

record to value the Surmene land and that this evidence (*i.e.*, the C&W report) is proof that the

Colliers report cannot be used because its prices cannot be justified.  However, as described

above, we find that:  (1) the Colliers report can and, indeed, should be used as a benchmark

despite the distance of Istanbul from Surmene and other colorable factors, (2) that the Colliers

report, while imperfect, is preferable to the C&W report in multiple ways, and (3) that such

prices are not disqualifying because of their high value solely because they exceed the C&W

report, which Commerce finds unreliable.  Consequently, we made no changes to this issue for

this final redetermination based upon Kaptan's comments or the petitioner's comments, which

broadly support Commerce's draft results, and we continue to use the Colliers report to

benchmark Kaptan's land lease rights.

**Comment 3:  Commerce's Determination to Apply AFA Regarding Law 27256**

*Kaptan's Comments:*

The following is a verbatim summary of arguments submitted by Kaptan.  For further details, *see*
Kaptan's Draft Remand Comments at 2-6.

Kaptan submits that Commerce's proposed final redetermination regarding Law 27256 is not "in compliance with the {CIT's} remand order," and, for the reasons identified by the CIT, is not "in accordance with law." Because the proposed final redetermination does not comply with the CIT's remand order, and is in fact contrary to it, the final redetermination must not include any margin related to an alleged subsidy under Law 27256.

*Petitioner's Comments:*

The following is a verbatim summary of arguments submitted by the petitioner. For further details, *see* Petitioner's Draft Remand Comments at 9-11.

Finally, {Commerce} should continue to apply AFA to Kaptan for its failure to provide requested information about Turkish Law 27256. {Commerce} correctly found a gap in the record based on Kaptan's attempt to provide information about this program in an untimely rebuttal factual information submission as well as at verification. Commerce did not rely on a rejected submission to establish that a gap existed on the record, but instead on its memorandum memorializing its rejection of the submission. Further, Kaptan's attempt to provide information regarding this program at verification provided {Commerce} with additional evidence that there was a gap in the record with respect to Kaptan's reporting of Law 27256 that was completely independent of Kaptan's rejected submission.

**Commerce's Position:**

We continue to find that the application of AFA to Law 27256 is appropriate. As explained in the Draft Remand, Commerce relied on the Rejection Letter and Kaptan's Verification Report in evaluating whether to apply AFA.[222] As part of this analysis, we considered whether reliance on these two documents contradicted our regulations. After reviewing the record, we determine that we acted in accordance with our established practice of assigning AFA when a party attempts to provide untimely NFI late in a proceeding (*e.g.*, for the first time at verification), and, as such, application of an AFA rate of 1.81 percent to Law 27256 is warranted.[223]

---

[222] *See* Draft Remand at 25-29.
[223] *Id.*

In its comments, Kaptan claims that Commerce failed to follow the CIT's instructions in the *Remand Order*, because we continued to rely on the Rejection Letter and Verification Report as the basis to apply AFA to Law 27256.[224]  According to Kaptan, the Court prohibited Commerce from using factual information contained in the rejected submissions as the basis to apply AFA.  Specifically, Kaptan argues that Commerce must reverse its decision to apply AFA because relying on the Rejection Letter and Kaptan's Verification Report violates its regulations under 19 CFR 351.104(a)(2)(i)-(ii) and 19 CFR 351.302(d) prevent it from using factual information that has been rejected in making determinations.[225]

The petitioner argues that Commerce's application of AFA to Law 27256 is appropriate.[226]  The petitioner explains that Commerce followed its regulations and explained the basis by which it was able to apply AFA.[227]  Further, even if the Court disagrees with Commerce's interpretation of its regulations regarding Kaptan's October 12, 2023 rejected submission, Kaptan separately tried to provide the same NFI at verification, and while commerce declined to accept this information, it did not constitute rejected information under 19 CFR 351.104(a)(2).[228]

As an initial matter, we have complied with the Court's *Remand Order* for Commerce's "reconsideration or further explanation" of our decision to apply AFA to determine Kaptan's benefits under Turkish Law 27256.[229]  The Court also specified that it "does not compel a result for any issue on remand."[230]  Given this guidance, upon further consideration, we do not find that Commerce's regulations precluded it from considering the Rejection Letter or Verification

---

[224] *See* Kaptan's Draft Remand Comments at 2-6.
[225] *Id.*
[226] *See* Petitioner's Draft Remand Comments 9-11.
[227] *Id.*
[228] *Id.*
[229] *Remand Order* at 35.
[230] *Id.*

Report in evaluating whether to apply AFA.  We also disagree that Commerce has circumvented its regulations in reaching this decision.  According to 19 CFR 351.104(a)(2)(i)-(ii), "{t}he Secretary, in making any determination under this part, will not use factual information, written argument, or other material that the Secretary rejects."  Further, "{t}he official record will include a copy of a rejected document, solely for the purposes of establishing and documenting the basis for rejecting the document, if the document was rejected because:" (1) "although otherwise timely, it contains untimely filed" NFI; (2) "the submitter made a nonconforming request for business proprietary treatment of factual information"; (3) "{t}he Secretary denied a request for business proprietary treatment of factual information," or; (4) "{t}he submitter is unwilling to permit the disclosure of business proprietary information under APO."  First, as explained in the Draft Remand, the basis for the application of AFA was Commerce's Rejection Letter and Kaptan's Verification Report, not Kaptan's untimely submission.[231]  Further, in the Rejection Letter, we articulated that we must remove untimely information from the record of the review under 19 CFR 351.104(a)(2)(iii) to comply with this regulation.  There is no statutory or regulatory requirement that we must ignore the fact that an untimely submission containing unsolicited NFI was filed on the record of the proceeding.  As such, we find that Commerce did not ignore or circumvent its legal obligations.

19 CFR 351.302(d)(1)-(2) articulates that the Secretary will not retain on the official record untimely filed or unsolicited information.  In the Rejection Letter, Commerce also explained that pursuant to 19 CFR 351.302(d)(1)(i) and (2), it was required to reject Kaptan's untimely submission from the official record.  In addition, the Rejection Letter explained that while Kaptan filed information under 19 CFR 351.301(c)(5), we determined the information it

---

[231] *See* Draft Remand at 27-28.

submitted constituted untimely NFI under 19 CFR 351.302(d)(1)(i) and (2) and 19 CFR 351.104(a)(2)(iii). Kaptan also does not dispute the accuracy of any of the details in Commerce's Rejection Letter. If Commerce's regulations preclude us from discussing or referring to rejected information in any way to establish the basis for rejecting a party's submission, as Kaptan argues, we would not be able to enforce our deadlines, explain our decisions to interested parties, or reject and remove untimely NFI from the official record. This would significantly impede Commerce's ability to meet its statutory deadlines.

Regarding the Verification Report, while Kaptan tried to again provide unsolicited information concerning Law 27256 at verification, we did not and could not accept this information pursuant to 19 CFR 351.104(a)(2).[232] The Verification Report thus constitutes a separate second instance whether Kaptan attempted to provide information about Law 27256.[233] As such, we can rely on the Verification Report, alone, as the basis to apply AFA to Law 27256. Further, we note that Commerce did, in fact, rely solely on the Verification Report to apply AFA to Kaptan's reporting of the BITT program based on NFI discovered at verification.[234] Specifically, while conducting verification, Commerce officials discovered additional previously unreported BITT program benefits.[235] In the *Final Results*, we determined that because Kaptan had failed to report all BITT program benefits in its initial questionnaire response and Commerce officials discovered this error in reporting BITT benefits at verification, we were unable to verify the program as required by section 776(a)(2)(D) of the Act.[236] As a result, a gap in the record

---

[232] *See e.g.*, Kaptan's Verification Report.
[233] *See* Kaptan's Verification Report at 9-10.
[234] *See Final Results* IDM at Comment 4.
[235] *See* Kaptan's Verification Report at 7-8.
[236] *See Final Results* IDM at Comment 4.

existed regarding Law 27256, and because Kaptan withheld necessary information and failed to cooperate to the best of its ability, we applied AFA to fill the gap in the record.[237]

In the Draft Remand, we also explained that the CIT and Federal Circuit have held that Commerce "need not seek corrective substantive information" regarding erroneous or deficient responses discovered at verification; and that verification "is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by the respondent in response to Commerce's requests for information."[238]  We further note that the CIT has sustained prior decisions to apply AFA, when Commerce officials discover and decline new information discovered at verification.[239]

Based on this analysis, we continue to find that it is appropriate to apply AFA to determine Kaptan's benefit under Law 27256.  Specifically, we determine that Commerce acted in accordance with its regulations, may rely on the Rejection Letter and/or Verification Report as the basis to apply AFA for benefit, and may apply AFA when warranted based on the scope of the untimely new information discovered at verification.  Therefore, we continue to apply the 1.18 percent rate, as AFA, for Law 27256.

---

[237] *Id*.

[238] S*ee Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2022-2023*, 90 FR 22240 (May 27, 2025), and accompanying IDM at Comment 9 (citing *Hung Vuong Corp. v. United States*, 483 F.Supp.3d 1321, 1349 (CIT 2020) (*Hung Vuong*) ("More importantly, the Court construes § 1677m(d) as inapplicable at the verification stage…. Thus, insofar as a respondent's questionnaire answers on their face comply with Commerce's information requests, § 1677m(d) does not apply if Commerce, upon verification, determines that those questionnaire answers are inaccurate."); *see also Dalian Meisen Woodworking Co. v. United States*, No. 20-00109, Slip. Op. 23-60, at *4 (CIT April 24, 2023) (Commerce "need not seek corrective substantive information when verification responses are deficient."); *Goodluck India v. United States*, 11 F.4th 1335, 1342–43 (Fed. Circ. 2021) (upholding Commerce's practice "to accept corrective information at verification only for minor corrections to information already on the record") (cleaned up); and NTN Bearing Corp. of America v. United States, 186 F.Supp.2d 1257, 1332 (CIT 2002) ("Commerce's verification of the data {} falls within Commerce's discretion.").

[239] *See* Draft Remand at 27-30 (citing *Pastificio Gentile S.R.L. v. United States*, Court No. 24-00037, Slip Op. 25-115 (CIT August 27, 2025) at 7-11; and *Certain Pasta from Italy:  Final Results of Countervailing Duty Administrative Review; 2021*, 89 FR 3382 (January 18, 2024), and accompanying IDM at Comment 1.).

## VI.     FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, we considered our specificity analysis of the BITT program, provided additional explanation regarding why we consider the Colliers report to be a more appropriate benchmark than the C&W report, and further explained our decision to apply AFA to determine Kaptan's benefits under Turkish Law 27256. For purposes of these final results of redetermination, we find that the BITT program is export specific, and thus countervailable. Consistent with the *Final Results*, we are continuing to apply 0.89 percent to Kaptan as the AFA rate for this program. Regarding the provision of land for LTAR, under Law 5084, because we are continuing to use the Colliers report to measure the adequacy of remuneration, we are making no revisions to the subsidy rate calculated for this program. Further, as we are continuing to find that the application of AFA is warranted to determine Kaptan's subsidy rate for Law 27256, we are making no changes to the subsidy rate applied for this program, as AFA. Therefore, the total subsidy rate applicable to Kaptan and its cross-owned affiliates (*i.e.*, Kaptan Metal Dis Ticaret ve Nakliyat A.S., Kaptan Geri Donusum Teknolojileri Tic. A.S. and Nur Gemicilik ve Tic. A.S.) is 5.54 percent *ad valorem*, which is the same rate assigned in the *Final Results*.

3/6/2026

X  *Chris J Abbott*
_____

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott,
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary of Enforcement and Compliance.