**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| **KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.Ş.,** |
| **Plaintiff,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant,** |
| **and** |
| **REBAR TRADE ACTION COALITION,** |
| **Defendant-Intervenor.** |

**Before: Hon. Gary S. Katzmann, Judge**

**Court No. 24-00096**

<u>**REBAR TRADE ACTION COALITION'S COMMENTS IN SUPPORT OF REMAND DETERMINATION**</u>

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

**Dated: July 24, 2026**

Ct. No. 24-00096

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................1

    A.   The Court's Remand .....................................................................................1

    B.   Commerce's Remand Proceedings ...............................................................2

        i.   BITT Exemptions.................................................................... 2

        ii.  Land Benchmark Selection ..................................................... 4

        iii. Law 27256 .............................................................................. 8

III. ARGUMENT ..........................................................................................................8

    A.   Exemptions from the BITT ...........................................................................9

        i.   Substantial Evidence Supports Commerce's Determination that BITT Exemptions are Specific as Export Subsidies ..................................................................... 9

    B.   Selection of the Benchmark Used to Value Nur's Land......................................11

        i.   Commerce's Determination to Use the Colliers Report is Supported by Substantial Evidence ............................................. 12

        ii.  Commerce's Rationale for Declining to Use the C&W Report is Supported by Substantial Evidence .......................................... 15

        iii. The C&W Report Does not Self-Establish That Rates from Istanbul Cannot Be Used as Benchmark Values for Nur's Land .................................................................................... 19

    C.   Law 27256 ...................................................................................................19

IV.  CONCLUSION......................................................................................................23

**Ct. No. 24-00096**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ellwood City Forge Co. v. United States*,
788 F.Supp. 3d 1317 (Ct. Int'l Trade 2025) ...............................................................10

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .........................................................22

*Hyundai Steel Co. v. United States*,
803 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) ...........................................................10

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011).................................................................................13

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
803 F. Supp. 3d 1276 (Ct. Int'l Trade 2025) ...........................................................11

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
803 F. Supp. 3d 1291 .................................................................................................1

**Statutes**

19 U.S.C. § 1677(5A)(B)................................................................................2, 3, 10

**Regulations**

19 C.F.R. § 351.104(a)(2)........................................................................19, 21, 22

19 C.F.R. § 351.104(a)(2)(iii)...........................................................................8, 20

19 C.F.R. § 351.302(d)(2).............................................................................20, 21, 22

19 C.F.R. § 351.511(a)(2)(i) ............................................................................13, 14

**Administrative Materials**

*Certain Corrosion-Resistant Steel Product from Brazil*,
90 Fed. Reg. 9,228 (Dep't Commerce Feb. 10, 2025).............................................11

*Certain Corrosion-Resistant Steel Products from Brazil*,
90 Fed. Reg. 42,204 (Dep't Commerce Aug. 29, 2025).........................................11

*Certain Steel Nails from India*,
87 Fed. Reg. 51,333 (Dep't Commerce Aug. 22, 2022)..........................................10

**Ct. No. 24-00096**

*Common Alloy Aluminum Sheet from the Republic of Türkiye,*
90 Fed. Reg. 38,453 (Dep't Commerce Aug. 8, 2025)...........................................................3

*Common Alloy Aluminum Sheet from the Republic of Türkiye,*
91 Fed. Reg. 17,941 (Dep't Commerce Apr. 9, 2026)...........................................................11

*Large Diameter Welded Pipe from the Republic of Türkiye,*
90 Fed. Reg. 44,019 (Dep't Commerce Sep. 11, 2025)...........................................................3

*Steel Concrete Reinforcing Bar from the Republic of Turkey,*
88 Fed. Reg. 85,234 (Dep't Commerce Dec. 7, 2023) ...........................................................9

*Steel Concrete Reinforcing Bar From the Republic of Türkiye,*
89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) ...........................................................1

Ct. No. 24-00096

## I.     INTRODUCTION

On behalf of the Rebar Trade Action Coalition ("RTAC"), we respectfully submit the following comments in support of the final remand determination issued by the U.S. Department of Commerce ("Commerce") in this action. *See* Final Results of Redetermination Pursuant to Court Remand, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, Court No. 24-00096; Slip Op. 25-131 (CIT October 6, 2025) (Mar. 6, 2026), ECF No. 59 ("Remand Results"). Commerce's Remand Results were filed in response to the court's order in *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 803 F. Supp. 3d 1291 Kaptan I (Ct. Int'l Trade 2025) ("*Kaptan I*").

## II.     BACKGROUND

### A.     The Court's Remand

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") appealed Commerce's final determination in the 2021 administrative review of the countervailing duty order on steel concrete reinforcing bar ("rebar") from Turkey. *See Steel Concrete Reinforcing Bar From the Republic of Türkiye*, 89 Fed. Reg. 35,071 (Dep't Commerce May 1, 2024) (final results of countervailing duty admin. rev.; 2021), P.R. 249,[1] ECF No. 20-3 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. 247, ECF No. 20-4 ("IDM"). Kaptan challenged, *inter alia*, (1) Commerce's determination that exemptions from the Bank and Insurance Transactions Tax ("BITT") were *de jure* specific and thus countervailable,

---

[1]     References made herein to the confidential administrative record ("C.R.") and public administrative record ("P.R.") correspond to the document numbers as filed by Commerce with the Court on August 6, 2024. *See* Administrative Record Index (Aug. 6, 2024), ECF Nos. 20-1 and 20-2. References to the confidential remand record ("C.R.R.") and public remand record ("P.R.R.") correspond to the document numbers as filed by Commerce with the Court on March 20, 2026. *See* Remand Record Index (Mar. 20, 2026), ECF No. 62-1 and 62-2.

Ct. No. 24-00096

(2) Commerce's choice of the benchmark by which to value certain land that the Government of Turkey ("GOT") provided to Kaptan's affiliate Nur Gemicilik ve Ticaret A.S. ("Nur") for less than adequate remuneration ("LTAR"), and (3) whether substantial record evidence supported Commerce's use of adverse facts available ("AFA") to determine the specificity and value of countervailable benefits that Kaptan received under Turkish Law 27256 ("Law 27256"). *See Kaptan I*, 803 F. Supp at 1303-07, 1310-14.

With respect to Commerce's determination that the BITT exemption program was *de jure* specific, the court remanded Commerce's determination to reconsider whether the BITT exemption was countervailable. *Id.* at 1304-05. The court also remanded Commerce's determination to value Nur's land using RTAC's proffered benchmark source, a real estate report prepared by Colliers International (the "Colliers Report"), instructing the agency to address Kaptan's claims that the Colliers Report data was aberrational. *Id*. at 1304-06. Finally, the court remanded Commerce's determination to apply AFA to Kaptan with respect to its reporting of benefits under Law 27256. *Id*. at 1314.

### B.    Commerce's Remand Proceedings

#### i.    BITT Exemptions

On remand, Commerce revisited its original analysis of the BITT exemption program's specificity, and determined to treat the program as an export subsidy pursuant to 19 U.S.C. § 1677(5A)(B). Specifically, Commerce observed that BITT exemptions are available for foreign currency sales to export companies with membership in an exporters' association. *See* Remand Results at 15. Commerce, consistent with its determinations in other proceedings involving the program, determined that the BITT exemption program was specific because it is an export subsidy. Remand Results at 15 (citing to Decision Memorandum accompanying *Large Diameter*

2

*Welded Pipe from the Republic of Türkiye*, 90 Fed. Reg. 44,019 (Dep't Commerce Sep. 11, 2025) (prelim. results and rescission, in part, of countervailing duty admin. rev.; 2023) at 12-13; *Common Alloy Aluminum Sheet from the Republic of Türkiye*, 90 Fed. Reg. 38,453 (Dep't Commerce Aug. 8, 2025) (prelim. results of the countervailing duty admin. rev.; 2023) and Memorandum from Scot Fullerton, Acting Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations, to Christopher Abbott, Deputy Assistant Sec'y for Policy and Negotiations, re: *Post-Preliminary Analysis for the Countervailing Duty Administrative Review of Common Alloy Aluminum Sheet from the Republic of Türkiye*; 2023 (Jan. 16, 2026) (ACCESS Barcode: 4867318-01) at 4-5)).

As Commerce explained, an "export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions." Remand Results at 34; *see also* 19 U.S.C. § 1677(5A)(B). Commerce noted that "one of the criteria for eligibility for BITT exemptions . . . is foreign currency sales to companies which are members of exporters' associations." Remand Results at 34. Commerce also noted that Kaptan had made numerous export sales and exchanges and belonged to two exporters associations during the period of review ("POR"). Remand Results at 34-35.

While Kaptan argued that the BITT exemptions were not contingent on export performance because companies were not required to meet a net export quota to qualify for the exemptions, Commerce explained that such a quota was not necessary in order for the program to be "contingent upon export." Remand Results at 35. Specifically, Commerce explained that a subsidy can be export contingent where various types of export obligations are met. Commerce explained that, here, eligibility for the BITT program was contingent, in part, upon membership in an exporters' association, which itself requires a company to have exported merchandise, and the

payment of fees proportionate to the value of the exported goods, and was thus similar to other programs Commerce had found export specific in the past. Remand Results at 35-36. In particular, Commerce found the BITT exemption program similar to Brazil's REINTEGRA program (which the agency had previously found to be export specific) which enabled exporters to request refunds of certain value added taxes if the cost of the imported inputs used in manufacturing its exports did not exceed 40% of the export value. Remand Results at 35-36.

### ii.    Land Benchmark Selection

On remand, Commerce also further explained its determination to select the Colliers Report as its source for benchmark land values, as well as its reasons for not selecting Kaptan's proffered benchmark, a report that Kaptan commissioned from Cushman & Wakefield (the "C&W Report"). Remand Results at 16-25, 37-46.

Commerce began its remand analysis by noting that the versions of the Colliers Report and the C&W Report placed on the record in the 2021 administrative review were "broadly analogous" or otherwise "similar" to the versions analyzed in the 2020 administrative review. *See id.* at 17.[2] Consistent with its analysis on remand in the 2020 administrative review, which this court upheld, Commerce went on to find that the Colliers Report was usable as the source of benchmarks for valuing Nur's land, while the C&W report "contains multiple flaws." *Id.* Then, and pursuant to the court's remand instructions, Commerce addressed the specific concerns that Kaptan had raised regarding benchmark selection pre-remand, before turning to the arguments that it raised in response to the agency's draft remand results. *See id.* at 16-25; *see also id.* at 37-46.

---

[2]    In accordance with the agency's usual practice, Commerce's final remand results consist of an introduction, the analysis it originally presented in the draft results, and then a separate section presenting and addressing the parties' comments on the draft results. *See generally* Remand Results.

First, Commerce addressed Kaptan's pre-remand argument that the Colliers Report's Istanbul-region rental rates could not supply reasonable benchmarks for the value of Nur's land in Trabzon province, because of the impact on rental values of factors such as differences in provincial per-capita GDP, level of land development, levels of competition and market size, and physical distance from Istanbul. *Id.* at 17-20. Commerce found that Kaptan provided no record evidence quantifying the proportional effect of these factors, and the record did not otherwise contain such evidence. *Id.* at 19. Commerce further noted that, consistent with its past determinations, it relied only on the Colliers Report's industrial rental rates for the Cerkezkoy region, the area covered by that report with the most similar population density to the province in which Nur's land is located. *Id.* at 23-24.

Commerce further explained that the relative contemporaneity of the Colliers Report compared to the C&W Report supported its reliance on the former source of data. Commerce noted that the Colliers Report was based entirely on data from 2021, while the C&W Report largely reflected 2022 data that had been restated. *Id.* at 20-21. As such, and consistent with the analysis contained in the remand results for the 2020 administrative review, Commerce found that the Colliers Report's data were more contemporaneous with Nur's 2014 acquisition of its land rights than the C&W Report.

Commerce also explained that it "strongly disfavors" selecting benchmarks prepared for purposes of administrative proceedings. *Id.* at 22. Commerce noted that Kaptan commissioned the C&W Report "for the purposes of the proceeding." *Id.* As such, Commerce found the Colliers Report, which was produced by an independent source and was contemporaneous, preferable to the C&W Report as a source of benchmark data. *Id.*

Commerce next explained why it had found that none of Kaptan's other pre-remand arguments regarding the underlying reliability of the Colliers Report compared to the C&W Report were availing. Commerce determined that the Colliers Report was based on data from original research performed by Colliers International while the C&W Report incorporated data from unknown sources. *Id.* at 23-24. Likewise, Commerce explained that the Colliers Report's disclaimer of liability supported the agency's conclusion that Colliers International did not rely on secondary sources, while the C&W Report's "guarantee of accuracy" did not resolve Commerce's concern about inherent bias in commissioned benchmarks. *Id.* at 24.

The agency then went on to address the five arguments that Kaptan made in response to the draft remand results: (1) use of the Colliers Report was *per se* unreasonable because it valued land 750 miles away from Nur's land; (2) the Colliers Report was not a "valuation"; (3) the Colliers Report was not more contemporaneous; (4) the C&W Report was not "litigation-inspired exaggeration"; and (5) the C&W Report demonstrated that rental rates in Istanbul were not reflective of rates in Trabzon province, where Nur was located. *See* Remand Results at 36-38; Letter from BGD Legal & Consulting to Sec'y Commerce, re: *Remand Redetermination in the 2021 Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from Türkiye: Kaptan Comments on Draft Results of Redetermination Pursuant to Court Remand* (Feb. 23, 2026), P.R.R. 38 at 11-22 ("Kaptan's Comments").

Commerce rejected each of these contentions. First, Commerce explained that its tier one benchmark regulations require it to select a "market-determined price for the good or service resulting from actual transactions *in the country in question*," and did not differentiate between in-country benchmarks by distance such that use of Istanbul area values was *per se* unreasonable. *See* Remand Results at 38. Commerce also noted that it had previously used in-country benchmark

sources reflecting distances greater than 750 miles, such as using harvest data in Nova Scotia as the benchmark for stumpage in Ontario and Alberta, and that this benchmark had been upheld by a NAFTA panel on appeal. *Id.* (citing to *In the Matter of Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination*, USA-CDA-2017-1904-02 (May 6, 2024) at sections III.2.B.2 and III.3.B). Commerce reiterated that Kaptan had provided no information demonstrating that the data in the Colliers Report was unreliable or that factors such as distance from Istanbul, total population, or GDP per capita were indicative of differing rent in the Istanbul region and Trabzon province. *Id.* at 38-42.

Commerce also rejected Kaptan's contention that the Colliers Report was not a "valuation," noting that Kaptan's contention relied on a selective quotation and misinterpretation of the disclaimer to the Colliers Report. *See id.* at 40-41. Commerce also rejected Kaptan's claim that the C&W Report's benchmark values were equivalent in contemporaneity to the Colliers Report, given that the C&W Report values were based on 2022 data that had been restated to provide estimated data for 2021. *Id.* at 42-43.

Commerce next addressed Kaptan's claim that the record did not demonstrate that the C&W Report was a "litigation-inspired exaggeration." *Id.* at 44. Commerce explained that it was the risk of such exaggeration inherent in a commissioned report that contributed to the agency's rejection of the C&W Report, rather than any "concrete proof" of such exaggeration. *Id.* Indeed, the agency noted that if such concrete proof existed, it could have rejected the report out of hand. *Id.* Moreover, the risk of exaggeration was just one of multiple factors detracting from the C&W Report's overall lack of reliability. *Id.* at 44-46. Finally, in response to Kaptan's argument that the C&W Report itself constituted evidence that the Colliers Report's prices were unreasonable,

7

Ct. No. 24-00096

Commerce noted that, because it found the C&W Report to be unreliable, the rental rates contained in it could not be used to discredit the rates in the Colliers Report. *Id.* at 46.

### iii.    Law 27256

On remand, Commerce continued to find it appropriate to apply AFA with respect to Kaptan's use of benefits under Law 27256, given Kaptan's failure to timely report its use of that program in response to the agency's initial questionnaire. *See* Remand Results at 25-29, 47-51. Commerce noted that it relied on two independent record documents in determining that Kaptan did not timely submit requested information: (1) its letter rejecting untimely factual information that Kaptan attempted to submit regarding the program, and (2) its verification report, which noted Kaptan's independent attempt to submit data relevant to the program at verification. *Id.* at 27-29, 49-50. Commerce explained that it did not violate 19 C.F.R. § 351.104(a)(2)(iii) in relying on the first document because nothing in the regulation requires the agency to ignore the fact that an untimely (and rejected) submission was submitted. *Id.* at 49. Rather, the regulation only requires the agency not to consider the contents of the rejected document. Further, Kaptan independently attempted to provide additional information regarding benefits received under Law 27256 at verification. *Id.* at 27, 50. In accordance with its practice, Commerce declined to accept the new information at verification, but made note of Kaptan's attempts to provide new factual information about this program. *Id.* at 27-29, 51. This separate attempt by Kaptan to provide information on Law 27256 further demonstrated that Kaptan failed to timely report the existence and use of the program in response to the agency's initial questionnaire. *Id.* at 50.

## III.    <u>ARGUMENT</u>

Commerce's Remand Results should be affirmed. As described below, there is no error in Commerce's specificity finding regarding the BITT program, its selection of the benchmark for

determining the benefit that Kaptan obtained through the GOT's provision of land to Nur, or its use of AFA to countervail Kaptan's receipt of benefits pursuant to Law 27256.

### A.    Exemptions from the BITT

#### i.    Substantial Evidence Supports Commerce's Determination that BITT Exemptions are Specific as Export Subsidies

The GOT normally imposes a tax, the BITT, on foreign currency transactions. *See* Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 88 Fed. Reg. 85,234 (Dep't Commerce Dec. 7, 2023) (prelim. results of countervailing duty admin. rev. and rescission of admin. rev., in part; 2021) at 14, P.R. 229. The GOT exempts certain transactions from the tax, including foreign exchange sales to companies that possess an industrial registry certificate or that are members of exporters' associations. *Id.* Kaptan reported that it availed itself of the BITT exemption during the 2021 POR by providing its banking institution with a copy of its exporters' association membership documents. *Id.*; Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Kaptan Initial Questionnaire Response* (May 26, 2023) at 52-53, C.R. 21-65, P.R. 59 ("Kaptan IQR"). Noting that Kaptan qualified for BITT exemptions based on its membership in an exporters' association, Commerce found on remand that the BITT program was export specific. Remand Results at 14-16, 31-37.

Kaptan argues that Commerce "waived" its ability to find that BITT exemptions are export specific by making this finding for the first time on remand. *See* Comments in Opp'n to the Remand Results of Pl. Kaptan Demir Celik Endsutrisi Ve Ticaret (June 11, 2026) at 14-15, ECF No. 65 ("Kaptan's Br."). However, the court did not issue a directed verdict or otherwise limit the agency's ability to reconsider its original specificity determination on remand. *See Kaptan I*, 803 F. Supp. 3d at 1304. Accordingly, Commerce was free to determine that the BITT exemption was

specific on new grounds. *See Ellwood City Forge Co. v. United States*, 788 F.Supp. 3d 1317, 1322 (Ct. Int'l Trade 2025) ("{A}n agency has two possible paths on remand: 'It can offer a fuller explanation of its reasoning at the time it made the decision" or it can take new agency action.'") (quoting *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)); *see also Hyundai Steel Co. v. United States*, 803 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) (sustaining remand results in which Commerce found that a subsidy was *de facto* specific, rather than *de jure* specific, as it had found in its original determination).

Kaptan further claims that Commerce's determination is not supported by substantial evidence because the BITT exemption "does not depend on export performance." *See* Kaptan's Br at 15-18. However, while export subsidies are specific only where they are "contingent on export," this does not mean that their specificity hinges on an "export performance" requirement. 19 U.S.C. § 1677(5A)(B). Rather, and as Commerce reasonably found, the record demonstrates that BITT exemptions were "contingent upon export" because they were conditioned, in part, on membership in associations that charge membership fees based on each export transaction made by the member.

As Commerce correctly explained, a subsidy is not "contingent upon export" only where a company meets certain export quotas, *i.e.*, where it meets a "performance" requirement relating to exports. Rather, a subsidy program may be export contingent where various types of export obligations are met. *See* Remand Results at 35. For example, Commerce has found that subsidy programs are export specific where exporters were provided with scrips worth a certain percentage of their exports and where exporters were provided a refund of certain value-added taxes if the cost of the inputs on those exports did not exceed 40% of the export value. *See* Remand Results at 35-36 (citing to Issues and Decision Memorandum accompanying *Certain Steel Nails from India*, 87 Fed. Reg. 51,333 (Dep't Commerce Aug. 22, 2022) at cmt. 4; Issues and Decision

Ct. No. 24-00096

Memorandum accompanying *Certain Corrosion-Resistant Steel Product from Brazil*, 90 Fed. Reg. 9,228 (Dep't Commerce Feb. 10, 2025) at 9-10, unchanged in *Certain Corrosion-Resistant Steel Products from Brazil*, 90 Fed. Reg. 42,204 (Dep't Commerce Aug. 29, 2025)). In other words, companies were eligible for subsidies so long as they exported *any* amount of merchandise.

Here, it is undisputed that membership in an exporters' association is one of the criteria for qualifying for exemptions from payment of the BITT. *See* Letter from Republic of Türkiye, Ministry of Trade, to Sec'y of Commerce, re: *Response of the Government of Türkiye to the Supplemental Questionnaire regarding 2025 Remand Redetermination of the 2021 Countervailing Duty Administrative Review on Imports of Steel Concrete Reinforcing Bar from Turkey* (Jan. 20, 2026) at 16 ("GOT Remand QR") C.R.R. 2, P.R.R. 2. Notably, not only are these associations that serve companies that export, they charge membership fees against each export transaction that a member makes. *See* Remand Results at 35-36; *see also* Issues and Decision Memorandum accompanying *Common Alloy Aluminum Sheet from the Republic of Türkiye*, 91 Fed. Reg. 17,941 (Dep't Commerce Apr. 9, 2026) (final results of countervailing duty admin. rev.; 2023) at cmt. 4. Accordingly, Commerce's determination that BITT exemptions are conditioned in part upon export performance is supported by substantial evidence.

### B.    Selection of the Benchmark Used to Value Nur's Land

As Kaptan notes in its brief, the issue before the court is the "exact issue {} currently on appeal to the {Federal Circuit} in Case Number 2026-1229." Kaptan's Br. at 18. That case concerns this Court's affirmation of Commerce's selection of the Colliers Report over the C&W Report as the benchmark to value Nur's land in the 2020 administrative review of the countervailing duty order on Turkish rebar.[3] *See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v.*

---

[3]    As the great Yogi Berra once said, "it's déjà vu all over again."

*United States*, 803 F. Supp. 3d 1276, 1289-91 (Ct. Int'l Trade 2025) ("*Kaptan 2020*"). Here too, Commerce's remand determination is supported by substantial evidence, and the court should affirm the agency's determination.

Nonetheless, Kaptan challenges Commerce's decision on remand, through arguments that fall into three categories. First, Kaptan argues that substantial record evidence does not support Commerce's rationale for selecting the Colliers Report as its source of benchmark data. Kaptan's Br. at 21-25. Likewise, Kaptan claims that the agency fails to adduce substantial record evidence to support its finding that the C&W Report is not preferable to the Colliers Report as a benchmarking source. *Id.* at 25-28. Finally, Kaptan argues that the C&W report presents the only reasonable benchmark data. *Id.* at 29-30. Kaptan does not persuade in any of these arguments.

### i.    Commerce's Determination to Use the Colliers Report is Supported by Substantial Evidence

Kaptan argues that Commerce's reliance on the Colliers Report was *per se* unreasonable. First, Kaptan claims that the agency's use of the Colliers Report was unreasonable because of distinctions between the Istanbul region (on which the Colliers Report's data is based) and Trabzon province (where Nur's land is located). Kaptan's Br. at 19-21. Second, Kaptan claims that Commerce's reliance on the Colliers Report is unreasonable because the report is "not an actual valuation" and does not disclose the underlying data or methodology for calculating rental values. Kaptan's Br. at 21-25.

Kaptan avers that the Colliers Report data is "distorted" because it is based on industrial rental values in a region of Turkey that is more developed than Trabzon province and 750 kilometers away from Nur's land. Kaptan's Br. at 20-21. However, as Commerce explained, Kaptan's speculation that industrial rental prices in Turkey correlate predictably with regional levels of development and proximity to Istanbul is just that: speculation. As Commerce noted,

12

"there is no information on the record that indicates that the Colliers Report is not comparable to Kaptan's Trabzon land purchase." Remand Results at 19. That is, "there is no evidence of a strict quantifiable link between a province's GDP and its industrial rent that would indicate a difference sufficient to be 'disqualifying.'" *Id.* Commerce further explained that nothing in its regulations differentiates in-country benchmarks by distance such that land prices in the Istanbul region are *per se* unreasonable. *Id.* at 38. Instead, the standard for tier one benchmarks is "a market-determined price for the good or service resulting from actual transactions *in the country in question*." *Id.* (quoting 19 C.F.R. § 351.511(a)(2)(i)) (emphasis added). Given this, "Istanbul area land prices are explicitly relevant, tier one benchmarks." *Id.* at 38.

Given the lack of "quantifiable evidence" indicating that Istanbul prices are unreliable, Commerce appropriately continued to find that the Colliers Report was a reliable benchmark. *See id.* at 40, 46. As the court recognized in sustaining Commerce's selection of the Colliers Report in the 2020 administrative review, the agency was not obligated to take at face value Kaptan's arguments that regional differences in level of development and proximity to Istanbul rendered reliance on the Colliers Report unreasonable. *See Kaptan 2020*, 803 F. Supp. 3d at 1289-90. Instead, "Kaptan, as an interested party, bears the burden of demonstrating the impact of the factors it raises." *Id.* at 1289 (citing to *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Having failed to provide evidence of the nature of such a relationship, or even its existence, Kaptan's attempts to overturn Commerce's benchmark selection should be rejected.

Kaptan's claims that Commerce unreasonably relied on the Colliers Report because the report is not a "valuation" and does not disclose the underlying data or the methodology for calculating rental values are also unavailing. *See* Kaptan's Br. at 21-25. As an initial matter, there is no requirement that Commerce must rely on a "valuation" (however that may be defined) as the

13

source of its benchmark data. The agency's regulations state only that it will normally measure the adequacy of remuneration based on market determined prices "resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). In assuming that that only a "valuation" can serve as a benchmark source, Kaptan reads a requirement into Commerce's regulations that does not exist. And while Kaptan claims that the Colliers Report's disclaimer of liability confirms that the report "must not be treated as . . . valuation," *see* Kaptan's Br. at 22, as Commerce correctly observed, Kaptan's reading of the disclaimer is incorrect. The disclaimer states that the report should "not be treated as . . . valuation advice." Remand Results at 40 (quoting Letter from Wiley Rein LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Submission of Benchmark Information* (July 20, 2023) at Exhibit 1 ("RTAC Benchmark"), P.R. 134). In other words, Kaptan selectively reads out a portion of the disclaimer. The disclaimer is not stating that the information is not a "valuation" (again, something that is beside the point), but that Colliers assumed no liability for others' reliance on the report to value property.

Kaptan's claim that the Colliers Report is unusable because it does not disclose its methodologies or underlying data is equally unavailing. Kaptan's Br. at 22-25. The Colliers Report was issued as part of a regularly published series of reports that Colliers International prepares. *See* RTAC Benchmark at Exhibit 1. Further, as Commerce found and Kaptan concedes, the report is based on Colliers International's own research into rental prices in and around the Istanbul region. *See* Remand Results at 41; *see also* Kaptan's Br. at 23 (agreeing that the Colliers Report is "based on inhouse data"). By contrast, the C&W Report relies on "data {that} is at best second-hand to C&W and collected from an unknown website and an unknown real estate advisory." Remand Results at 42; *see also id.* at 45.

14

In further support of its claim that the Colliers Report is unreliable, Kaptan claims that courts often reject expert valuation reports[4] when the expert does not sufficiently disclose the underlying data. Kaptan's Br. at 23-25. But the cases it cites relate to the admissibility of expert testimony in judicial proceedings, not selection of benchmark data sources by Commerce. Remand Results at 42. And as Commerce noted, Colliers International is a trusted, independent third-party source whose reports have been used in other Commerce proceedings as benchmarks, whereas the C&W Report was prepared at Kaptan's behest and reflects data of unknown provenance and completeness. *See id.* at 23-24, 42, 45. In any event, Kaptan has provided no evidence demonstrating that Colliers International is an unreliable source, or that the Colliers Report's figures are inaccurate, unreliable, or otherwise unusable as a source of benchmarking data. *Id.* at 41.

### ii.     Commerce's Rationale for Declining to Use the C&W Report is Supported by Substantial Evidence

Consistent with its determination in the 2020 administrative review—which was upheld by this court—Commerce explained its preference for benchmarks that were not created for use in agency proceedings and benchmarks that are most contemporaneous with the period in which a respondent receives a benefit. Remand Results at 43-45; *Kaptan 2020*, 803 F. Supp. 3d at 1290 ("In explaining that these two factors were crucial in differentiating the reports, and in showing that Commerce has historically preferred to choose reports that were more contemporaneous and more independent, Commerce acted reasonably in choosing the Colliers Report."). Kaptan nonetheless argues that Commerce's stated reasons for not relying on the C&W Report are

---

[4]     Kaptan does not seem to appreciate that this line of argument contradicts its argument that the Colliers Report is not a "valuation" in the first place.

unsupported by substantial evidence. *See* Kaptan's Br. at 25-28. These arguments are belied by the record.

With respect to Commerce's preference for independently created benchmarks, Kaptan does not dispute Commerce's finding that Kaptan commissioned and paid for the C&W Report. *See generally* Kaptan's Br. Nor could it do so with a straight face, given that the report clearly states that it was prepared for Kaptan. *See* Letter from BGD Legal & Consulting to Sec'y Commerce, re: *Remand Redetermination in the 2021 Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from Türkiye: Provision of Cushman & Wakefield Benchmark* (Feb. 5, 2026) ("Kaptan Benchmark") at Exhibit 1 (Cover Page, p. 5), P.R.R. 26.

Instead, Kaptan argues that Commerce has not pointed to any evidence that the information contained in the C&W Report is "litigation-inspired exaggeration." Kaptan's Br. at 26-28. Kaptan misses the point. Commerce strongly disfavors using benchmarks commissioned for use in administrative proceedings not because such benchmarks necessarily reflect "litigation-inspired exaggeration" but because they inherently present the "risk" that such "fabrication or exaggeration" is present. Remand Results at 22. As Commerce noted, had there been concrete proof of exaggeration in the C&W Report, Commerce would "not even consider {it} and would disqualify it offhand." *Id.* at 44. Instead, Commerce explained Kaptan's role in commissioning and paying for the C&W Report called into question the objective and independent nature of the report's data and results. *See* Remand Results at 45.

Enlarging on this theme, Commerce noted that Kaptan submitted information suggesting that the C&W report "may have been partially based on prices {derived from} *Kaptan's own data*." IDM at 12 (emphasis added); *see also* Remand Results at 39. Indeed, the C&W Report notes that C&W was alerted to certain properties discussed in the report "upon oral information" received

from Kaptan. *See* Kaptan Benchmark at Exhibit 1 (p. 32). The fact that the report incorporates such information underscores the risk that the benchmark data are skewed and unreliable. Further, while Kaptan asserts that Commerce had  "no issue" with the data in the report or the methodology used to prepare it, Kaptan's Br. at 28, Commerce noted that it lacked information regarding the sources and completeness of the data presented, as well as "visibility into the process of the C&W Report{'s} creation."  Remand Results at 45-46. The mere fact that the report was purportedly prepared pursuant to what Kaptan calls "industry-leading standards" did not fully address or resolve Commerce's concerns that the C&W Report could be inherently biased given that it was prepared specifically for use as a benchmark. Kaptan's Br. at 28; Remand Results at 46.

Kaptan next argues that Commerce erred in finding that the Colliers Report was based entirely on rental values from 2021, while the valuation data in the C&W Report was from 2022, rendering the later data source's values the less contemporaneous with Nur's 2014 acquisition of land use rights. Kaptan's Br. at 26; *see also* Remand Results at 42-44. Kaptan argues that because the Colliers Report does not identify the individual underlying transactions used to create the "trend" data within it, it is impossible to know when the transactions took place, or how many of them there were. Kaptan's Br. at 26. By contrast, Kaptan avers that the C&W Report clearly identifies individual transactions and their dates. *Id.* Kaptan also implies that the data in the C&W report included 2021 figures.

Kaptan's challenge is unpersuasive. First, it points to no affirmative evidence indicating that the data in the Colliers Report reflect non-2021 rental values. If anything, the record indicates the opposite, inasmuch as the report is one of a regularly prepared and updated series, was issued specifically to provide data on rental rates in the second half of 2021, repeatedly refers to this period of time in discussing the data presented therein, and then gives distinct values for industrial

rental prices in the fourth quarter of 2021, while contrasting these with values for prior quarters and years. *See* RTAC Benchmark at Exhibit 1.

Nor is Kaptan's argument that the C&W Report contains more detail about individual properties evidence of the greater contemporaneity of the data in that report. While the report "discussed purchases in 2021" at various points, the information does not relate to, or match with, Kaptan's proposed benchmark rates. Remand Results at 43; Kaptan Benchmark at Exhibit 1 (p. 25). Rather, Kaptan used only values for 2022 transactions in constructing its proposed benchmarks. *Compare* Kaptan Benchmark at Exhibit 1 (pp. 29-31) *with* Letter from Law Offices of David L. Simon, PLLC to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from Turkey; Case Brief* (Jan. 8, 2024) at 23, C.R. 241, P.R.235 (identifying proposed benchmark rates).[5]

In sum, because the C&W Report was commissioned for use as a benchmark and was less contemporaneous than the Colliers Report, Commerce determined that the C&W report was not preferable to the Colliers Report as a benchmark source. The agency's selection against the C&W Report based on these factors was reasonable and supported by substantial evidence. Accordingly, just as it did when confronted with Kaptan's challenge to Commerce's reliance on the Colliers Report over the C&W Report in the 2020 review, the court should sustain Commerce's determination.

---

[5]    The C&W Report presents the results of four different approaches to valuation, only one of which appears to be based on actual rental transaction values on the open market. *See, e.g.,* Remand Results at 39. The other three are based on 2022 advertised (but not the final, agreed-upon) values for government-owned "fisher shelter" and "pier" properties, analyzing the terms of Nur's lease agreement with the GOT, and constructing a hypothetical turnover-based rental rate for dockyard properties. *See* Kaptan Benchmark at Exhibit 1 (pp. 29-31).

### iii.    The C&W Report Does not Self-Establish That Rates from Istanbul Cannot Be Used as Benchmark Values for Nur's Land

Finally, Kaptan argues that information in the C&W Report establishes that rates from the Istanbul region (*i.e.*, rates of the sort found in the Colliers Report) cannot reasonably be used to value Nur's land. Kaptan's Br. at 29-30. Kaptan's argument is unconvincing. Essentially, Kaptan argues that because the industrial rental rates in the Colliers Report are higher than those listed in the C&W Report, the Colliers Report must be distorted. Kaptan's Br. at 30. This argument reflects a logical fallacy, as well as speculation. First, while a difference in the values provided by two data sets may indicate that one of the data sets is distorted, it does not indicate which of the two data sets reflects distortion. Kaptan's means of filling this logical gap is simply to assume that the C&W's Report's data set is more accurate than the Colliers Report's data. But as Commerce reasonably determined, because the C&W Report was commissioned for purposes of use in this administrative proceeding, it presents concerns as to the objective and independent nature of the report. Remand Results at 46. Those concerns are underscored by the C&W Report's failure to identify its specific data sources beyond Kaptan itself. *Id.* at 39, 45; *see also* IDM at 12. In other words, not only does Kaptan fail to persuade that the Colliers Report data is distorted, but its argument actually cuts against its claim that the C&W Report provided a superior source of benchmarking data.

### C.    <u>Law 27256</u>

In its original final results, Commerce applied AFA with respect to benefits that Kaptan received pursuant to Law 27256, after concluding that Kaptan failed to timely report those benefits in response to the agency's original questionnaire. In explaining that decision in its IDM, Commerce noted that Kaptan attempted to submit untimely data relevant to its use of the program, and that it had documented its rejection of that data in a memorandum. The court remanded

19

Ct. No. 24-00096

Commerce's determination to apply AFA because 19 C.F.R. § 351.104(a)(2) "preclude{s Commerce} from considering evidence it rejected in determining that there is a gap in the record or deciding to apply an adverse inference." *Kaptan I*, 803 F. Supp. 3d at 1314.

On remand, Commerce has explained that in applying AFA to Kaptan, it did not rely on information it rejected to find a gap in the record or apply an adverse inference. Instead, the agency relied on its own letter rejecting Kaptan's untimely submitted factual information and on the separate Kaptan verification report. Remand Results at 48-51. As the agency explained, 19 C.F.R. § 351.104(a)(2)(iii) forbids it from considering the substantive contents of a rejected submission, but does not oblige it to ignore that the rejected submission was submitted at all. Remand Results at 26, 27, 49-50. Nor does Commerce's separate regulation at 19 C.F.R. § 351.302(d)(2) oblige it to ignore the fact that a participant in the proceeding attempted to file information untimely. Remand Results at 26. Rather, the regulation affirmatively requires the agency to provide a "written notice stating the reasons for rejection" of untimely and unsolicited material. 19 C.F.R. § 351.302(d)(2). As such, nothing in Commerce's regulations establishes that it may not rely on its memorialization of a rejection to establish a gap in the record. *See* Remand Results at 26-27; 49-50. Notably, a contrary interpretation of the regulations would create a perverse incentive for respondents to be dilatory and incomplete in their responses to agency questionnaires, knowing that if they later attempted to untimely file responsive information, the agency would not be able to rely on its memorialization of rejecting the untimely filing to establish a gap in the record or apply AFA.

Further, Commerce is correct that the verification report provides independent evidence— which is completely unrelated to the agency's rejection of Kaptan's untimely submission containing information about Law 27256—that establishes a gap in the record with respect to

Ct. No. 24-00096

Kaptan's reporting of benefits under Law 27256. *See* Remand Results at 27-29. At verification, Kaptan attempted to provide Commerce with information about the benefits it received under Law 27256, as documented by the agency in its verification report. Specifically, the verification report stated that Kaptan "attempted to provide information for benefits it, Geri, Martas and Nur received under laws 4447 and 27256." *See* Letter from John McGowan, Program Manager, Off. I, AD/CVD Operations to The File, re: *Verification of the Questionnaire Responses of Kaptan Demir Celik Endustrisi ve Ticaret A.S.* (Nov. 2, 2023) at 10 ("Kaptan Verification Report"), C.R. 233, P.R. 222. In other words, even if Commerce's regulations obliged it to ignore Kaptan's initial attempts at submitting untimely information regarding Law 27256, Kaptan's attempt to provide such information at verification independently established the existence of a gap in the record resulting from Kaptan's failure to timely submit the data in response to the agency's initial questionnaire.

Notably, "verification is not intended to be an opportunity for the submission of new factual information." Remand Results at 28. Rather, it is intended to allow Commerce to confirm whether a respondent's questionnaire responses are accurate—including whether a respondent has omitted information about subsidies received during the period of review in question. This is exactly what happened at verification here: Commerce obtained information at verification indicating that Kaptan had received benefits under Law 27256, which Kaptan had failed to timely disclose to the agency. In similar past situations, the courts have affirmed Commerce's authority to apply AFA in circumstances in which the agency obtains information at verification that indicates that a respondent failed to timely provide requested data. *See* Remand Results at 27-28, 51.

For that matter, substantive information that the agency declines to accept at verification is not information rejected within the meaning of 19 C.F.R. §§ 351.104(a)(2) and 351.302(d)(2). Those regulations only apply to submissions made on the record and later rejected as untimely

21

filed. In attempting to provide information regarding Law 27256, Kaptan did not submit a formal filing or otherwise place material on the record. While Commerce refused to accept that information, consistent with its practice and its authority to ensure that verification does not become "an opportunity for a do-over," *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020), that is not the same as rejecting the information pursuant to 19 C.F.R. §§ 351.104(a)(2) and 351.302(d)(2). As such, those regulations are simply not relevant to the agency's memorialization of Kaptan's attempt to provide information regarding Law 27256 at verification, or to the agency's determination that a record gap existed based on that memorialization.

In sum, Commerce's application of AFA to Kaptan with respect to its reporting of benefits under Law 27256 is supported by substantial evidence. In applying AFA, Commerce did not rely on information that it rejected pursuant to 19 C.F.R. § 351.104(a)(2), but instead relied on its rejection letter and verification report to find that the necessary gap in the record existed in order for it to apply AFA. Thus, substantial evidence supports Commerce's determination to use AFA to countervail Kaptan's receipt of benefits under Law 27256, and the Court should sustain the *Final Determination*, as amended by the Remand Results, with respect to this issue.

Ct. No. 24-00096

IV.    **CONCLUSION**

For the reasons detailed above, this court should sustain Commerce's *Final Determination*, as amended by the Remand Results.

*        *        *

Respectfully submitted,

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: July 24, 2026

Ct. No. 24-00096

## CERTIFICATE OF COMPLIANCE

Pursuant to the Standard Chambers Procedures ¶ 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for RTAC's Comments in Support of Remand Determination, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,850 words.

*/s/ John R. Shane*
(Signature of Attorney)

John R. Shane
(Name of Attorney)

Rebar Trade Action Coalition
(Representative Of)

July 24, 2026
(Date)